# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BECKLEY DIVISION

**UNITED STATES OF AMERICA**

v.  Criminal No. 5:19-00247

**NATALIE PAIGE COCHRAN**

### DEFENDANT'S SENTENCING MEMORANDUM

Now comes the defendant, Natalie Cochran, by Assistant Federal Public Defender Rhett H. Johnson, and submits this Sentencing Memorandum. In view of her objections to the presentence report, Ms. Cochran maintains that her guideline range should be 70 to 87 months (TOL 27; CHC I).

Ms. Cochran and the government have entered into a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), whereby the parties have agreed upon a sentencing range of between 37 and 135 months of imprisonment. In view of Ms. Cochran's complete lack of criminal history, her record of employment as a pharmacist in which she rendered valuable medical services to her community, coupled with the considerable collateral consequences she has endured and will continue to endure, she respectfully submits that a sentence near the bottom of the agreed upon range is sufficient, but not greater than necessary, to achieve a just sentence.

1

I.  **PRESENTENCE REPORT OBJECTIONS**

   1.  **Paragraphs 29, 65 through 71, 105 and 106 – Bankruptcy Proceedings**

Ms. Cochran maintains her objection to the inclusion of the information related to her bankruptcy proceedings under U.S.S.G. § 1B1.3 and the proposed enhancement under § 2B1.1(b)(9)(B).

Ms. Cochran objects to the inclusion of this paragraph to the presentence report. She did not admit to, nor was she convicted of, any offense related to her bankruptcy proceeding. Moreover, her actions in the bankruptcy proceeding do not constitute relevant conduct as defined in U.S.S.G. § 1B1.3, as they did not occur during the offense of conviction or in the course or attempting to avoid detection or responsibility for that offense, nor were they a part of the same course of conduct or common scheme or plan. *Cf. United States v. Griffith*, 115 F. Supp.3d 726 (S.D. W.Va. 2015) (Johnston, J.) (kick-back scheme itself was not relevant conduct to offense of conviction, making subsequent false statements about the scheme to IRS agents).

Ms. Cochran's actions in the bankruptcy proceedings did not occur during the commission of the offense of conviction. By the time she appeared at the meeting of creditors, the government had already amassed the bulk of their evidence against her. The government's investigation was not thwarted or hampered in any way due to any of the representations made by Ms. Cochran in the course of her bankruptcy proceedings.

In its response to the instant objection, the government claims that because Ms. Cochran pled guilty to Count 6, that she admits that the bankruptcy proceedings that were initiated on July 24, 2019, were a part of the wire fraud scheme.[1] A month prior, law enforcement executed a search warrant at her home on June 25, 2019.[2] She did not solicit any investments or seek any loans afterward. On this point, it is unclear at what point in time the government believes the scheme concluded. But in any event, the government's reliance on the surplusage in the indictment rather than the signed stipulation of facts is misplaced. A guilty plea admits only the elements of a formal criminal charge. *United States v. Vann*, 660 F.3d 771, 775 (4th Cir. 2011); *see also United States v. Willis*, 992 F.2d 489, 490 (4th Cir. 1993) (a guilty plea "constitutes an admission of all **material facts** alleged in the charge.") (emphasis added). Accordingly, neither Ms. Cochran nor this Court are bound by unconvicted allegations in the indictment or any surplusage contained therein.

Finally, a review of the transcript of the meeting of creditors reveals genuine confusion on Ms. Cochran's part. She repeatedly asks for clarification regarding the distinction between her personal and business interests. Moreover, Ms. Cochran and her counsel for the bankruptcy proceedings worked in good faith with the Trustee to correct any errors in her representations. For all of these reasons, the two-level enhancement under § 2B1.1(b)(9)(B) should not be applied.

---

[1] The government provided the probation officer with its response to the defense objections after objections were due, but prior to the completion of the revised presentence report. The probation officer included the government's response in the revised presentence report.

[2] There is no mention of the search warrant or its execution for Ms. Cochran's home in the presentence report.

## 2. Paragraph 97 – Enhancement for "Intended" Loss

Ms. Cochran's guidelines should be determined by the actual loss she is responsible for, not the probation officer's opinion of her "intended" loss. The probation officer opines that Ms. Cochran's amount of loss for purposes of U.S.S.G. § 2B1.1(b)(1)(J) is $4,850,000, and accordingly, applies an 18-level enhancement on that basis. Ms. Cochran agrees that the actual loss is approximately $2,567,838.53, *see* PSR, ¶ 79, and, as a result, she should be subject to a 16-level enhancement because the total loss is between $1.5 and $3.5 million. *See* § 2B1.1(b)(1)(I).

The pertinent text of § 2B1.1(b)(1) that precedes the loss table refers to "loss." The term "intended" or "intended loss" is not included in the text of the guideline itself. The concept of "intended loss" as a basis for increased punishment is entirely a product of the guideline's commentary. *See* § 2B1.1, comment. n. (3)(A)(ii). It is the commentary alone that provides the basis for the $4.9 million dollars of entirely speculative loss. But the proper role of the commentary that is insulated from Congressional review is to interpret, not expand, the scope of the guidelines.

The plain language of the guideline's text refers to "loss." In the context of the guideline, this is an unambiguous term. The commentary's inclusion of "intended loss" does not merely interpret this ordinary word, it drastically expands it by including "intended loss."

Moreover, the text of the guideline itself demonstrates that the Commission understood the concept of intended conduct versus actual conduct. In § 2B1.1(b)(14) the text of the actual guideline includes the phrase "knew or intended" with respect

4

to offenses involving trade secrets and/or foreign governments. *See* § 2B1.1(b)(14) ("If the offense involved a misappropriation of a trade secret and the defendant knew or **intended**…). This alone suggests the omission of "intended" loss in subsection § 2B1.1(b)(1) was intentional.

Several courts have recognized the important separation of powers interest in not allowing the commentary to expand upon the text of the guideline itself, as doing so, would allow the Sentencing Commission to circumvent Congress by setting rules that can deprive citizens of their liberty without passing "through the gauntlets of congressional review or notice and comment." *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (en banc) (per curiam). In *Havis*, the court recognized that the "commentary has no independent legal force—it serves only to interpret the [g]uidelines' text, not to replace or modify it." *Id.* at 386. Most recently, the Third Circuit followed suit in *United States v. Nasir*, ---F.3d ----, 2020 WL 7041357 at \*9 (Dec. 1, 2020) (en banc), holding that the commentary to § 4B1.2 cannot expand the definition of controlled substance offenses to include inchoate crimes. The court recognized that its jurisprudence "may have gone too far in affording deference to the guidelines' commentary standard set forth in *Stinson*" and that such deference is no longer warranted in light of the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). *Id.* at \*8. *Accord United States v. Winstead*, 890 F.3d 1082, 1089 (D.C. Cir. 2018). This approach has been followed by at least three courts in our district. *See United States v. Bond*, 418 F. Supp. 3d 121, 123 (S.D. W. Va. 2019) (Chambers, J.); *United States v. Cooper*, 410 F. Supp. 3d 769, 773 (S.D. W. Va. 2019) (Goodwin,

J.); *United States v. Timothy Gibbs II*, 2:18-cr-00089, Dkt. Nos. 53, 59 (S.D. W. Va. 2019) (Copenhaver, J.).

In his concurring opinion in *Nasir*, Judge Bibas observed a broader problem at play, and offered a more pointed rebuke of the decades old tradition of reflexive deference to the guidelines' commentary, particularly when it results in increased punishment. *See Nasir*, 2020 WL 7041357 at *24 (Bibas, J., concurring). Judge Bibas urges courts to look at things "afresh" because "[o]ld precedents that turned to the commentary rather than the text no longer hold." *Id*. Through an extensive historical analysis, he further reminds courts that the commentary should only be relied upon when the text of the guideline is truly ambiguous. *Id*. at *24-25. And in such situations, the rule of lenity should be employed to resolve any to strictly construe penal laws and resolve ambiguities therein in favor of the defendant. *Id*. at *25. Put succinctly, Judge Bibas reasoned that "[t]here is no compelling reason to defer to a Guidelines comment that is harsher than the text." *Id*.

In the instant case, the "intended" loss provided for by the commentary dwarfs the actual loss by over $2 million dollars and further provides a two-level increase in the advisory guideline range of punishment. It does not interpret the guideline itself, rather it effectively expands the scope of the guideline's reach—and does so in a drastic manner in the instant case. Ms. Cochran's advisory sentencing guideline range should be determined based upon the ordinary meaning of the words employed in the text of the guidelines, not the Commission's interpretation. And in the event

6

the Court finds the term "loss" to be ambiguous, the rule of lenity should be employed, and the ambiguity should be resolved in favor of the defendant.

In its response to the instant objections, the government fails to address *Kisor, Havis, Nasir, Winstead, et. al.*, and instead cites a host of cases where courts have utilized "intended loss." However, none of these cases address the commentary argument advanced by Ms. Cochran. The government's only attempt to address the commentary argument is to point out that the cases cited by the defense involve drug cases, not fraud cases. This is both true and inconsequential. The important separation of powers interest applies to all sentencing guidelines and their accompanying commentary with equal force. Commentary that expands the reach of a guideline rather than interprets has no legal force and should be disregarded by the sentencing court.

### 3. Paragraph 152 – Net Worth (Response to Government's Objection)

Though it is difficult to ascertain with precision Ms. Cochran's exact net worth, what is certain is the Government's claim that her net worth is $383,403.79 is a mathematical fiction. Net worth is the balance of a person's assets and liabilities. Counting the estimated value of Ms. Cochran's home without discounting the amount she owes on the mortgage for the home undermines the whole point of attempting to determine a person's net worth. The probation officer was correct to reject the government's proposal on this point.

4. **Paragraph 176 – Restitution Payments**

a. **Inmate Financial Responsibility Program.** Put simply, the government should be required to do more than openly surmise that Ms. Cochran can obtain a higher paying position within BOP because she is "very skilled" before asking this Court to double her quarterly restitution payment while incarcerated. That BOP will afford Ms. Cochran to utilize her pharmacy training through institutional employment is a dubious claim. Should the government endeavor to offer factual support for its belief that Ms. Cochran will be able to earn more than the average inmate while in BOP custody, then the parties can engage in honest dialogue and debate on the matter. Otherwise, the probation officer was correct to reject the government's suggestion on this point.

b. **Post-incarceration restitution payments.** Ms. Cochran requests this Court require her to pay restitution in the amount of $250 a month upon her release from incarceration. The probation officer originally agreed with this amount in the original presentence report. *See* Draft PSR, ¶ 176. Now in the final report, the probation officer believes a $1,000 a month is appropriate per the government's suggestion. It appears this suggestion is in part based on an inaccurate review of Ms. Cochran's finances. Curiously, the probation officer previously observed the errors in the government's calculation of Ms. Cochran's net worth, but now agrees with quadrupling her monthly restitution payment notwithstanding the government's mistaken account of Ms. Cochran's finances.

The government contends that $1,000 a month is appropriate based on a review of Ms. Cochran's finances, amount of debt she owes to the victims, and her future ability to find gainful employment. 18 U.S.C. § 3664(f)(2) provides that the schedule of payments shall be determined "in consideration of—(A) the financial resources and other assets of the defendant…; (B) projected earnings and other income of the defendant; and (C) any financial obligations of the defendant, including obligations to dependents." Both the government and probation officer's cash-flow analysis include social security payments for her children. These payments should not be considered as "projected earnings" for Ms. Cochran. First, at least one of her children will be an adult upon her release. Secondly, these payments are intended to provide assistance to her children, not a restitution award.

The probation officer reasons that because Ms. Cochran has accepted an emergency pharmacist position to assist with the administration of COVID-19 vaccinations she will be able to obtain a comparable paying position in the future. What is not mentioned is that Ms. Cochran applied for over 200 positions before obtaining her current position. Furthermore, there is little reason to believe her services in administering COVID-19 vaccinations will be in high demand upon her release from incarceration considering that the (c)(1)(C) agreement between the parties requires the Court to impose a term of incarceration of at least 37 months. Accordingly, the probation officer's change in position whereby he agreed with the government to quadruple the monthly restitution payment is ill-founded and Ms.

Cochran requests this Court establish a more reasonable amount that she could actually be expected to pay on a monthly basis upon her release.

## II. 18 U.S.C. § 3553(A) FACTORS FOR CONSIDERATION

Ms. Cochran submits the following points relating to the pertinent statutory sentencing directives provided in 18 U.S.C. § 3553(a) in support of a sentence at the bottom end of the (c)(1)(C) range agreed upon by the parties.

### A. Nature of the Offense

The facts and circumstances of the offense are adequately set forth in the presentence report. While Ms. Cochran originally set out to join her husband's business with honest intentions, she readily acknowledges that she soon got in over her head and made a series of poor decisions that have adversely impacted the victims in this case, many of whom were friends and family of her and her late husband, Michael Cochran.

### B. Background and Personal Characteristics of Natalie Cochran

Natalie Cochran is 40 years old. She grew up in Beckley, West Virginia. She was the youngest of three siblings. Her father, Larry Jessup, worked as an accountant for the Raleigh County Board of Education. *See* PSR, ¶ 130. Her mother, Daphne Jessup, worked as a school teacher. *Id*. Natalie was the youngest of three children, and her parents doted on her as the "baby." *See* PSR, ¶ 132.

Natalie graduated as the valedictorian of Greater Beckley Christian School in 1999. *See* PSR, ¶ 31. While in high school, she met her future husband, Michael Cochran. Natalie followed him to WVU after high school. They were married a year

later on May 20, 2000, when she was 19 years old. PSR, ¶ 133. She obtained her Doctorate of Pharmacy from WVU in 2005. *See* PSR, ¶ 147. She and Michael then moved to Tennessee for a brief period before returning home to the Beckley area in 2006.

From 2007 until 2013, Natalie worked in several retail pharmacy locations in the Beckley area. *See* PSR, ¶ 150. From 2013 through 2017, she worked for Access Health where she focused on diabetes education and management. She enjoyed working in this capacity, but nonetheless left her position with Access Health in 2017 to join her husband's business.

While in Tennessee, they welcomed a daughter, N.R.C., into their family. *See* PSR, ¶ 133. N.R. is now 15 years old. Two years later, after returning to West Virginia, they welcomed a son, M.A.C. M.A. is now 13 years old. Since the day her daughter was born, Natalie has been a loving and devoted mother to both of her children. After Michael passed away in February 2019, Natalie assumed the role of sole caretaker and provider for both her children. Knowing that she will soon be taken away from their lives has caused her considerable anguish.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment

A sentence at the bottom of the agreed upon range constitutes significant and ample punishment for Ms. Cochran. It would likewise constitute just punishment as Ms. Cochran gained very little as compared with what she has already lost and still stands to lose with the imposition of a sentence even at the bottom of the guideline

range. Her daughter is 15 years old and will be a rising junior this fall. Her son will be a rising freshman. While her daughter will have completed high school, a sentence at the bottom of the agreed upon range will allow her some limited time to still parent her son before he completes high school and enters adulthood. Being removed from her children's lives while they are still under her care is a far greater punishment for Ms. Cochran than the incarceration itself. She will never get those formative years of her children's lives back and she will live with the guilt of leaving them without a parent.

### D. The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct, to Protect the Public from Further Crimes of the Defendant

A sentence at the bottom of the agreed upon range would afford adequate deterrence to both Ms. Cochran and others and is more than adequate to protect the public. Ms. Cochran has been the subject of significant media attention and public scrutiny. Her once robust social network has dwindled. Her family has been torn apart. At this point, there is little reason to believe the public is in any serious need of protection from further crimes of Ms. Cochran.

### E. The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

This aim of sentencing is not furthered in any measurable way by a lengthy sentence of incarceration.

F.  **The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records who have been Found Guilty of Similar Conduct**

Any purported disparity between Ms. Cochran and similar defendants is warranted by the reasons set forth herein.

G.  **The Kinds of Sentence and Sentencing [Guideline] Range**

In the event this Court denies Ms. Cochran's substantive objections to the guideline range, she respectfully submits that the combination of enhancements for conduct—most of which is routinely intrinsic to fraud offenses of this magnitude—unduly exaggerates her culpability and proposes a sentencing far greater than necessary to meet the objectives of § 3553(a).

### III. CONCLUSION

In view of her limited criminal history, employment record, coupled with the collateral consequences she will endure, Ms. Cochran submits that a sentence at the bottom of the sentencing range agreed upon by the parties in this matter is sufficient, but not greater than necessary, to adequately punish her for her crimes.

Date: January 15, 2021.                      Respectfully submitted,

                                             **NATALIE PAIGE COCHRAN**

                                             By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/Rhett H. Johnson**
Rhett H. Johnson, WV Bar No. 12114
Office of the Federal Public Defender
300 Virginia Street, East, Room 3400
Charleston, WV 25301
Telephone: (304) 347-3350
Facsimile: (304) 347-3356
E-mail: rhett_johnson@fd.org