```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                        AT BECKLEY

_____x
                               :
UNITED STATES OF AMERICA,       :        Criminal Action
                               :
              Plaintiff,        :        No.  5:19-cr-00247
                               :
v.                             :
                               :        Date:  March 18, 2021
NATALIE P. COCHRAN,             :
                               :
              Defendant.        :
_____x


            TRANSCRIPT OF SENTENCING HEARING HELD
         BEFORE THE HONORABLE FRANK W. VOLK, JUDGE
              UNITED STATES DISTRICT COURT
               IN BECKLEY, WEST VIRGINIA

APPEARANCES:

For the Government:         AUSA KATHLEEN ROBESON
                           AUSA R. GREGORY MCVEY
                           United States Attorney's Office
                           P. O. Box 1713
                           Charleston, WV 25326-1713


For the Defendant:         AFPD RHETT H. JOHNSON, ESQ.
                           Federal Public Defender's Office
                           Room 3400
                           300 Virginia Street East
                           Charleston, WV 25301


Probation Officer:         Jeffrey Gwinn


Court Reporter:            Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

**INDEX**

| GOVERNMENT WITNESSES | STATEMENT |
|---|---|
| Donna Bolt | 6 |
| Edward Bolt | 21 |
| Chris Davis | 32 |
| Jeff Vickers | 41 |
| Stephanie Hamilton | 45 |
| Lacy Treadway | 51 |
| Toni McCall | 53 |
| Jessica Miller | 59 |
| Dr. Kevin Bailey | 62 |

**DEFENSE WITNESSES**

None

| GOVERNMENT EXHIBITS | ADMITTED |
|---|---|

None

| DEFENSE EXHIBITS | ADMITTED |
|---|---|

None

1          PROCEEDINGS had before The Honorable Frank W. Volk,

2     Judge, United States District Court, Southern District of

3     West Virginia, in Beckley, West Virginia, on March 18, 2021,

4     at 2:01 p.m., as follows:

5               THE COURT:  Please be seated.

6          To avoid any concerns, I'm obviously not wearing my

7     mask.  I'm going to be talking quite a bit, but I have been

8     vaccinated twice, and we've done some air modeling studies

9     that indicate that expelled breaths go up, as opposed to

10    down and out.  Plus, I have the screen up here.  So, while I

11    do take the mask mandate seriously, those are the reasons

12    why I won't be using it today.  I expect the proceeding to

13    be a lengthy one, as well.

14         So, we're ready to go forward in the case of Natalie

15    Cochran, if counsel would please note their appearances.

16              MS. ROBESON:  Good afternoon, Your Honor.

17    Kathleen Robeson and Greg McVey, who is with me at counsel

18    table, for the United States.

19              MR. JOHNSON:  Rhett Johnson on behalf of Ms.

20    Cochran.

21              THE COURT:  Thank you very much.

22         I would ask that Ms. Cochran please stand with Mr.

23    Johnson and I will have the clerk administer the oath to Ms.

24    Cochran.

25              COURTROOM DEPUTY CLERK:  Please raise your right

1    hand.

2                    **NATALIE COCHRAN, DEFENDANT, SWORN**

3            THE COURT:  Ms. Cochran, on September 21st, 2020,

4    you pled guilty to wire fraud in violation of 18 United

5    States Code Section 1343 as charged in Count Six of the

6    indictment filed against you and unlawful monetary

7    transactions in violation of 18 U. S. C. Section 1957 as

8    charged in Count 18.

9        At the time of your plea hearing, I inquired whether

10   you understood your appellate rights and a variety of other

11   things, as well.

12       Since the time of the plea, the United States Probation

13   Office has prepared a written Presentence Investigation

14   Report.

15       Mr. Johnson, have you had an opportunity with Ms.

16   Cochran to read the report prepared on he November 16, 2020,

17   last revised, I believe, on January 22nd, 2021, and also the

18   addendum, which was last revised on March 17, 2021?

19           MR. JOHNSON:  I have, Your Honor.

20           THE COURT:  And having read all those items, is

21   there any reason why sentencing should not take place today?

22           MR. JOHNSON:  No, Your Honor.

23           THE COURT:  And, Ms. Cochran, have you indeed been

24   able to read those materials and have any questions answered

25   by Mr. Johnson?

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  And are you satisfied with the amount

3      of time that you have had to discuss those documents with

4      Mr. Johnson?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  And I would ask you, as well, do you

7      understand the contents again and if you have any remaining

8      questions?

9              THE DEFENDANT:  Yes, Your Honor, I understand them

10     and I have no questions.

11             THE COURT:  Thank you very much.

12       Before we -- I'm inclined to hear whatever victim

13     statements there are prior to the resolution of objections.

14     I can't imagine that they bear entirely on the objections,

15     but I'd rather find out to the contrary, having taken them

16     in advance.  So, I think we will proceed to the victim

17     testimony, if there is no objection from counsel.

18             MR. JOHNSON:  No objection, Your Honor.

19             MS. ROBESON:  No objection.

20             THE COURT:  It's my understanding that Kevin

21     Bailey wishes to address the Court, but he wishes to go

22     last, for some reason.  So, what I'm going to do is ask

23     counsel for the United States just to call each witness in

24     the order that it intends to call them.

25             MS. ROBESON:  Yes, Your Honor.  Are you ready for

1    the first one?

2              THE COURT:  I am.  And the witnesses should also

3    understand that, as they approach the podium to speak, the

4    courtroom deputy will swear each of them and provide the

5    oath.  Please proceed.

6              MS. ROBESON:  Thank you, Your Honor.  I would like

7    to call Donna Bolt first as the first victim.

8              THE COURT:  Ms. Bolt, if you would please come

9    forward.  You can stand here at the podium and then the

10   courtroom deputy will administer the oath to you.

11             COURTROOM DEPUTY CLERK:  Please raise your right

12   hand.

13             **DONNA BOLT, GOVERNMENT WITNESS, SWORN**

14             THE COURT:  Please proceed, Ms. Bolt.

15             MS. BOLT:  Is my mask okay?

16             THE COURT:  Certainly.

17             MS. BOLT:  Okay.

18       My name is Donna Bolt and I am the mother of Michael

19   Brandon Cochran, who suddenly passed away February 11th,

20   2019 at the young age of 38.  I am also Natalie Paige

21   Cochran's mother-in-law.  My husband Eddie and I are victims

22   twice.  First, our precious son, Michael Brandon, passed

23   away and we will never, ever get over this.  We will always

24   continue to grieve and miss him.  Second, our beloved

25   daughter-in-law, Natalie Cochran, stole our entire life

1    savings and we were led to believe by Natalie that our money

2    was being invested in legitimate government and state

3    contracts that had substantial profit returns.  Eddie and I

4    loved Natalie so much.  She was our daughter-in-law, but we

5    treated her and thought of her as a daughter.  Natalie was

6    the wife of our son, Michael, and the mother of our precious

7    grandchildren, Nicole and Ashton.  We were so proud.  Eddie

8    had no reason -- we had no reason to not believe Natalie

9    because she was family, our daughter-in-law.  Natalie said,

10   "I want to help you both out to live comfortably in

11   retirement because I am doing it for my parents, too."

12   Natalie went further to say, "My parents made $60,000.00 in

13   five months."

14        Natalie Cochran had a scheme of financial gain while

15   destroying us at the same time.  It did not matter that we

16   were family; that Natalie was married for almost 19 years to

17   our son Michael.  We are not only financially devastated,

18   but we are also broken and grieving for Michael.

19        I will never forget the day, Tuesday, June 25th, 2019,

20   that two men dressed in suits came to our door.  They

21   identified themselves as West Virginia State Police

22   Investigator and U. S. Attorney's Office.  They asked to

23   speak with us and we invited them in.  It was on this day

24   that mine and Eddie's life changed forever.  We were already

25   grieving the tragic and sudden death of Michael just four

1    months earlier.  Now, we're being told that there are no

2    government or state contracts, that Natalie was running a

3    Ponzi scam.

4         We were also told that our son Michael's death is being

5    investigated, that Michael laid on the couch in their home

6    for several hours without getting any treatment.  I just

7    remember screaming and wailing.  What do you mean?  What do

8    you mean?  I kept asking, but the officials couldn't tell me

9    anything more.  This day was the beginning of a new kind of

10   death for Eddie and me.

11        Our precious Michael gone and our beloved

12   daughter-in-law Natalie had stolen all of our life savings

13   and we just couldn't believe what we were hearing.  How

14   could this happen?  Why?  How can Natalie do this to us?

15        We had just been texting and talking to Natalie for the

16   last three days, getting ready to sign a written agreement

17   with Natalie this very day, June 25th, 2019.  Natalie

18   verbally stated to us that she owed us $290,000.00 that we

19   invested in her two companies, that TSG and TMS was going to

20   pay us $9,000.00 a week for a total of $290,000.00 and the

21   profit of $1.1 million to be paid by Natalie Cochran, owner

22   of TSG and TMS, for our elder care, to take care of us in

23   our aging years for whatever we needed to live; pay our

24   monthly mortgage, new car, lawn mower, et cetera.

25        It was all a lie.  Our life savings was gone, stolen by

1    our daughter-in-law.  Eddie and I were in shock and we're

2    still in mental and financial turmoil.  We are numb.  We

3    can't function or think.  Sleepless nights, depression and

4    anxiety, so stressed all the time.  We're finding it so

5    difficult to go on with our lives each day.

6        I cry all the time.  And I am so sad.  And my heart is

7    broken with Michael's passing and now this financial loss

8    has taken a devastating and traumatic toll on our well-being

9    as our health is declining.

10        I constantly worry about how we're going to pay this

11    bill or that bill, especially since we're both retired and

12    on a fixed income.  What's going to happen to us?  Are we

13    going to lose our home because we can't pay our mortgage?

14    What do we do if our car breaks down?  We can't afford to

15    buy another one because we can't afford the payments.

16        Eddie and I have worked hard for over forty years just

17    so we could save a little nest egg to ensure a comfortable

18    rest of our lives together.  Natalie Cochran took that away

19    from us.  She betrayed us.  She took advantage of us because

20    we loved her and we believed everything she said, never once

21    doubting her, especially when she said, "I want to help you

22    both to live comfortably in retirement because I am doing it

23    for my parents, too."  We thought it was such a blessing.

24        Over the course of two years, from June 26th, 2017 to

25    February 28th, 2019, we used up our life savings and

1     invested all our money in Natalie Cochran's businesses, TMS

2     and TSG, and gave her 31 checks, a bank cashier's check and

3     11 Visa credit card wire charges to invest in government and

4     state contracts, all this time still believing Natalie that

5     the money is coming.  You will receive a wire transfer in

6     24 hours.  Your $1.39 million will be in your bank account

7     within the next seven days.  Being audited, but the money is

8     coming, I promise.  Or there is a Government shut down.

9     Excuse after excuse, lie after lie after lie, and still no

10    deposits were made.  The money never came.

11        We trusted Natalie because we loved her.  She was our

12    beloved daughter-in-law.  She was married to our son,

13    Michael, for almost 19 years.  We never, ever questioned or

14    doubted Natalie because she was family and because she was

15    so convincing.

16        Natalie would tell us either in person or by text that

17    she owed us this money and that she is going to pay us.  I

18    promise.  We even received several written documents from

19    Natalie Cochran that looked original and professional.

20    Betsy Britland of the Federal Reserve; Christopher Davis,

21    attorney of Wooten Davis Hussell Ellis; Senator Joe Manchin;

22    Senator Manchin's assistant, Gerrie Greene; Brian Delkowski

23    (phonetic) of Defense Financing and Accounting Services, or

24    "DFAS" for short; Bank of America and Pay Simple Billing of

25    Bank of America.

1          These documents stated that they were assisting Natalie

2     Cochran in retrieving our money and the Bank of America

3     simple pay document stated on April 10th, 2019 that our

4     funds of $105,000.00 and $1.285 million would be in our bank

5     account within the next 24 hours.  Every time Natalie's

6     mouth opened, or another text or piece of mail, e-mail came

7     from her, it was just another lie, another con.

8          I kept very detailed records with -- written on three

9     pages of spreadsheets.  These records show all the

10    transactions between Natalie Cochran, owner of TSG and TMS,

11    and us, Eddie and Donna Bolt.  These records show the names

12    of the contracts, the amounts of each, the profit return,

13    the due date and the pay date starting June 26th, 2017.

14    As I said, 31 checks written to TMS and TSG, one cashier's

15    check and 11 credit card wire charges.

16         I also have text messages on my cell phone that, for

17    some reason, I never erased.  These text messages start July

18    31st, 2018 and shows how Natalie Cochran connived, and lied,

19    and conned us, and how she enticed and manipulated us to

20    invest in her companies.  The language she used and how she

21    told us time after time that the money is coming.  These

22    texts show how Natalie continued to lie to us, abuse us,

23    because we trusted her and kept reassuring us into believing

24    in her fraudulent diabolical plan as she continued to steal

25    our life savings.

1   When Michael was in the hospital on the ventilator at

2 CAMC in February of 2019, Natalie sat in the corner on her

3 computer and cell phone away from Michael and us and she

4 would look up occasionally and say "I am doing some work.

5 I'm working on contracts."  As my precious son laid helpless

6 in the hospital.  Natalie even sent texts of government

7 contracts trying to entice us with enormous profit returns.

8 She didn't care about anything or anyone, not even Michael

9 as he laid in that hospital bed.

10   Just ten days after Michael died, Natalie was texting

11 us state contracts with huge ten-day profit returns; once

12 again, conniving and scheming with her lies, promising that

13 these contracts had affidavits and that the State always

14 pays on time guaranteed.  Again, we believed Natalie because

15 she was family and we loved her and never in a million years

16 thought she would ever hurt or deceive us because we thought

17 she loved us, too, and wanted to help us.

18   We continued to believe Natalie until June 25th, 2019,

19 when our eyes were opened for the first time to her

20 evildoings.  Natalie Cochran has ruined our lives.  We will

21 never be the same.  We are so heartbroken and devastated.

22 Eddie and I are so mentally, physically and emotionally

23 distraught to the point of almost having a nervous

24 breakdown, having chest pain and heart palpitations, and are

25 frequently seeing a cardiologist and our physician for

1  mental and emotional stress and severe health issues.

2        Not only have we lost our son, Michael, and dealing

3  with his death, but we have also lost the relationship with

4  Michael's children, our grandchildren, Nicole and Ashton.

5  Natalie Cochran has turned our grandchildren against us with

6  her lies and deceit and her evil ways.  We have heard rumors

7  that both grandchildren are going to school in Greenbrier

8  County, West Virginia, and that Natalie has relinquished her

9  rights of our grandchildren to her parents, Daphne and Larry

10  Jessup.

11        We do know that Daphne and Larry Jessup sold their home

12  and have moved in with Natalie and our grandchildren at the

13  4h Lake home in Daniels, West Virginia and have been living

14  there for almost a year now.

15        We have no contact with Nicole and Ashton, as they will

16  not speak to us or contact us.  Their minds have been

17  distorted with untruths and incorrect information by their

18  mother and her family.  We've reached out to Nicole and

19  Ashton by text.  However, Nicole stopped responding as of

20  June, 2019.  Ashton's last text in August, 2019 was, "Don't

21  text me anymore.  I'm going to block you.  You never loved

22  us.  We know that now."  Where did this come from except

23  from their mother, Natalie Cochran?

24        It's been almost two years since we have seen Nicole,

25  who is almost 16, and Ashton, almost 14.  We love our

grandkids and we miss them so much.  I believe that our
grandchildren think and have been told that we are
responsible for all that is happening around them, but I
hope that one day Nicole and Ashton will know the truth
about what their mother has done to us and to others.  We
pray for our grandchildren continuously and we hope that
someday, we will have a relationship with them again.

Nicole and Ashton may not understand now what's going
on, or they may wonder why everyone is ganging up on their
mother, but they are very intelligent and one day, they will
know.  They will become curious.  It may take them to grow
into adulthood before they know the truth about their mother
and what she has done to us and others.

My husband, Eddie, and I find ourselves devoid of
future hope.  We are both 62 years old and both on
disability social security.  We still can't believe it and
find it so difficult to deal with what Natalie Cochran has
done to us.

Natalie has stolen our entire life savings.  My family
doctor has, on several occasions, offered to prescribe
medicine for my anxiety and depression and emotional stress,
but I have declined.  I have thought about talking with a
therapist/psychiatrist, but I don't think anyone can help
with everything we have been going through these last three
and a half years and are still going through.

1    I have confided in a few close church friends and

2    pastors and it's a lot for anyone to hear and comprehend, so

3    I just hesitate placing that awful burden on anyone else.

4    I've been told by friends you must be a very strong person

5    to be dealing with all of this.  They've also said it sounds

6    like a Lifetime movie or one of those crime shows on TV.  If

7    they only knew and could see that I am completely broken

8    both mentally and physically.

9    Eddie and I have worked hard all of our lives and

10   worked at jobs for over 40 years.  We never lived above our

11   means and we lived a modest life.  In the past three and a

12   half years, our lives have been like something from a bad

13   science fiction movie.  The emotional devastation is too

14   intense to be able to describe in words.

15   Because of Natalie Cochran's evil schemes, the safety

16   net that we had worked so hard to ensure was in place was

17   now gone.  Now, we are living our lives with no protection

18   and depending on our monthly social security checks to

19   survive.  We have a monthly mortgage, monthly health

20   insurance premiums, not to mention regular monthly utilities

21   and food, and yearly insurance and taxes that have to be

22   paid.  We drive a 2001 Toyota and a 2008 Jeep.

23   Since all of this has happened, we live from one month

24   to the next, and that's not what we worked our entire lives

25   for.  The hardships we are feeling are overwhelming.  I

1    often feel as if life is futile, that heaven is looking

2    better all the time, but I am praying to God continually for

3    strength, and peace, and comfort to continue to move forward

4    with my life.  And I also pray for justice in this case with

5    Natalie's Ponzi scam and justice in the death of my son,

6    Michael Brandon.  I know in my heart that Michael would want

7    us to do everything in our power to try to get our money

8    back and to put the evil one away.  And that's what we are

9    doing.

10        Judge Volk, Natalie Cochran is a criminal.  She

11   committed wire and bank fraud against us.  We are

12   financially broke.  We have no savings account or retirement

13   fund now.  It is all gone now because of her evildoings.

14   She is the devil.  And God will deal with her on judgment

15   day.

16        Natalie Cochran, she is evil and a thief.  Not just an

17   ordinary thief who stole money.  This woman is intelligent,

18   and conniving, and so convincing.  She stole our life of

19   financial security to live our lives in stability and

20   comfort in our aging years.

21        Natalie took our entire life savings and was laughing

22   at us the entire time.  Natalie Cochran's fraud is of

23   unparalleled evil and she is a monster.  She thinks she is

24   above the law and better than everyone else.  Natalie thinks

25   she is untouchable and always in control.  She doesn't care

1    about anyone but herself, not even her children.  She is a

2    user and abuser.  But Natalie has to be stopped because she

3    will do it again to others if given a chance.

4        Immediately after Natalie Cochran's plea deal on

5    September 21st, 2020, she released a statement to the local

6    WOAY TV station, "I look forward to the day I am provided

7    the opportunity to go into more detail regarding the events

8    that have transpired in the last few years."  What is

9    Natalie going to say, that my son, Michael, was responsible

10   for her evil deeds and her narcissistic and sociopathic

11   ways?  I personally handed the checks and credit cards to

12   Natalie Cochran and I only dealt with Natalie about the

13   government and state contracts.

14       Is Natalie going to also blame my son, Michael, for the

15   fake scholarships and the stolen money from the Shady Spring

16   baseball league, and the lying in bankruptcy court, and the

17   fake tax returns?  Natalie also said in her statement, "In

18   the interest of my family and children and so my family can

19   go forward."  These statements just show that Natalie only

20   cares about her and her family, that there is no concern or

21   compassion for us, as Natalie's mother and father-in-law,

22   and what we have been through because of Natalie or any

23   concern for the other victims that she has harmed.

24       Natalie Cochran has to pay restitution for what she has

25   done.  Natalie has stolen our life savings from us,

$245,360.69, by bank fraud and wire fraud.  We ask that this money be returned to us.

Judge Volk, I know you're going to receive other letters regarding Natalie Cochran's sentencing.  I know my husband Eddie's and my thoughts will have some input on your decision.  I don't know if my letter can actually state my hardship and I fear not because you would have to live it with me to really know and understand what I and my husband have been through and are still going through.  I don't think I could portray the pain, the sinking feeling, the sadness in my heart, and the fear of living life on the brink of destitution.

Suffice to say, there is no quality of life for us right now.  The financial devastation easily be defined, but the emotional, spiritual and psychological devastation is indescribable.  The destruction is insurmountable.  I ask you to please look at the big picture of what happened.

Natalie Cochran portrayed TMS and TSG as legitimate businesses for government contracts.  She lied over and over and over again.  Natalie schemed and devised a plan with fake contracts and used the words, "I guarantee you, you will get your money.  I promise you will get paid back.  I want to help you be comfortable in your retirement years because I'm doing it for my parents, too."

Natalie robbed and stole all our money with her lies

1   and deceit and her conniving ways.  Natalie Cochran clearly

2   has only interest in herself in her narcissistic way.  She

3   committed fraud and is a thief and she is an agreed felon.

4        Natalie Cochran has no conscience, no soul, and

5   definitely has no remorse for what she has done.

6        Eddie and I only have social security to fall back on

7   now.  We now have nothing.  No retirement saving.  No extra

8   money if anything unforeseeable happens.  Please remember

9   us, Eddie and Donna Bolt, as Natalie Cochran's victims.

10        Please spend some time, Judge Volk, when you sentence

11   Natalie Cochran to fully discuss the damage that Natalie has

12   done to us.  I trust that you touch on the loss of money,

13   the loss of dignity, the loss of freedom from financial

14   worries, and financial ruin that Natalie Cochran has done to

15   us.  And please do the right thing and hold Natalie Cochran

16   accountable for her crimes.

17        Although she pled guilty to two of the 26 indictments,

18   Natalie Cochran is guilty on all 26 counts.  Sentence

19   Natalie Cochran to the maximum of 11 years and 3 months.

20   Although this time does not seem enough for destroying our

21   lives, Natalie Cochran truly needs to look forward to just

22   exactly what she has done to us.  No hope.  No future.  And

23   no forgiveness.  The saying goes the wheels of justice

24   grinds slow, but they grind sure.

25        Natalie Cochran will speak at her sentencing today

1    because Natalie has to have the last word.  She will try to

2    blame my precious son, Michael, or blame someone else for

3    her evilness and deceit.  Natalie may even shed a tear or

4    two, but we have now come to know that every word coming out

5    of Natalie Cochran's mouth would just be another lie, and

6    her tears will be fake tears, trying to get sympathy from

7    the Court.

8        Natalie is also going to use the children to get

9    sympathy here today.  Judge, please don't fall for her con.

10   Natalie only cares about herself.  She will use, abuse and

11   manipulate anyone to get her way.  That's what Natalie does.

12       But we know the real Natalie Cochran, the thief, the

13   liar, the taker of life, the doer of evil deeds.  Natalie

14   Cochran will not only have to answer for her crimes here on

15   this earth, but she will also have to answer to our all

16   mightily God in heaven.

17       Since Natalie Cochran's 26-count federal indictment and

18   arrest on September 26th, 2019, it has been 538 days waiting

19   and praying.  The day has come.  This has been a very long

20   and traumatic process with all the court delays and

21   continuances.  Watching Natalie Cochran go on living life

22   like a free bird, living life without a care in the world

23   while we suffer and grieve.  We have to just sit back and be

24   silent while Natalie gives newspaper interviews about my

25   precious son, Michael, and her statements about what

1    happened on February 6th, 2019 and the incidences leading up

2    to his death.

3        We kept quiet as Natalie continues to blame Michael for

4    her evilness that did not stop even after his death.

5    Michael is not here to defend himself, but we are here.  We

6    are standing up and speaking for Michael and ourselves and

7    asking the Court for justice.

8        I thank God for answering my prayers and giving us

9    patience and strength, as judgment day fortunately Cochran

10   is finally here.

11       The media will not try this case.  All the evidence,

12   and the proven facts, and her guilty plea is enough to

13   sentence Natalie Cochran to the maximum sentence of 11 years

14   and 3 months.  Judge Volk, please, please, we have suffered

15   long enough.

16           THE COURT:  Thank you, Ms. Bolt.

17        Ms. Robeson, you may call your next victim.

18           MS. ROBESON:  I would like to call Mr. Bolt,

19   please.

20           THE COURT:  Mr. Bolt, if you would please come

21   forward and be sworn.

22           COURTROOM DEPUTY CLERK:  Please raise your right

23   hand.

24           **EDWARD BOLT, GOVERNMENT WITNESS, SWORN**

25           MR. BOLT:  I've been given an opportunity to offer

1    a victim impact statement how my wife Donna and I have been

2    affected how this horrible crime against us.  It is a crime

3    of unparalleled proportion.  But before I proceed, I have to

4    offer forgiveness.  My statement may be directed to you,

5    Judge Volk, but it is intended for Natalie Cochran.

6         I forgive you, Natalie.  But Donna and I, we want to

7    ask you why, why you did this to us?

8         My name is Edward Bolt.  I am the stepfather of Michael

9    Brandon Cochran ever since Michael was eight years old.  I'm

10   also Natalie Cochran's father-in-law.  We loved Natalie.  We

11   never thought of her as a daughter-in-law, but as a

12   daughter.

13        And on that day, on June 25th of 2019, when we found

14   out about how the mis-deeds -- it floored us.  And then, to

15   find out that Natalie was being investigated for Michael's

16   death, was overwhelming.  We were, and we are, devastated.

17   Our beloved daughter-in-law of 19 years had stolen and

18   robbed us of our entire retirement savings; but more, had a

19   hand in the death of our son.

20        As Christians, we are to forgive, and we do forgive

21   Natalie, but having said that, we know that we will all have

22   a judgment day, not only by this Court of law here today,

23   but before God.  Natalie Cochran's day of judgment has come

24   and her high-minded, self-centered, greedy, un-remorseful

25   attitude of being untouchable and unaccountable to no one

1    has come to an end.

2        The bitterness was destroying us, but God has delivered

3    us from all bitterness because we have turned it over to

4    Him.  Any sentence the courts put upon Natalie today will

5    not be enough, whether it be one day, or a hundred years.

6    How appealing Natalie made everything appear, especially

7    with the language.  "I'm doing it for my parents and I want

8    you to be comfortable in your retirement."  Oh, what a

9    tangled web we weave when we practice to deceive.  The hours

10    she must have spent on this is mind boggling.

11        We were so proud of Natalie, our beloved

12    daughter-in-law, thinking that she had put so much time into

13    this and -- but we know now that Natalie was laughing and

14    mocking us all the time.  I think back how hard Donna and I

15    worked, Donna going back to school at the age of 30 to

16    become a nurse and taking college classes.  Not only did she

17    become a nurse with an RN BSN degree but, also, still being

18    a mother and a wife.  She is the most amazing person I know.

19        When Natalie approached us with this opportunity, we

20    thought about it, and we prayed about it.  What a pretty

21    picture Natalie presented.  She preyed on our openness and

22    our love for her and Michael.

23        I worked for over 40 years, many times two jobs from

24    paycheck to paycheck, 10-12 hours a day, and I always worked

25    six and seven days a week.  But it was finally starting to

1    pay off.  Donna and I were actually saving money and looking

2    forward to retirement.  Natalie's cunning approach and

3    appealing position subdued us.  How wonderful that she would

4    think of us.

5        Natalie Cochran is an evil person, not only thinking

6    about what she was doing to us and others, but also to her

7    children.  Her actions have been proven to be none other

8    than that, but look at what I'm doing.  All along, stealing

9    our life savings of $245,360.69.

10       Today, Natalie will be reduced to a thief, a robber, a

11   taker of life; and now, a felon, a permanent title that will

12   stay with her the rest of her life.

13       Natalie may say that she is sorry here today, but we

14   know that she is only sorry because she got caught.  There

15   are many commandments God gives us to live by and she has

16   broken nearly all of them.

17       I could continue to be harsh with my words, but it

18   doesn't take away the suffering that she has put us through.

19   The closure that I will find is when they say guilty on all

20   charges and her life is to be lived out in a prison cell.

21   She is a criminal and should be treated as such.

22       It is a joy knowing that good will always prevail

23   against evil.  Evil is what she is and what she has done.

24   Prison may or may not change her, but from there, she will

25   not be able to hurt anyone anymore.

1    I was asked the question had I received any counseling

2    or therapy as a result of this crime.  Yes, I have.  You

3    must understand that this crime and death of our son has

4    overwhelmed Donna and I.  The death of our son, Michael;

5    then, four months later, to find out that they were victim

6    of a Ponzi scam by our beloved daughter-in-law makes us

7    victims twice.

8    Our son's death is still unresolved.  We have sought

9    refuge in our pastor and a few close friends, one of those

10    also being a minister.  They first have offered prayer and

11    spiritual insight, compassion, and an outpouring of love and

12    support.  These close friends have helped us to stay sane

13    and reminded us that God is in control.  Because of what our

14    feelings and emotions are with everyone, we didn't want to

15    place this huge burden on others.  We do attend church

16    regularly and pray daily.  Prayer helps, but the pain

17    remains.

18    Our family doctor has offered to prescribe us something

19    with the depression and anxiety, the moodiness, the whole

20    range of emotions that we have gone through, but we have

21    decided not to do that because it would take us out of

22    reality.  This crime, this Ponzi scam, really happened to

23    us.  It is unbearable and devastating.  But time will heal

24    us and we will remain strong in our faith.

25    In the first days, weeks and months when we realized

1    that she had deceived, and lied, and robbed us of our entire

2    savings, I felt bitter, and angry, and revengeful.  I was

3    even at the point of having overwhelming anxiety attacks and

4    nightmares.  Having shared this full pattern of emotions

5    with my wife and others in confidence has helped me with the

6    healing.  But I'm still not there.  I am praying for a full

7    positive healing.

8        But, Judge Volk, this has been a life-changing event.

9    I will move forward and move on once I have some sort of

10   closure with all of this, the death of our son, Michael, and

11   justice is served on Natalie Cochran.  Ungodly and evil will

12   never find rest.  Natalie has tried to take refuge behind

13   her children and her parents, not caring what she is putting

14   them through.

15       I pray the courts today see through Natalie Cochran

16   just as everyone else does.  Only thinking about herself.

17       You must be held accountable.

18       My beloved son, Michael, is not here to speak and

19   trying to imply he had a part in stealing from me and his

20   mother is just another cunning diversion from the truth.

21   Even after his death, Natalie's deeds were unbridled and

22   went into overdrive.  When you lie and steal, you must be

23   held accountable.

24       Our hearts were broken when Natalie made the

25   announcement that she had cancer.  The grandchildren, Donna

1    and I, Natalie's parents, and having Michael to pass, and

2    now this.  We had our church family to pray for Natalie and,

3    in just a few weeks, the cancer was gone.  Praise God.

4         Then, in just a few weeks, the cancer returned.  Oh,

5    how she preyed on everyone's emotions.  And the word "prey"

6    here is with an "e".  Testimonies were given that God had

7    healed her, but know now God can't heal her from cancer that

8    she never had.

9         The scholarships that were given by Natalie in

10   Michael's name was such an amazing gesture, deserving young

11   adults an opportunity of a lifetime, standing in front of

12   hundreds of people declaring full rides anywhere of their

13   choice.  Just imagine the disappointment of the families.

14   Just imagine our disappointment.

15        We even drove her and attended one ceremony at

16   Independence High School where Michael attended school; once

17   again, displaying herself, bringing attention upon herself

18   while deceiving so many families.  She was so convincing.

19   But in the end, her actions devastated so many.

20        We trusted and we believed her.  Our entire retirement

21   savings gone.  Sleepless nights.  Days of feeling numb and

22   not being able to function.

23        Donna and I are victims.  We have been deceived, robbed

24   and humiliated.  We may never recover either psychologically

25   or financially.  This has been a life-changing event for us.

```
1   We feel we may never be able to trust anyone again.  Only
2   God.  I will put all my faith and trust in Him and I urge
3   you all to do the same here today.  We have been violated,
4   suffering from depression and isolation.
5        Judge, we appeal to you today for the maximum sentence
6   of 11 years and 3 months.  No pardon.  No parole.  No deals.
7   But any sentence isn't enough for the devastation and
8   heartache she has put us through.  She is guilty on all 26
9   indictments and deserves nothing less than 30 years behind
10  prison bars.
11       Our entire savings, savings that was intended to be
12  used for our healthcare coverage, which we have to pay for,
13  gone.  Stolen by Natalie Cochran.  Our entire savings that
14  was intended for the upkeep and maintenance of our home,
15  gone.  Stolen by Natalie Cochran.  Our entire savings that
16  was to supplement our social security, gone.  Stolen by
17  Natalie Cochran.
18       Her planning, and scheming, and how she kept it all in
19  order was above and beyond anything that can be imagined.
20  The contract names and amounts, those documents that looked
21  so professional and official.  Natalie wanted to assure us
22  and convince us that it was all real, all legitimate.
23       She was always thinking, and working, and plotting to
24  stay ahead, ready to steal more money from us with her next
25  fake contract scam.  This was not an investment that went
```

1    bad.  This was a crime.

2         She used her position as a respected member of our

3    community.  Her professional status as a doctor of pharmacy.

4    And, most importantly, she used our relationship of being

5    our daughter-in-law to deceive us.  All the evidence clearly

6    shows this.

7         Natalie, you have no influence here today.  No social

8    standing.  No influence on anyone anymore.

9         As I said earlier in my statement, trying to imply that

10   Michael would steal and lie to his mother and I is just

11   another untruth.

12        She often boasted that because TSG and TMS was

13   woman-owned, that she received priority over other companies

14   because of her gender.  She even implied as being a minority

15   because she was a quarter Cherokee Indian, which provided

16   her with even more business opportunities.

17        You deceived Michael, your children, Donna and I, and

18   the other victims here today.  The efforts, time and money,

19   and resources spent on this case will never be recovered.

20        Judge Volk, the only justification can be a sentencing

21   to the fullest extent.  Judge Volk, now is the time to be

22   tough on crime.  Enforce and enact all the law you can to

23   deter this type of heinous crime, that it will not be

24   tolerated.  Bad behavior cannot go unpunished.  Today, this

25   court proceeding can show this community and its victims

1    that she is a criminal, and a felon, and will be sentenced

2    as such by giving her the maximum sentence of 11 years and

3    3 months.

4        I've not enjoyed writing this statement, but it is a

5    tough and necessary part of this process.  Michael would

6    want us to see that she be held accountable and prosecuted

7    to the fullest extent of the law.

8        Judge, don't let another person get hurt.  Don't let

9    another family go through this.  Don't give her any

10   satisfaction.

11       Donna and I feel like we've been in prison and held

12   hostage.  Bitterness that I have towards Natalie will pass.

13   I will not allow it to destroy me.  But she can have all the

14   bitterness she desires from her prison cell.  Her twisted

15   sociopathic mind obsessed with attention will now be

16   received by prison guards where she will be reduced to just

17   another number.

18       This Court must know that she would return to her evil

19   wicked ways if she does not receive the maximum judgment

20   sentence.  Being a victim to her arrogance, ego-driven

21   nature, she has not even once said I'm sorry.

22       Natalie, you've taken more than just money.  A part of

23   my life is now fractured as I continue to look for closure.

24   How can I not have these feelings of bitterness, revenge,

25   anger and hatred that try to control me?

1      But I will not be reduced to her level.  I will find

2    comfort in knowing that our son, Michael, would want us to

3    do everything we can today to put her away.

4      How much is enough?  Will the prison sentence deter

5    Natalie from doing it again?  I pray that her prison time is

6    lengthy.  The community must be protected from her.  Whether

7    Natalie is rehabilitated or not, that is entirely up to her.

8      A maximum sentence of 11 years and 3 months will keep

9    Natalie from harming anyone again.  No pardon.  No parole.

10   No deals.

11     Natalie, you will get to agonize over the pain you have

12   caused Donna and I, your family, and the other victims from

13   your prison cell while we will be putting our lives back

14   together.  Your evil and unremorseful actions will not

15   defeat us.  You will not be given that satisfaction.  I will

16   find peace in knowing that my God-given testimony is good

17   will always triumph over evil.  And evil is what you are.

18     I dedicate my victim impact statement here today to my

19   beloved son, Michael, and to the other victims here today

20   that celebrate in the fact that Natalie will not be the

21   center of attention, but all the attention will be on all

22   the harm that she has done.

23          THE COURT:  Thank, sir.

24     Ms. Robeson, you may call the next witness.

25          MS. ROBESON:  We would like to call Hauling

1    Reorganization to give their victim impact statement.

2            THE COURT:  Gentlemen, before you're sworn, will

3    there just be one of you speaking?

4            MR. DAVIS:  Yes, Your Honor.

5            THE COURT:  Very good.  Then, I will ask that you

6    be sworn.  What is your name, sir?

7            MR. DAVIS:  Chris Davis, Your Honor.

8            **CHRIS DAVIS, GOVERNMENT WITNESS, SWORN.**

9            THE COURT:  Please proceed.

10           MR. DAVIS:  Thank you, Your Honor.  We understand

11   that you have read our impact statements from November.

12   However, we're concerned that they do not portray the actual

13   shock and disgust that we all felt in June 2019, when

14   Natalie's Ponzi scheme was exposed.  Just as Ms. Bolt said,

15   financial devastation can be defined, but emotional,

16   spiritual and psychological effects are indescribable.  You

17   know the economic impact that she's had on all of us here

18   today.

19       Specifically, she stole $511,000.00 from us standing

20   here, Mr. Miller, myself and Mr. Gray.  We are thankful for

21   this opportunity to address this Court and Natalie Cochran

22   directly.

23       First, we want to thank the U. S. Attorney's Office and

24   the tireless work of the investigators.  We strongly believe

25   her Ponzi scheme would be flourishing today without their

1   skills and expertise.

2        Our statement today is not about anger.  It's about

3   truth.  King Solomon in Proverbs 14:30 says, "Envy rots the

4   bones."  Natalie's envy drove her feelings of entitlement.

5   She lived a life of entitlement that we all paid for, and

6   will continue to pay for, for decades to come.  She felt

7   entitled to our finances, our lives, our reputations, our

8   futures, our securities and our retirements.  Now, we're

9   simply asking this Court to follow her perspective in life

10  and give her exactly what she's entitled to, 11 years and 3

11  months in a federal penitentiary.

12       Our lives will be troubled far longer than 11 years,

13  and it took more than 11 years to accumulate the resources

14  she deviously stole, kept and lived carefree on for several

15  months.  Why should her punishment be any less than the

16  impact it will have on the dozens of her victims?

17       According to Natalie's plea, there are 2.4 million

18  reasons why 11 years is insufficient from the victims'

19  perspectives.  This was not just about money.  Money was

20  simply the byproduct of her malicious intent.  This is not

21  some drug dealer or some user trying to feed a habit.  Her

22  actions were maliciously and purposefully calculated to

23  steal from those very people who trusted her.

24       Evil has an ordinary face.  It laughs.  It cries.  It

25  deflects.  It rationalizes.  And, in this case, it claims to

1    be your friend.  She's not a victim, Your Honor.  She's

2    vicious.

3       Manipulative people like Natalie do not understand the

4    concept of boundaries.  They are relentless in their pursuit

5    of what they want and they have no regard for who gets hurt

6    along the way.  She knew the damage before she stole the

7    first dime.

8       What she's asking this Court now to consider for

9    leniency was not enough to stop her in her criminal

10   activities two years ago.  Once again, we are all supposed

11   to care, when she could care less.

12      Your Honor, today, you are the gate keeper between fact

13   and fiction.  Here's a fact:  Natalie is a matter of fraud

14   and deceit.  We look back at the phony spreadsheet that she

15   provided to us and other victims regarding contracts.  It

16   had factor fees, defaults, payouts.  This document was not

17   created accidentally or mistakenly.  It was with purposeful

18   and predatory intent.  The details to deceive.

19      This same fraudulent intent to deceive was led to the

20   creation of other additional documents in which we were

21   provided.  We were given a document from the Bank of America

22   promising the deposit of $29 million.  We were given a

23   document of an e-mail from Dun & Bradstreet promising the

24   deposit of $348 million.  We were given letters from Senator

25   Joe Manchin's office indicating that he was assisting her in

1  her frozen accounts.  All of these documents in time

2  directed directly to Natalie.  That is a fact, not fiction.

3      It was not a poor choice for her to join the business,

4  as she and her lawyer claimed in the Register-Herald.  It

5  was her explicit choice to create it and then portray it as

6  a flourishing federal contracting business.  Simply look at

7  her application to the federal government.  She directed us

8  before our investment to visit the website to look where

9  Tactical Solution Group was listed and, just as the Bolts

10  indicated, it was woman-owned, woman's small business, and

11  it was actually a specific medical qualification that only

12  Natalie had.  This is a fact, not fiction.  It is

13  overwhelming evidence that she operated the company at her

14  discretion.

15      The fact that all the witnesses here, when you hear

16  from everyone, you'll hear they all communicated directly

17  with her regarding contract solicitations, descriptions,

18  updates, payments, renewals, et cetera.  Of course, I'm

19  referring to the fake contracts she was peddling.  The

20  excuse she offers today and in the media that she joined her

21  husband's business with honest intentions as if she was an

22  unwilling participant is disgustingly false and as worthless

23  as the contract she sold us.

24      Speaking from experience, Your Honor, don't buy it.

25  The fact that her crimes didn't stop after her husband,

Mike, passed away.  They actually increased and became more
aggressive.  Ultimately, as victims, we were told, since you
can't get your money, just reinvest with her.  This is a
fact, not fiction.

So, why didn't she stop?  To stop was not an option for
her narcissism and it didn't matter who the victims would be
on either side.  I would like to think that anyone who
maliciously steals millions of dollars from friends and
family would now experience post traumatic stress disorder,
but this is self-inflicted trauma and it's self-inflicted
stress.  This attempt to abuse her own medical training and
continuing to manipulate other medical professionals is not
only predictable, but it's transparent.

She was not traumatically forced to steal $2.5 million
dollars.  She was not traumatically forced to take elaborate
vacations, purchase cars, a boat, motorcycles, ATVs and
other luxury items while remodeling her home and living the
high life on everyone else's money.

Was she forced to enjoy these luxuries?  I think not.
Yet, this is what each victim here today has had to watch
and suffer through for the last two years.  It's nothing
less than insulting to the victims here today who she
confidently approached with a braggadocios demeanor of her
successful woman-owned federal contracting business.  This
foolishness is just further victimization of every victim

1    here today in allowing her to continue to deny

2    accountability.

3        None of the victims here today did anything to cause

4    her traumatic stress.  She should save that for her next

5    trial.

6        Her Ponzi scheme now moves from economic to emotional.

7    It's the same concept.  Lure new victims in and use their

8    emotions to pay back the previous people who cared.  This is

9    evil personified; yet again, predictable.

10        To understand what we've dealt with, I quote Dr. Sam

11    Vaknin.  He's an author/professor and he's a self-confessed

12    narcissist.  And he says, "Narcissists live a fantasy --

13    live in a fantasy land all their own in which they are the

14    center of the universe, admired, feared, held in awe.  They

15    hold themselves immune to the consequences of their actions

16    and the inactions; therefore, beyond the punishment of the

17    law of man.  They often find themselves on the receiving end

18    of investment scams believing they're destined to greatness.

19    They have unreasonable expectations and especially favorable

20    treatment and are upset when the way they treat people, they

21    do not automatically comply with their expectations.  They

22    feel entitled to money, power, and honor in commensurate

23    with their accomplishments or toils.  They are rudely

24    shocked when they are penalized for their misconduct or

25    their fantasies remain just that."  End quote.

1        Her greatest suffering is not separation, Your Honor.

2    It is the four walls of eternal irrelevance, rejection,

3    humiliation defeat.  But, Judge, you are the only one who

4    can express it and enforce it.  She doesn't listen to anyone

5    else but her own ego.  She's now required to listen to you.

6        We respectfully ask that you speak bold, and loud, and

7    with the authority she needs to hear and that is overdue.

8    We know justice is blind but we hope today she's not deaf.

9    Our voices stop with you, but you have the authority to

10   allow these voices to echo for 11 years and 3 months.

11       Don't silence the victims, Your Honor.  This sentencing

12   today will be based on fact and not fiction.  Although she

13   is now relevant -- or irrelevant, make our losses relevant.

14   She's asking the Court to consider her family and we're

15   simply asking you to, likewise, to consider all the victims

16   and all of her victims' families.

17       I don't envy your job or the decision that you have to

18   make today, but I do remind you, you are not only the

19   Honorable Judge Frank Volk.  You are Tom Miller, Evona

20   Miller, Tommy Miller, Laura Lucas, Teddy Gray, Teresa Gray,

21   Colby Gray, Eddie Bolt, Donna Bolt, Chris Davis, Jennifer

22   Davis, Grant Davis, Gavin Davis, Toni McCall, Dylan McCall,

23   Riley McCall, Cash McCall, Dr. Heath Bailey, Abby Bailey,

24   Ava Bailey, Dr. Dan Foley, John Poteat, Wendy Poteat,

25   Thatcher Poteat, Steve Maynard, Heather Maynard, Parker

1    Maynard, Jason Bowen, Stephanie Bowen, Malachi Bowen, Noah

2    Bowen, Mason Bowen.

3         You're the late Jonathan Miller.  You're his wife

4    Jessie.  You're Laura Miller, Asher Miller and Emily Miller.

5    You're John Hamilton.  You're Stephanie Hamilton.  You're

6    Hunter Hamilton and you're Alli Hamilton.

7         You're Jeff Vickers for Premier Bank and all of their

8    shareholders.  These are just a few victims that we know,

9    but you stand for us all.  You stand for our communities,

10    our charities, our churches, our neighbors and our futures.

11         Since our previous sentence date of January 29th, she

12    has been granted additional 48 days of undeserved freedom,

13    freedom she's used to falsely claim her innocence, and that

14    she's actually paid the victims in full.  All of this, we

15    know, is false.  Another malicious attempt to pass blame and

16    avoid responsibility.  These attacks on the victims will

17    continue until she is finally incarcerated.  It must end

18    with you, Your Honor.

19         Betrayal is not something that is reimbursed through

20    restitution.  It is only recouped through the sentencing of

21    Natalie Cochran.  Because of that, we strongly oppose any

22    consideration for her to self-report to prison.

23         Her sentencing has basically been continued three

24    times.  This is more than adequate time she deserves to

25    prepare herself and her family for her prison sentence of

```
 1    11 years and 3 months.

 2         Her lack of remorse and accountability over the past

 3    two years alone should earn her direct removal to prison.

 4    The victims deserve better and she should be taken

 5    forthwith.

 6         Exodus 14:14 says, "The Lord shall fight for you and ye

 7    shall hold your peace."  All the victims here have done that

 8    for almost two years.  Let us now be heard.  Thank you, Your

 9    Honor.

10              THE COURT:  Thank you.

11         We are about at an hour.  The Court will take a

12    ten-minute recess and you can prepare your next witness to

13    come forward.  Thank you.

14         Court is in recess.

15         (Recess taken)

16              THE COURT:  You may call your next victim.

17              MS. ROBESON:  Thank you, Your Honor.  The United

18    States would like to call Mr. Vickers, who is here with

19    Premier Bank.

20              THE COURT:  Could you say that again?

21              MS. ROBESON:  Yes, Your Honor.

22              THE COURT:  Mr. Vickers from Premier Bank?

23              MS. ROBESON:  Yes, Your Honor.

24              THE COURT:  Please come forward, Mr. Vickers.

25              COURTROOM DEPUTY CLERK:  Please raise your right
```

1    hand.

2                    **JEFF VICKERS, GOVERNMENT WITNESS, SWORN**

3         MR. VICKERS:  As was said, I'm Jeff Vickers.  I'm

4    a Divisional President for Premier Bank.  I've been doing

5    this my whole life.  Started as a teller when I was in

6    college.  Worked my way up.  A majority of what I've done my

7    whole life is commercial lending; specifically, trying to

8    help small businesses.  In 20-some years of doing this, I've

9    seen every type of criminal, crook, liar, manipulative,

10   financially manipulative package, and they all pale in

11   comparison to what Natalie Cochran did.

12        You know, she wants to say that she's a victim here

13   because this was Michael's doing.  Well, Michael and Natalie

14   approached the bank and came to us with their financials and

15   made a request.  Well, we declined it based upon that

16   information.  And it wasn't until Michael was out of the way

17   that she really elevated and escalated the level of deceit

18   and lies.

19        The next time we meet, new -- new tax returns.

20   Financial records, DFAs, e-mails, everything.  All these

21   contracts that you've heard about.

22        We met and met with Natalie.  I brought another senior

23   member from the bank.  And you'd sit there and ask her

24   questions and she could just spit out a lie.  And that lie

25   then would lead to -- or her answer would lead then to other

1    questions.  And she couldn't know all of them, but she never

2    missed a beat.  Lie, after lie, after lie.

3        And we asked her, how was she able to do all of this?

4    Of course, Senator Manchin letters, all this other stuff.

5    And she sat there.  Of course, I'm a woman-owned business in

6    a HUD zone that's Native American.  Native American kind of

7    took us back.  Oh, yes, I'm Native American.  That's what

8    puts me in the top five percent of supplier providers for

9    the Department of Defense.

10        She, of course, broke down once.  Michael, I'd give it

11    all back to him.  I'd give the $400 million dollars back if

12    he was just here.  Well, there was no $400 million dollars.

13    And we thought, after the fact, there were no tears either

14    when she made that statement.

15        So, long and short, with all the financial information,

16    we extended her a loan.  Ultimately that loan defaulted on

17    the first payment.  That's when my life changed, because

18    despite an almost perfect record over 20-some years in

19    lending, I had defrauded by her lies and manipulation.

20        I was written up by my so boss.  My became under -- my

21    lending authority was reduced.  The one thing I prided

22    myself on in helping small business was having individual

23    lending authority so I could sit across the table from them

24    and help make a decision for legitimate businesses and help

25    them meet their goals.

1          I also came under scrutiny by the executive management

2     within the bank and then, further, by the Board of

3     Directors.  You know, I started losing sleep.  Every day, I

4     thought I'd come to work and there would be an HR director

5     sitting there with my boss ready to let me go.

6          My blood pressure shot up.  I never knew from one day

7     to the next if I had a job.

8          At the end of every year, I'd get a little bonus based

9     upon my performance from the year before.  It's not a big

10    bonus.  It's not some Bank of America-type bonuses you would

11    get to keep these type of contracts.  But it was a bonus

12    enough that allowed me to take my kids on a little vacation

13    and put a little money in their 529 Plans.

14         Well, my bonus was almost all but eliminated.  So,

15    there wasn't a vacation.  There wasn't a 529 Plan

16    contribution.  Instead, I held every little bit I could in

17    anticipation of losing my job, something I've worked hard at

18    for years.  So, that was -- wasn't enough.

19         Life started to move on and things started getting a

20    little bit better.  I did not lost my job, thankfully.  I

21    remained under a probationary period.  And so, life started

22    going on even though the bank continued to spend an enormous

23    amount of resources and money with lawyers and everything

24    trying to chase Ms. Cochran, who ultimately filed

25    bankruptcy.

1    I thought things were getting back to normal and this

2    would resolve itself.  My kids have attended school in

3    Greenbrier County their whole lives.  And then, all of the

4    sudden, Natalie Cochran decides to take her kids and put

5    them in the same school system as mine because I'm assuming

6    she didn't want the embarrassment of being in this area.  So

7    now, I'm seeing her a pick-up lines, at drop-off lines, at

8    football games, at practices, at everything.  So, it all

9    came back again that I'm having to still live with this with

10   my bosses and she's just out and about, can take her kids to

11   wherever she wants to go.

12      It started again right before they had the initial

13   trial scheduled for her.  She started -- and I'm a potential

14   witness in this federal trial.  She starts taking pictures

15   of me at practices as I'm coming in and as I am going.  And

16   the final straw is I pulled in and she videotapes me coming

17   by.

18      Here I am supposed to be a federal witness, there was

19   all these other allegations about her and Michael and

20   everything.  I was fearful for my life.  I was fearful for

21   my kids' lives.  This isn't fair.  We've been -- lived here

22   our whole lives.  We didn't do anything wrong.

23      So, I ended up having to call the State Police and

24   saying, you know, I need this to top.  They, of course, made

25   the appropriate calls to the prosecutors and I'm assuming to

1    her attorney, and they did, but it was too late.

2        You know, Natalie Cochran is not a victim.  She's

3    created a room full of victims.  You know, this doesn't

4    bother her whatsoever.  And it hasn't.

5        She lives the life.  You see pictures of her at the

6    Greenbrier at Christmastime having dinner, going to parties.

7    I mean, she's not been impacted by this whatsoever.

8    Everyone in here else has.  And so, you know, again, she is

9    not a victim and I ask that you sentence her accordingly.

10   Thank you.

11       MS. ROBESON:  Your Honor, we would like to call

12   Stephanie Hamilton, please.

13           THE COURT:  Ms. Hamilton, please come forward.

14           COURTROOM DEPUTY CLERK:  Please raise your right

15   hand.

16       **STEPHANIE HAMILTON, GOVERNMENT WITNESS, SWORN**

17           MS. HAMILTON:  I'm Stephanie Hamilton.  Was

18   working some weekends for an urgent care company, along with

19   a full-time job.  Ms. Cochran, who I had been, quote,

20   "friends" with for about three months starting talking to me

21   about investigating in government contracts.

22       When she first mentioned it, I did not fully understand

23   how the contracts worked.  She told me to watch the movie

24   War Dogs to better understand how they got the idea to start

25   their business.

1          My son, 13 at the time, was getting ready to have a

2     major surgery that was going to take a year to recover.  At

3     the time, we were -- we thought we were facing lymphoma with

4     him.  Thank God, it was not.

5          Ms. Cochran used that tactic to pull me into the

6     so-called government contracts.  She was persuasive, saying

7     that this would enable me to be home more with my family and

8     take care of my son.  At first, she offered me money per

9     contract just to consult as a medical provider.  To make

10    things seem legit and real she needed my medical license

11    number.

12         Natalie told me several times that because I was

13    working with government that I was not allowed to talk to

14    anyone about the business and it was confidential what we

15    were doing.

16         As time went on, when money was supposed to have been

17    paid, she would send me a list of contracts that I could pay

18    into to flip my money with promises of doubling it.  She

19    told me Michael's mom, Donna, had been doing them and she no

20    longer wanted to work with her.  I asked her if Michael was

21    okay with that and she told me that he did not want his mom

22    working for them either.

23         My husband fell and had to have urgent surgery for a

24    shoulder injury and was out of work.  A week later, I was

25    told my full-time job was cutting to part-time, as we were

1    closing.  Things were getting hard financially.  I had

2    cleaned out my savings to give to Ms. Cochran.  I had been

3    saving up my weekend pays to do a big house remodel.  I had

4    also taken out two bank loans to pay money to her which I am

5    still paying on.

6        With all the financial difficulties, I would talk to

7    Natalie about some of my payouts.  There were always

8    excuses.  Example:  The State Police have my accounts locked

9    up because of Michael's death.  The government is on

10   shutdown.  And many more.  She even went to lengths to fake

11   an illness, cancer, to use as a tactic to detract people she

12   owed money to.

13       Every single time my money was due, there was an excuse,

14   or there was an even better list of government contracts

15   with promises of more return.  I remember her always saying,

16   "You are going to be just fine.  You will pay off your

17   student loans and be financially free."

18       On her TSG website, she advertised she was a woman-owned

19   small business and boasted her pharmacy degree, claiming to

20   be a controlled substance distributor for the government.

21   She would always say she had first dibs on the contracts

22   because she was an American Indian female running a small

23   business.

24       She would try to get old friends to separate because

25   she did not want them talking to each other in case they

would figure out that things were not adding up.  She took advantage of her real friends through a fake cancer diagnosis, ones taking her to doctors' appointments, providing food for her family and her.  I even went to make cancer T-shirts for her and her family and friends.

One day, on a lunch date with Ms. Cochran and her mother, Ms. Jessup, Natalie kept saying she was waiting on a big deal to drop.  Her mother started telling me that Natalie was one of the top gun salespersons in the United States.  Natalie was shaking her head and smiling the whole time.

The story went on.  She had sold all the guns needed for the wall being built on the Mexico border.

The stories and lies were always amazing.  She lived a life of luxury to bait everyone into her scheme.

On May of 2019, after much harassment, she finally put a check into my bank account for a small portion of my funds.  Three days later, the bank called me and told me the check had bounced.  I called Ms. Cochran to let her know about the check.  Of course, there were there more excuses about the feds locking up accounts.  She was meeting with lawyers to get them unlocked.

She did issue another check four weeks later, which again bounced.  Ms. Cochran did not care about people or their well-being.  She was a phony all-American mom who

1    manipulated and took advantage of an entire community.  She

2    used religion and her self-proclaimed introverted

3    personality disorder to deceive and defraud everyone.

4        She quoted Bible verses through texts and social media.

5    She used those tactics to gain more victims for her scheme.

6    She hurt people that deeply cared for her and her family.

7        After Detective Bledsoe called me in and I found out

8    the truth of the scheme, I was still trying to take up for

9    her.  After days, I was sad, hurt, and then I became angry.

10       I went through a lot of anxiety and depression.  I had

11    to see my primary care doctor to get put on medications for

12    depression and anxiety.  We were struggling financially, as

13    I was part-time and my husband was still out of work, as

14    well.  My son was recovering from his surgery and going

15    through many emotions, as well, realizing the money I had

16    saved up, I had just thrown off the bridge.  The bank loans

17    were still going to be my responsibility.

18       She gifted my son a hunting bow.  It was later taken

19    because we found out that she purchased the bow with money

20    she had stolen from the baseball league.

21       If she is put on a light term, she is just getting a

22    slap on the wrist.  I feel she should have maximum sentence.

23    She has never shown an ounce of remorse or regret.  She's

24    continued to parade around the community in Lewisburg and

25    blame everything on her deceased husband.  She's continued

1    to run the scheme after his death.

2         She took two payments from me in April and May after

3    his death.  She is still trying to tell people lies about

4    what she did.  She is a danger to the community, as in the

5    past, she tried to get innocent people tried for stealing

6    money from leagues when she was doing it all along to her

7    friends and family.

8         She is still trying to use deceit and play the victim.

9    We are the victims here.  She has not been on any kind of

10   home confinement.

11        One key point I want to leave you with.  I never spoke

12   to Michael Cochran about contracts or money.  She needs to

13   be punished for the lies, deceit and manipulation, and pain

14   that she put her true friends and family through.

15        How can someone fake cancer?  So many people die every

16   day from such a horrible disease.  I am sure if COVID-19

17   were around then, she would have had it, too, and been on a

18   ventilator.

19        We need to make sure she will never do this again.  I

20   plead for maximum sentence.  Thank you.

21             THE COURT:  Thank you.  You may call the next

22   victim.

23             MS. ROBESON:  Your Honor, I call Lacy Treadway.

24             THE COURT:  Let me ask you a question before Ms.

25   Treadway comes forward.  Will John Hamilton be testifying?

```
 1                  MS. ROBESON:  No, Your Honor.

 2                  THE COURT:  Very good.  Ms. Treadway, please come

 3       forward and you will be sworn, as the others were.

 4                  LACY TREADWAY, GOVERNMENT WITNESS, SWORN

 5                  MS. TREADWAY:  I'm not quite as prepared and

 6       scripted and ready as everybody else.  I haven't looked at

 7       my stuff since last time we were here.  So -- but you asked

 8       me to tell the truth, so I have not seen Natalie as

 9       everybody has seen her.  I have seen her differently than

10       everybody else has, so I'm obviously the odd person out in

11       this group.

12            So, she has always been a caring and kind wife and

13       mother and a friend with a servant's heart.  I've always

14       seen her give to others.  She is always ready to help people

15       and support others.  She always liked working in the

16       background without anybody knowing what she was doing

17       because she liked to see other people happy.

18            When you came to her house, she always made sure that

19       you left with something --

20                  COURT REPORTER:  Could you slow down just a little

21       for me, please?

22                  MS. TREADWAY:  Oh, yeah.

23                  COURT REPORTER:  Thank you.

24                  MS. TREADWAY:  I'm sorry.

25                  COURT REPORTER:  When you came to her house --
```

1           MS. TREADWAY:  Okay.  And so, when you would go to

2     her house, she always made sure that you left with something

3     baked and that you felt at home.

4           She would help other people afford their medications

5     with samples since they couldn't afford them or their

6     insurance wouldn't cover.

7           We were in ball teams together and she made sure that

8     kids who couldn't afford things, helmets, or to attend an

9     event always were able to do that.

10          Coming from a big championship in the 2019 middle

11    school baseball, she had just lost Mike and she didn't want

12    anything to do with sports anymore.  They made her sick.

13    But she helped organize a travel baseball team because

14    everyone was so excited that the team was able to win.

15          So, many people, at first, I feel like they misread her

16    because she's really reserved and an introvert.  When Mike

17    passed away, she said she was going to have to find -- I

18    said that she was going to have to find herself and grieve

19    because everything that he did, she did.  They did

20    everything as a whole family.  If Mike didn't want to do

21    something, then she wasn't able to do it either.

22          They were private.  And they looked perfect in every

23    way.  And I know that a lot of people may not know that when

24    Mike became aggressive, she and I had plans that anything

25    would happen to her, that the kids would just be sent out of

1      the house, that I was to get them and take them to their

2      grandparents.

3             I still can't believe everything that has happened.

4      It's unbelievable.  I can't even wrap my head around all

5      that's happened.

6             I'm still close to her friends -- I mean, still close

7      to her kids.  They're at -- Ashton is at my house often.

8      So, I hope you take that into consideration when you are

9      serving her sentence.

10            Unlike everybody else, I would not like her to have the

11     maximum sentence.  I think that her kids need her at home.

12     They often talk about how hard it has been on them and how

13     much they have suffered and they need their mama home with

14     them.

15            THE COURT:  Thank you very much.

16     Will Mr. Treadway be heard?

17            MS. TREADWAY:  No, sir.

18            THE COURT:  Thank you very much.

19     So, we'll remove Thomas Treadway from the list.

20     You may proceed.

21            MS. ROBESON:  I would like to call Toni McCall,

22     Your Honor.

23            THE COURT:  Ms. McCall, if you would please come

24     forward.

25            **TONI MCCALL, GOVERNMENT WITNESS, SWORN**

1            MS. MCCALL:  Thank you, Your Honor, for allowing

2     me the time to speak today.  I would also like to say thank

3     you to all of the investigators.  Because of them, we all

4     know beyond the shadow of a doubt that Natalie is guilty and

5     deserves the maximum sentence of 11 years and 3 months

6     without the opportunity to self-report.

7          Although I'm a business owner, I feel that being a

8     parent that's caring, present and responsible is my first

9     priority.  My children and I are wounded by the loss of

10    $256,000.00 that Natalie stole from us by running her

11    American Indian female-owned Ponzi scheme.

12          I'm a widow raising my children alone, but I have no

13    compassion for Natalie.  I'm not fooled when she says that

14    she would serve her time at home, or should, because she's a

15    widow and her children need her.  And you shouldn't either.

16          Her sole mission is exclusively to satisfy her

17    narcissistic needs.  My youngest son, Cash, and Natalie's

18    children, Nikki and Ashton, have been very good friends

19    since they first met, but since a week before the

20    January 29th sentencing, Cash has been made to feel guilty

21    for supporting me as a victim.

22          I wrote a victim impact statement to you, but Cash was

23    told by Ashton from Natalie that I had written a nasty

24    letter to her and, as instructed by Natalie, that Ashton and

25    Cash couldn't hang out anymore.  That directive was later

changed and she said that Ashton just couldn't be around me

anymore.  Of course, that's Natalie saying that I'm the bad

influence.

Natalie is using our boys' communication to not only

keep her kids believing that she's innocent, but to try to

gain my son on her side, as well as insinuating I'm a liar.

I believe Natalie's goals are to maintain her innocence

to her kids and to make the victims look like liars.

Because I live in this community, I know that other victims

are experiencing the same treatment.  So, the Ponzi scheme

victims are also victims of slander, both by Natalie.

A good and loving mother who is remorseful for her

crimes would tell her kids the truth about what she had done

so that the people she hurt would accept that as a penance

and would take care of the kids while she's away in prison.

It blows my mind that instead of preparing her teenagers for

her eventual absence from them to be in federal prison,

Natalie has spent her time developing her current evil plan

that is building on her fabricated story that the U. S.

Government and state law enforcement have framed her and

that all of the victims, her family, and friends, and their

kids, aren't their friends because we're all saying bad

things and spreading lies about their mother.

I see on social media and hear from the kids that she

is continuing to splurge on luxury items.  I'm sure that's

to keep them believing that she's the one telling the truth.
She wants her kids to stay isolated and to trust no one but
her.  She cares so little about them that she wants them to
believe that she's innocent instead of being honest with
them and preparing them for the next 11 years and 3 months.
What a hobble thing to do to your kids.

Being dishonest and not preparing them for her absence
is criminal in itself to me, but isolating them from family
and friends that she stole from and lied to in order to
maintain control of them is abusive.  She wants them to hate
the victims so that they will want no contact with us,
allowing her to maintain her control over them, and ensure
that they continue to believe her.

I've seen on social media that she hasn't been able to
tell her side of the story yet, but she's had all this time
with her kids that she could have spent explaining the truth
to them and allowing them to hear it from her own lips
first.  Then, they would have had time to begin to heal from
what obviously will be hard for them to understand on so
many levels.

Of course, that would have also given them time to wrap
their minds around what their life will be like with her
away in prison.  She denied them that.  Natalie has been
consistently lying to her kids when it would have benefited
them most to have the truthful information concerning this

massive change in their life and lifestyle.

Her manipulative, deceptive behavior toward Nikki and Ashton show how she was able to be so merciless in damaging her immediate family and close friends. I thought that the plea meant that she not only had to verbally admit to the crimes she's done, but that she also has to acknowledge and own up to it in her everyday life.

Secrets and lies are toxic in a family, but it's apparent that she never worried about family. The incessant lying to her kids and the level of --

COURT REPORTER: I'm sorry. Can you slow down for me, please?

MS. MCCALL: I'm sorry.

COURT REPORTER: The incessant --

MS. MCCALL: The incessant lying to her kids and the level of betrayal she reached in order to do these things to her parents, brother, sisters, other family members and friends is beyond measure.

I hate to say these things in front of Nikki, who believes she's innocent. However, I feel it's imperative for me to point out to you that not only are our children also victims, but that her children are victims of a different kind, and will continue to be long after ours have moved on.

If Natalie isn't made to recognize the damage she's

1    done and truly be remorseful for it, she will be an even

2    more harmful influence as they grow older.  She is ruthless.

3    She isn't honest with her kids when it's essential they know

4    the truth.  She is a danger to the community and to her own

5    children.

6         Natalie is an educated adult and clearly knows right

7    from wrong.  She created the Ponzi scheme and then carried

8    it out on her family, friends and members of the community

9    she lives in and, since signing the plea, has continued to

10   tell people that she's innocent.

11        Her ceaseless lying to Nikki and Ashton is intentional

12   and destructive to them.  Her kids deserved the truth.  The

13   victims deserve to get their hard earned money back.  And

14   Natalie deserves justice by serving time in federal prison

15   for her crimes.

16        She deliberately chose this course with malice toward

17   her victims.  She chose to inflict this pain and burden on

18   her children and her family.  She chose to receive the

19   maximum penalty of 11 years 3 months without the privilege

20   of self reporting.  Thank you.

21             THE COURT:  Thank you very much.

22        I'm showing we have a final witness, Mr. Bailey; is

23   that correct?

24             MR. JOHNSON:  Correct, Your Honor.

25             MS. ROBESON:  Your Honor, I believe there's one

```
 1    more, as well, Mrs. Miller, Jessica Miller.

 2            THE COURT:  I don't see that one highlighted, but

 3    Ms. Miller does wish to testify?

 4            MS. ROBESON:  Yes, Your Honor, and I apologize for

 5    --

 6            THE COURT:  Quite alright.

 7        You may come forward, Ms. Miller, to be sworn.

 8        JESSICA MILLER, GOVERNMENT WITNESS, SWORN

 9            MS. MILLER:  My husband, Jonathan Miller, was a

10    contractor who owned his own business, Miller Construction,

11    and he worked for Mike and Natalie Cochran.  He completed

12    jobs at their various properties, their home, their rental

13    property, their business.

14        During this time, he came to think of them as friends.

15    He and Mike called each other brothers.  And when Mike

16    passed away, he was devastated.  I had never seen my husband

17    so upset.

18        He continued working for Natalie after Mike passed away

19    until her assets were seized.  He worked at least six weeks

20    with no pay because she continually made excuses about her

21    money being unavailable, tied up or delayed.  That was at

22    least $6,000.00 in earned income that was never received.

23        Jonathan himself did a government contract.  He did the

24    paperwork and he went and completed the contract.  He and

25    his friend roofed a shelter at Cranberry.  So, he knew that
```

1    the -- there were legitimate contracts available.

2         He worked hard on the contract that he completed.  He

3    earned that money and he trusted the Cochrans enough that he

4    invested that money back into other contracts which did not

5    exist.

6         The amount of money that we lost may not be large to

7    some people, but to us, it was a large amount of money.

8    After time passed and we should have received the money for

9    those contracts, he asked Natalie about the money.  Again,

10   there were constantly excuses.  It was tied up.  The

11   government was shut down.  Her accounts were locked.

12        He continued working for Natalie, believing her until

13   the assets were seized, and he continued to defend her until

14   he was shown definitive proof.  He understandably was upset

15   and angry when he found out the truth about the contracts

16   and other lies.  He felt betrayed by someone he thought was

17   a friend.

18        He had to quickly find employment.  He took a job that

19   caused him to work away most of the time.  We missed out on

20   a great deal of time with him because of this job.  And we

21   did suffer financial loss because of Natalie's actions, but

22   the emotional toll that this took on my husband was

23   tremendous.

24        He was a United States Air Force veteran.  He had been

25   through some very difficult times in service.  He did not

1    trust easily.  He did not let people in.  He let them in, so

2    their betrayal was even worse.  His anger and hurt over the

3    financial loss and lies were intensified by the fact that he

4    trusted them and became close to them.

5        The thing that upset him the most is that he felt like

6    Natalie stole from our children.  He worked hard.  He was

7    willing to do whatever it took to provide for me and for our

8    children.  The money that he earned was meant to do just

9    that, to provide for us, to better our home, and to save for

10   our future.  So, when Natalie took that money, she did take

11   from our children.

12       My husband was killed in an automobile accident last

13   March.  I'm sorry.  We're devastated.  My children and I

14   miss him so much.  We would much rather have him back than

15   to have this money, but our family does deserve what he

16   worked for.

17       I am a half-day teacher.  We have two children together

18   and a stepdaughter who lives out of state.  Our children are

19   ages 3, 5 and 16.  My family's finances are obviously very

20   different now.

21       We ask that the money that Jonathan earned and invested

22   be returned to our family.  He worked very hard with the

23   goal of taking care of us.  He is no longer here to do that,

24   but having his investments returned would achieve that goal

25   and help us.  I do ask you that justice be served.

```
 1              THE COURT:  Thank you very much, Ms. Miller.

 2        Next?

 3              MS. ROBESON:  Our final victim, Dr. Bailey, Your

 4   Honor.

 5              COURTROOM DEPUTY CLERK:  Please raise your right

 6   hand.

 7          DR. KEVIN BAILEY, GOVERNMENT WITNESS, SWORN

 8              DR. BAILEY:  Your Honor, I'd like to say it's easy

 9   to do nice things when you're spending somebody else's

10   money.

11        I'd like to also address Nikki and say I'm sorry that

12   you have to hear this, but you are entitled to the truth.

13        I'm not going to rehash a lot of my victim statement

14   that I had wrote to you earlier because you know that my

15   daughter's had cancer and that's very dear to my heart and

16   some of my reasons for that.

17        But as I stand here today, it is a sad day, as I was

18   hoping that this case would go to trial and Natalie Cochran

19   would be fully exposed for who she is.

20        Your Honor, the reason these victims sit before you is

21   of no coincidence, but because of the greedy intent in which

22   Natalie Cochran possesses, I am speculating that the defense

23   has tried to paint a picture of a sweet, kind woman that was

24   forced into doing these greedy evil acts due to her late

25   husband's involvement and aspirations to be likened unto the
```

1    movie War Dogs, but let me wholeheartedly assure you that

2    this is not the woman who stands judgment before you today.

3         The 26 counts in which she has originally been charged,

4    there is no argument beyond a reasonable doubt that I feel

5    that she would have been guilty with overwhelming evidence

6    on all counts.

7         The court system is about truth and justice and I

8    realize that a guilty plea of only two counts, which is less

9    than eight percent of the total counts in which she's faced,

10   is a mere insult to those lives who have been affected.  It

11   is our lives that have suffered the damage from public

12   scrutiny and with the loss of our self esteem and worth.

13        Many of us will never recover from the financial and

14   emotional losses which have been delivered to us.  We that

15   address you today are only a part of the victims which have

16   been affected.

17        When you reflect your decision for judgment, remember

18   not only the victims that are before you now, but those of

19   our children, our parents, the children affected on the

20   baseball team, the volleyball team, and those children that

21   received scholarships for four years of a fully funded

22   college of their choice and the parents of those children

23   who also had their prayers answered as a way to pay for

24   their child's education and who turned down other legitimate

25   scholarships and are now struggling to keep their children

1    in college.  You see, everyone involved has some sort of a

2    dream, only to be crushed by Natalie's personal greed.

3        I say this because if she were forced to do this

4    scheme, it would have ended at the death of her husband.

5    Instead, as he lay in a hospital bed, he was used as a

6    reason why the contracts were not fulfilled as Natalie

7    continued to solicit investors.  If there were a conscience,

8    it would have ended then.

9        Any dealing I had concerning the contracts that

10   involved questions of timing or had any depth were always

11   fielded to Natalie.  Mike never had an immediate answer.  It

12   did not take me long to figure out that Natalie was the

13   brains behind the whole scheme.  She was the one that would

14   advise about the type of contract, the dates, what was

15   required and the payouts.

16       It was Natalie that posted on crowdfunder.com to

17   solicit other investors.  She was the one in control of the

18   misuse of the baseball account and I feel that one that

19   ultimately caused the death of her husband.

20       She may play the part of the only parent left to raise

21   her children, but what type of parent is fit for leniency

22   who has stolen from family and friends, stolen from youth

23   sports, lied to everyone to fulfill her personal wants, lied

24   to us about having cancer, lied under oath in a court of law

25   using wire fraud, bank fraud, aggravated identity theft of

1    multiple people, and the list goes on, Your Honor.

2         If her children are a reason she seeks leniency, I

3    again ask what type of example did she willingly set for her

4    children?  As she pleads guilty to only less than eight

5    percent of her crimes, I ask that you uphold the honor of

6    the court and of all the victims that have been mentioned

7    today and give the maximum sentence possible with no hope of

8    parole.  We, the victims, will only get a penance of what we

9    lost in restitution.

10        And what restitution do we fully deserve, Your Honor,

11   like her plea of only eight percent of what we invested?  It

12   is our life savings.  It is our borrowed money.  Our

13   children's money.  Our immeasurable losses are much greater

14   than 11 years and 3 months.  We have all lost relationships

15   in which no restitution could ever be made whole.

16        I again ask that you give the full eight percent of her

17   guilt, Your Honor, 11 years and 3 months.  The emotional,

18   financial and psychological losses of we, the victims, can

19   never be made whole again.  She never stopped after the

20   death of her husband and would not have had she not been

21   caught.  She only cared for what she wants and would stop at

22   nothing to achieve it.

23        Being a pharmacist making a well-earned and honest

24   income was never enough.  It was not drugs.  Not spousal

25   coercion.  But her own simple greed and manipulation that

1    drives her to do what she did.

2        Your Honor, the maximum sentence without parole on only

3    eight percent of her crimes is what we, the victims, ask.

4    Please remember these words which were said to you today.

5    May God weigh this heavy on your heart.  Thank you.

6            THE COURT:  Thank you very much.

7        Does that conclude the victim and witness testimony?

8            MS. ROBESON:  From the government's side, Your

9    Honor, yes.

10           THE COURT:  Anything, Mr. Johnson?

11           MR. JOHNSON:  No, Your Honor.

12           THE COURT:  Well, we've arrived at that point in

13   the proceeding and I thank the witnesses for their testimony

14   on both sides.

15       We've arrived at that point in the proceeding where

16   we'll take up objections to the Presentence Report.  I have

17   carefully reviewed the Presentence Investigation Report and

18   the addendum, along with the materials that have been

19   submitted by way of letter, and it appears that the

20   government has made no objections to the report; is that

21   correct, Ms. Robinson?

22           MS. ROBESON:  Yes, Your Honor, that's correct.

23           THE COURT:  I'm showing the defendant with three

24   remaining objections and the Court will address those

25   objections one at a time.

1          I would like to first take up the objection regarding

2     the inclusion of information related to the bankruptcy

3     proceeding and to the two-level enhancement pursuant to

4     2B1.1(b)(9)(B).

5          I will be pleased to hear you on that, Mr. Johnson.

6               MR. JOHNSON:  Thank you, Your Honor.  If I could

7     have one moment to get my things?

8               THE COURT:  Certainly.

9          (Pause)

10              MR. JOHNSON:  Yes, Your Honor.  Basically, the

11    gist of this objection is that, you know, the bankruptcy

12    proceedings themselves, which Your Honor is more familiar

13    with than I or Ms. Robeson is, did not occur during the

14    offense of conviction and it was not a part of any, you

15    know, meaningful attempt to conceal the offense either.

16         As I raised in the memo, I'm not sure, you know, by the

17    government's reasoning where they believe her scheme ended.

18    I mean, to them, it may be going on right now, but I think

19    the evidence supports that it was over by the time she got

20    to the meeting of the creditors.

21         Beyond that, I think the record is -- you know, does

22    show some genuine confusion on her part, you know, during

23    the bankruptcy proceedings and, you know, the things that

24    were mentioned, the earrings and what have you, I mean, it

25    is all so minor compared to the overall loss that we're

1    talking about here.

2        I mean, what is this, that she's going to not disclose

3    a pair of earrings and somehow magically get away with it

4    all?  It doesn't stand to reason, Your Honor.  It should not

5    be included.

6        And in the alternative, should the Court find that it

7    is a part of the relevant conduct and properly attributable

8    to her for the two-level enhancement, again, as compared to

9    the offense itself, to the amount of loss we're talking

10   about, I would ask the Court to vary on that same ground.

11       Again, and to fall on my sword a little bit, Your

12   Honor, I'm not sure Ms. Cochran would have proceeded to

13   bankruptcy but for my own advice and I probably should have

14   stayed in my lane with criminal law and, you know, she just

15   came to me and said, hey, I'm getting bill collectors

16   calling me and I just gave her some off-the-shelf advice.

17   You probably should file for bankruptcy.  In hindsight, I

18   would have given her different advice and said change your

19   number.  Let the criminal proceedings play through.  So, I

20   do want the Court to know that.

21       I do think it's not -- it should not be proper relevant

22   conduct, but if the Court believes that it is, I would still

23   think that would be grounds for a two-level variance from

24   the guidelines themselves.  Thank you.

25               THE COURT:  Thank you.

1          Please proceed.

2              MS. ROBESON:  Your Honor, we believe that Ms.

3     Cochran did much more in her bankruptcy than simply disclose

4     that she had gifted earrings to an insider.  The most

5     glaring example is she didn't list her ownership interest.

6              THE COURT:  Could you speak into the microphone,

7     please, Ms. Robeson?

8              MS. ROBESON:  I'm sorry, Your Honor, and I think

9     it was off, so this should be better.

10             THE COURT:  Thank you.

11             MS. ROBESON:  But she didn't list her ownership

12    interest in her businesses; most notably, TSG and TMS, along

13    with others.  She didn't tell the bankruptcy court that she

14    had given a financial statement showing what the businesses

15    are believed to be worth.  She didn't list her pre-petition

16    transfers to insiders.  She didn't list her creditors.

17         Overall, we think these actions show a concerted effort

18    on Ms. Cochran's part to distance herself from the

19    businesses.  And if you go through the 341 transcript, she

20    blames a lot of things on the businesses.  She says, "Well,

21    this property is in the business.  It's not my personal

22    property."  But if you don't even tell the Bankruptcy Court

23    what business interest you have, they have no idea what

24    other assets you have.  They have no idea of your true

25    financial picture and your true debt.

1          Other circuits who have been faced with this issue in

2     similar Ponzi schemes or fraud schemes, they have applied

3     this enhancement because they believe this works as an

4     effort to try to limit your responsibility from the scheme

5     and to cover up the scheme.

6          THE COURT:  Any rejoinder, Mr. Johnson?

7          MR. JOHNSON:  Again, Your Honor, I think from the

8     review of the transcript, there appears to be genuine

9     confusion on Ms. Cochran's part between what was personal

10    and what was business.  I think that's it and it should be

11    relied upon by the Court thank you.

12         THE COURT:  Thank you very much.

13         Well, Section 1B1.3 states that relevant conduct

14    includes all acts and omissions committed by the defendant

15    that occurred during the commission of the offense of

16    conviction in preparation for that defense or in the course

17    of attempting to avoid detection of responsibility for that

18    offense.

19         Also, the applicable guideline provides for a two-level

20    enhancement if the offense involved a misrepresentation or

21    other fraudulent action during the course of the bankruptcy

22    proceeding.  The scale of the rare occasion before the

23    trustee and meeting of creditors and then the bankruptcy

24    generally is shocking.

25         As many of you know, and counsel certainly know, I was

1    previously the chief bankruptcy judge of this district for

2    almost five years.  As I look at these misrepresentations,

3    I'm frankly shocked.  This is a case that would have taken

4    me moments to refer to the United States Trustee for further

5    action.

6         One of the reasons why it's clear to the Court that

7    these falsehoods and misrepresentations were made in an

8    attempt to avoid detection of responsibility for her

9    criminal conduct is that those who are intelligent, the

10   intelligent debtors who are trying to gain the system, and I

11   certainly include the defendant within that.  She is

12   undeniably an accomplished individual if, for no other

13   reason, by virtue of her educational attainments and the

14   skill with which she perpetrated the frauds herein, but

15   those type of debtors know that once a bankruptcy trustee,

16   especially the seasoned and experienced bankruptcy trustees

17   that we have in this district begin on the trail of

18   something that doesn't look quite right, they will pursue

19   that.  They will go down the hole and they will look and

20   they will make the necessary references and alert the Court.

21        And the defendant was undoubtedly aware of that and,

22   for that reason, I find that she -- this conduct falls

23   squarely within the confines of 1B1.3 and 2B1.1(b)(9)(B)

24   and the misrepresentations were clearly done in an attempt

25   to avoid detection or responsibility for the offenses with

1    which she's charged and just the omission of all of the

2    information regarding TSG and TMS makes that clear to the

3    Court.  And so, for that reason, the Court overrules the

4    objection.

5         We'll now move on to objection number 2 regarding the

6    18-level enhancement pursuant to 2B1.1(b)(1)(J).

7         And please proceed, Mr. Johnson.

8              MR. JOHNSON:  Thank you, Your Honor.  I believe

9    this objection is less fact intensive and more sort of a

10   legal based argument.

11             THE COURT:  Could I trouble you, Mr. Johnson, to

12   make sure your microphone is on?  It may not be.  Is the

13   green light on there, sir?

14             MR. JOHNSON:  It is, Your Honor.

15             THE COURT:  Very good.  Please proceed.

16             MR. JOHNSON:  I'll just hunch over a little bit,

17   if it pleases the Court.

18             THE COURT:  That's much better.

19             MR. JOHNSON:  As we all know, the guidelines

20   manual is promulgated by the Sentencing Commission.  You

21   know, it's a hybrid institution that straddles the judicial

22   and legislative branches of government.  The text of the

23   guidelines themselves is that which is promulgated by the

24   Commission and subjected to congressional review.

25         The commentary where the intended loss part comes from

1    is not submitted -- or subjected to that same review.

2    Congress does not get to weigh in as the legislative body

3    that enacts the laws.

4        And, again, there has been a bit of a shift in this

5    area of the law, I believe, in 2008, that when the Supreme

6    Court in *Kisor v. Wilkie* sort of reigned in what was, you

7    know, the broad deference that had been given to

8    administrative agencies in interpreting their own respective

9    regulations.  And, of course, we've cited that case and I

10   understand the Court has had time to review it, as well.

11       And, you know, so when you start with the text, you

12   have to really look to see if the language is ambiguous in

13   the first place before you would even get to the commentary

14   under this approach.

15       And we're talking about the word "loss".  Loss is an

16   ordinary term.  My team lost the game.  We took a loss.  I

17   lost $20.00 in Blackjack.  We all know what we're referring

18   to.  It doesn't need additional definition and it certainly

19   doesn't need expansion that more than doubles the loss in

20   this case.

21       I mean, what effectively this commentary does would put

22   the speculative loss to Dan Foley, $4 million, somehow,

23   whatever, on the same -- on the same plane as the victims

24   who lost real, real world money, you know, whose futures

25   were shattered.  The guidelines -- or I should say the

commentary puts those amounts on the same plane and says

they're equal as far as guidelines go.  They're equal as far

as her proposed punishment should go.

So, even though I don't think we should get to the

commentary because it's not ambiguous, I think the

commentary is sort of unfair in putting, you know, such

speculative loss on the same plane as real world loss that

the folks here today have suffered.

Again, I've cited and heavily relied on the *Havis* case

from the Sixth Circuit and then, particularly, the

concurring opinion by Judge Bivus (phonetic), I believe it

is pronounced.  And, again, and his approach is that, you

know, we should -- we should all be re-looking or taking a

fresh look at the commentary's impact on the calculation of

the sentencing guidelines in light of the Supreme Court's

recent ruling giving less deference to the commentary itself

and that, you know, even if there is some purported

ambiguity that one of the things courts should look to is

the Rule of Lenity, you know, that provides if there's an

ambiguous term, you know, we try to look at it in favor of

the defendant.  We resolve it in favor of the accused, the

one that stands to be punished.

So, again, for those reasons, Your Honor, the loss, the

intended loss, is entirely a product of commentary.  It

expands the scope of the guideline and it is not subject to

1    the same congressional review as the text of the guideline

2    itself.  That may happen in the future, but it hasn't

3    happened yet.

4        So, for those reasons, Your Honor, we would ask that

5    Ms. Cochran be held accountable for the roughly $2.5 million

6    in actual loss and not the additional $4-some-odd million in

7    completely speculative loss for the purpose of calculating

8    her guidelines.  Thank you.

9              THE COURT:  Understood.  Thank you very much.

10        Let me ask you, Mr. Johnson, I think the actual loss is

11    calculated at $2,567,838.53.  Does that come out of the plea

12    agreement?  Is that the agreed upon loss?

13        And, Ms. Robeson, you're welcome to weigh in on that,

14    as well, but I do want to make sure I understand Mr. Johnson

15    on that point, also.

16              MS. ROBESON:  Judge Volk, we didn't have a

17    guidelines agreement in the plea agreement which would agree

18    upon loss.  I believe the Stipulation of Facts put that

19    number -- let me see.  That's where the number comes from.

20              THE COURT:  And it is that exact figure?

21              MS. ROBESON:  It is not the exact figure.  What we

22    said was she agreed, "Through my false and fraudulent

23    misrepresentations, I adduced at least 11 people to pay

24    approximately $2.5 million."  So --

25              THE COURT:  Very good.

1          MR. JOHNSON:  Yes, Your Honor.  We have no

2   exception to the loss chart, which is in Paragraph 187 that

3   sets forth the amount of $2,567 -- or $2,567,838.53.

4          THE COURT:  Did you say you have no objection to

5   that?

6          MR. JOHNSON:  Correct, Your Honor.  Yes, sir.

7          THE COURT:  Understood.  Thank you very much.

8       Please proceed, Ms. Robeson.

9          MS. ROBESON:  Your Honor, I believe that Fourth

10  Circuit case law on this issue is clear.  Many courts within

11  our -- many courts, District Courts and the Fourth Circuit

12  itself, has spoken to this issue, including after 2008.

13  It's very clear that the District Court is supposed to take

14  either the greater of the intended loss or the actual loss.

15  In this case, it's very clear that Ms. Cochran intended to

16  get at least $4.9 million and so the greater loss can be

17  taken.

18      As the Presentence Report sets out, she undertook a

19  great deal of steps to get Mr. Foley to try to buy these

20  companies that she knew were -- I think the most generous

21  assessment is that the companies were worthless and

22  potentially huge liabilities for him.  She sought him out.

23  She texted him about this sale.  She created contracts for

24  him about the sale.  And she created false tax documents

25  about the sale, even encouraging him to submit $50,000.00 in

1    advance.

2        There is absolutely nothing in the record that

3    indicates that she would have stopped unless -- until she

4    had been caught.  If she could have had $4.9 million

5    transferred to her in June, she would have.  We think she

6    should be held accountable for this and held to that loss

7    standard.

8              THE COURT:  Thank you.

9        Any rejoinder, Mr. Johnson?

10             MR. JOHNSON:  Only to say that I believe the cases

11   the government refers to, none of those cases involve any

12   analysis of this commentary issue.  Thank you.

13             THE COURT:  And you are correct.  Your argument is

14   a novel one.  It's one that may ultimately command a

15   majority of judges in Richmond, but at present, I'm bound by

16   the long-standing line of precedent in our circuit, albeit

17   unpublished, that speaks to the importance of and

18   appropriateness of considering and even applying the

19   intended loss figure.

20       I do agree with the probation officer that the relevant

21   amount of loss is $4,850,000.00, which is a little more

22   conservative than the actual transaction described in

23   Paragraph 60 of the Presentence Report which Mr. Foley was

24   going to be agreeing to.  There was simply an attempt to get

25   from Mr. Foley $4.9 million and he was, in fact, defrauded

1    of $50,000.00 of that amount believing, due to the

2    skillfulness of her misrepresentations, that he was going to

3    be purchasing a very valuable company, or companies.  I

4    suppose it was company.

5        And so, it seems as if it's appropriate under the

6    circumstances, given the allegations in the Presentence

7    Report, particularly in Paragraphs 58 to 61, to attribute

8    the intended loss to Ms. Cochran as the amounts selected by

9    the probation officer, $4,850,000.00.  So, the intended loss

10   is the appropriate calculation for purposes of 2B1.1(b)(1)

11   and, again, you have preserved your argument for appeal, but

12   the Court overrules the objection.

13       We'll proceed next to the third objection.  I believe

14   that the defendant asserts that the restitution to Frank

15   Steve Maynard should be $60,235.00 and I'll be pleased to

16   hear you on that.

17              MR. JOHNSON:  May I have one moment, Your Honor?

18              THE COURT:  Certainly.

19       (Pause)

20              MR. JOHNSON:  We'll withdraw that objection, Your

21   Honor.

22              THE COURT:  Thank you very much.  The Court treats

23   it as withdrawn.

24       I would supplement, because it's necessary to do so, my

25   earlier findings with respect to your bankruptcy argument,

1    you had suggested that it would also be a proper basis for a

2    downward departure consistent with the Court's legal ruling.

3    I do not find it to be appropriate for either a departure or

4    a variance under the circumstances for the reasons given.

5        And so, we will move on and, Mr. Johnson, do you have

6    any other objections to the Presentence Report?

7                MR. JOHNSON:  No, Your Honor.

8                THE COURT:  Ms. Cochran, are you completely

9    satisfied with Mr. Johnson's legal representations to this

10   point in the case?

11               THE DEFENDANT:  Yes, Your Honor.

12               THE COURT:  Thank you.

13       Well, the Court finds sufficient indicia of reliability

14   to support the probable accuracy of the information

15   contained in the Presentence Investigation Report and the

16   addendum to that report because there is quite a bit of

17   development in there on the objections, the thoughts from

18   the probation officer and the government that I have not

19   expounded upon, but I adopt them in full as if I had stated

20   them explicitly from the bench.

21       And so, the Court adopts the Presentence Investigation

22   Report and the addendum, except as otherwise indicated in

23   the Court's earlier findings.

24       I'm going to direct the probation officer to file a

25   copy of the Presentence Report in the court file under seal.

1        At the September 21, 2020 plea hearing, the Court

2    deferred -- well, pardon me.  I accepted the plea agreement,

3    I believe, at the September 21, 2020 hearing; isn't that the

4    case?

5            MS. ROBESON:  I actually believe you deferred it,

6    Your Honor.

7            THE COURT:  Understood.  Well, I will now accept

8    the parties' plea agreement and the plea agreement was

9    ordered to be filed, as well.  The Court, again, accepts the

10   plea agreement to the extent it had not done so previously

11   on the grounds that the defendant's plea adequately reflects

12   the seriousness of the actual offense behavior and accepting

13   the agreement will not undermine the statutory purposes of

14   sentencing or the United States Sentencing Guidelines.

15       The Court's judgment and sentence will be consistent

16   with the plea agreement.

17       Also, during the plea hearing, the Court accepted the

18   defendant's guilty plea.  I believe I may have deferred

19   adjudging the defendant guilty until sentencing.

20       Pursuant to the defendant's plea of guilty to Count Six

21   and Count 18 of the indictment on September 21, 2020, I

22   adjudged the defendant guilty and she now stands convicted

23   of violating 18 U. S. C. Sections 1343 and 1957.

24       So, the defendant stands convicted of wire fraud in

25   violation of 18 U. S. C. 1343.  Federal law provides the

1    following maximum penalties for violating this statute:  A

2    term of imprisonment of 20 years; a period of supervised

3    release of three years; a fine of $250,000.00, or twice the

4    gross pecuniary gain or loss resulting from the defendant's

5    conduct, whichever is greater; an order of restitution; and

6    a special assessment of $100.00.

7         The defendant also stands convicted of an unlawful

8    monetary transaction, or transactions, in violation of 18 U.

9    S. C. Section 1957.  The following maximum penalties apply

10   for this statute:  A term of imprisonment of not more than

11   ten years; a period of supervised release of three years; a

12   fine of $250,000.00, or the twice gross pecuniary gain or

13   loss I spoke about previously; an order of restitution; and

14   another special assessment of $100.00.

15        Now, the sentencing guidelines that the Court has under

16   consideration are advisory.  They're not binding in any

17   respect.  I can't presume that any guideline range is

18   reasonable.  However, I'm still required to calculate and

19   consider the applicable sentencing guideline range.  I also

20   must consider the sentencing factors enumerated in Section

21   3553 of Title 18 United States Code, but I'll begin by

22   calculating the advisory guideline range.

23        The Base Offense Level as to Count Six is found in

24   Section 2B1.1 and provides for a Base Offense Level of 7.

25   Section 2B1.1(b)(1)(J) provides for an 18-level increase if

1    the intended loss is more than $3,500,000.00 but

2    $9,500,000.00, or less.

3         Again, I find that the intended loss in the instant

4    case is $4,850,000.00.  So, that increases the Total Offense

5    Level -- or the Offense Level to 25.

6         Section 2B1.1(b)(2)(B) provides for a four-level

7    increase if the offense resulted in substantial financial

8    hardship to five or more victims.  I find that substantial

9    hardship fell upon the following victims as a result of the

10   offense:  Ed and Donna Bolt, as they invested their entire

11   life and are now relying exclusively on social security

12   checks; John Hamilton, as he invested his savings and is now

13   paying on two loans which he took out as a result of

14   fraudulent inducements; Dr. Kevin Bailey, as he had planned

15   on using proceeds from his investments to set up a trust for

16   his ill daughter in the event she became paralyzed and

17   required a handicap accessible home; John and Wendy Poteat,

18   as they invested all of their retirement and savings and

19   equity from their home and business; Frank and Heather

20   Maynard, as they invested all of their son's college fund

21   and another savings account, and as Mr. Maynard is now

22   searching for employment after retirement.  And, to the

23   extent that that recitation of victims is incomplete, I note

24   the victim statements given in open court and would also

25   adopt those individuals as having suffered serious financial

1    harm where they stated as much.  So, that increases the

2    Offense Level to 29.

3        Section 2B1.1(b)(9)(B) provides for a two-level

4    increase if the offense involved a misrepresentation or

5    other fraudulent action during the course of a bankruptcy

6    proceeding.  I find that in Ms. Cochran's bankruptcy

7    proceeding and a statement of financial affairs Ms. Cochran

8    falsely reported her interests in businesses, particularly

9    TMS and TSG, and she gave -- her giving of financial

10   statements to others, her income, her payments to family

11   members, and other items as set forth in the Presentence

12   Report and also earlier referenced by the Court.  That

13   increases the Offense Level to 31.

14       Section 2B1.1(b)(10)(C) provides for a two-level

15   increase if the offense involves sophisticated means and the

16   defendant engaged -- intentionally engaged in or caused

17   conduct constituting sophisticated means.  Ms. Cochran

18   provided investors fraudulent communications purportedly

19   from Betsy Britland, for example, a fictitious employee of

20   the Federal Reserve, and falsified documents from other

21   individuals from The Veterans Administration, Bank of

22   America, and Defense Finance Accounting Service.

23       Additionally, Ms. Cochran provided investors Heath

24   Bailey and Mario Lowry with false Form 1099-MISCs.

25       Further, Ms. Cochran provided fraudulent tax returns to

1    Premier Bank to secure a loan and line of credit and to Dan

2    Foley to induce him to purchase a portion of TSG.  That

3    increases the Offense Level to 33.

4        The Court would have to say, additionally, in its

5    roughly two decades of experience in the District Court and

6    with financial crimes that it's frankly astonishing the

7    scale, and level, and complexity of this and that it could

8    have been carried out by one, perhaps even two people.  It

9    really is a remarkable undertaking and one of great

10   complexity, exceedingly sophisticated, as well.

11       As to Count 18, the relevant U. S. Sentencing Guideline

12   is found in Section 2S1.1 and provides for a Base Offense

13   Level of 33.  Section 2S1.1(b)(2)(A) provides for a

14   one-level increase if the defendant was convicted under 18

15   U. S. C. Section 1957, which she was.  That increases the

16   Offense Level to 34.

17       When a defendant has been convicted of more than one

18   count, Section 3D1.2 provides that all counts involving

19   substantially the same harm should grouped together in a

20   single group.  Section 3D1.2(a) explains the counts involve

21   substantially the same harm when counts involve the same

22   victims in the same acts or transactions.

23       I find that Count Six and Count Eighteen involve the

24   same victim -- victims -- and the same acts and transactions

25   by the defendant.

1        Section 3D1.3(a) provides in the case of counts grouped

2   together pursuant to Section 3D1.2(a), the applicable

3   offense level to the group is the highest offense level for

4   the most serious of the accounts comprising the group.

5   Again, that is the highest offense level of the counts in

6   the group.  Here, the greater adjusted offense level, as

7   noted, is 34.  The resulting combined adjusted offense level

8   is 34.

9        Section 3E1.1(a) provides for a two-level decrease for

10  acceptance of responsibility.  I find that the defendant has

11  accepted responsibility for the offense by pleading guilty

12  before trial and by admitting the conduct comprising the

13  offenses of conviction.  That decreases the Offense Level to

14  32.

15       3E1.1(b) provides for an additional one-level decrease

16  if the offense level prior to the adjustment for acceptance

17  of responsibility was 16 or greater and upon motion of the

18  Government stating that the defendant has assisted

19  authorities in the investigation or prosecution of her own

20  misconduct by timely notifying the authorities of her

21  intention to enter a plea of guilty, thereby permitting the

22  Government to avoid preparing for trial and permitting the

23  Government and the Court to allocate their resources

24  efficiently.

25       Does the Government so move?

1    MS. ROBESON:  Yes, Your Honor, the Government

2    does.

3    THE COURT:  So, the third point reduction for

4    responsibility decreases the Offense Level to 31.

5    The Court finds that the Total Offense Level is 31.

6    The defendant has no criminal history, has apparently

7    led a law-abiding lifestyle and, according to the sentencing

8    table, 0 criminal history points establishes a Criminal

9    History Category of I, which is the best Criminal History

10    Category that the defendant might be in for sentencing.

11    Given a Total Offense Level of 31 and a Criminal

12    History Category of I, the advisory guideline range is as

13    follows:  A term of imprisonment of 108 to 135 months; a

14    period of supervised release of 1 to 3 years; a fine of

15    $30,000.00 to $5,135,677.06; an appropriate order of

16    restitution; a special assessment of $200.00, which is

17    $100.00 on each count of conviction.

18    And, Mr. Johnson, is there anything you or Ms. Cochran

19    would like to proffer with respect to these calculations

20    with the understanding that your objections are preserved?

21    MR. JOHNSON:  Nothing further, Your Honor.

22    THE COURT:  Ms. Robeson, anything?

23    MS. ROBESON:  No, Your Honor.

24    THE COURT:  Well, Section 3553(a) of Title 18

25    United States Code provides several factors that the

1   District Court must consider when determining the

2   appropriate sentence for Ms. Cochran.  I must consider the

3   nature and circumstances of the offense; the history and

4   characteristics of the defendant; the need for the sentence

5   imposed to reflect the seriousness of the offense; to

6   promote respect for the law; and to provide just punishment

7   for the offense; to afford adequate deterrence to criminal

8   conduct; to protect the public from any further crimes that

9   the defendant might choose to commit; and to consider the

10  need for the sentence to provide the defendant with needed

11  educational or vocational training, medical care or other

12  corrective treatment in the most effective manner.

13      The Court is also instructed by Section 3553(a) to

14  consider any pertinent policy statement issued by the

15  Sentencing Commission that is in effect on the date of the

16  defendant's sentencing; the need to avoid unwarranted

17  sentence disparities among defendants with similar records

18  who have been found guilty of similar conduct; and the need

19  to provide restitution to victims, if any, of the offense

20  which, of course, is a very serious matter in this

21  particular case.

22      Section 3553(a) also instructs the Court to consider the

23  kinds of sentences available under the advisory sentencing

24  guideline range.  I've already calculated the applicable

25  range and will take it, along with these Section 3553(a)

1    factors, into account when determining the appropriate

2    sentence in this case.

3        I have carefully reviewed the sentencing memorandum of

4    the United States and the sentencing memorandum of the

5    defendant, both of which are well-written and

6    well-considered.  I don't say that in every case, but it's

7    obvious that both parties have had exceptional

8    representation throughout this matter.

9        Having said that, I will now permit counsel to address

10    any of the Section 3553(a) factors you deem relevant to the

11    circumstances of this case.

12        And we'll begin with you, Ms. Robeson.

13            MS. ROBESON:  Your Honor, the Government would

14    request a sentence of 135 months, the top of the guideline

15    range and the agreed upon range between the parties.  We

16    believe the sentence is necessary due to the serious nature

17    of her crime, to -- for just punishment and, also, to afford

18    specific deterrence, as well as general deterrence, against

19    financial crimes.

20            THE COURT:  Does that conclude your comments?

21            MS. ROBESON:  Yes, Your Honor.

22            THE COURT:  Mr. Johnson?

23            MR. JOHNSON:  Thank you, Your Honor.  I'm going to

24    go on a little bit longer than my colleague, Ms. Robeson, if

25    the Court would indulge me.

1              THE COURT:  Take all the time you wish.

2              MR. JOHNSON:  It's been a long afternoon.  It's

3    been a long case, frankly, you know.  And the Court has

4    heard from several victims.  And they deserved to be heard.

5    But, you know, we're talking about the victim impact

6    statements, so I think the Court should limit its

7    consideration of what was received to the testimony about

8    the impact Ms. Cochran's crimes have had on these folks.

9         All these other extraneous allegations, or the

10   diagnoses of personality disorders, or all that stuff being

11   said about her children, the Court should give that the

12   weight it deserves, and that is nothing.  That has nothing

13   to do with impacts on victims.  So, I hope the Court can put

14   that in its proper place in deciding the appropriate

15   sentence in this matter.

16        This has been a long journey for everyone.  I know it's

17   been a long journey for Ms. Cochran, the folks that have

18   lost their money, for her extended family, for her immediate

19   family.  And that's one of the real tragedies here, is you

20   didn't hear from her siblings or her parents, but the family

21   has been torn apart.

22        Her parents very much wanted to be here today, but they

23   didn't know where to sit.  You know, they don't want to

24   offend one sibling at the expense of the other.  It's

25   terrible.

1          She is now, for the most part, estranged from all her

2     family members except her children and her parents.  And her

3     parents are good people.  They love all of their children.

4     You can tell.  And I know their hearts are broken and

5     they're going to suffer on the outside while Natalie suffers

6     in prison.

7          So, it's been a long journey, and I -- I know it's been

8     a long journey for the Government, too, and I commend my

9     colleague.  This is a difficult case and Ms. Robeson was

10    very reasonable to work with, very, very professional the

11    entire way through.

12         You know, Ms. Cochran has been punished, Your Honor,

13    and she's going to continue to be punished.  She deserves to

14    be punished.  It would be wrong not to punish her for what

15    she did and the devastation she has caused.

16         And the Court has a lot of leeway in making that

17    determination.  The Government and Ms. Cochran have agreed

18    upon a very broad range and they've made their position

19    known.  They want the top of that range.  Of course, we want

20    something towards the lower end of that range.

21         And we simply ask that the Court weigh the Government's

22    request for the maximum punishment, you know, with the

23    Court's own sense of humanity, proportionality,

24    consideration of Ms. Cochran, her whole life, the whole

25    person that stands to be punished here.

 1          You know, justice is hard to define and it's often
 2     aspirational, but what it's not is bloodlust.  What it's not
 3     is, you know, we hate what you did, so you deserve the
 4     maximum punishment; everything else, you know, can fall by
 5     the wayside.  You know, that's what folks here want.  That's
 6     what the Government wants.  That's how they want their press
 7     release to read.

 8          But, you know, proportional punishment is based on more
 9     sober and objective consideration.  That's one of the
10     paramount virtues of our system.  And justice is achieved
11     when courts try to strike that balance between retribution,
12     between -- and its own humanity, and mercy, and
13     understanding of human frailties.

14          And I know the Court has given careful, careful
15     consideration to the statements given by the victims here
16     today, to the letters they submitted before court, and they
17     deserve consideration.  But I hope the Court also gives
18     consideration to, again, Natalie's whole life, all her other
19     achievements, all her other contributions to her family and
20     community.

21          And another thing I want to impress upon the Court is
22     that, you know, you have a -- I'll echo Mr. Davis'
23     observation.  You have an unenviable job, a difficult task,
24     Your Honor, you know, picking a number within this broad
25     range to choose from.

1        But I want to impress upon the Court that the number

2   Your Honor decides upon, it's only a -- whatever it is, it's

3   only a small part.  It's only a fragment of the punishment

4   Ms. Cochran has endured and will continue to endure.  That's

5   something I really want the Court to understand.

6        These last couple years have been no picnic for her.

7   She lost her husband, lost her career, found herself

8   supporting two children on her own, two children who have

9   been subjected to no small degree of ridicule.  I mean, the

10  vile things people say on the internet that they were

11  subjected to, it's really shameful.

12       So, that will continue to be -- you know, punish her.

13  Even a sentence at the bottom of the guideline is going to

14  -- I mean, there's talk about, you know, home confinement.

15  No one is asking for home confinement.  That's not what the

16  agreement is for.  She's going to prison.  We know that.

17       But even a sentence at the bottom of the guidelines

18  will remove her from her children, all she has left in this

19  world during their final most formative years.  And I think

20  the Court, in not just looking at the quantitative length of

21  the sentence, I think the Court can look at that qualitative

22  impact.

23       You know, I know Ms. Cochran would rather do her

24  incarceration -- you know, let her self-report when her

25  youngest son is off to college, but that's not realistic,

1    and she knows that.  So, I submit there's a qualitative

2    component to it and not just a quantitative number the Court

3    has to pick from.

4        And, you know, the amount of loss is what drives, you

5    know, the sentencing range and financial crimes, as it

6    should, but I would like the Court to look back through the

7    Presentence Report and consider, you know, what did -- what

8    did Natalie really gain out of all of this?  She went out to

9    dinner with her family a bunch.  I think they took one

10   vacation.  Modest amount of jewelry.

11            THE COURT:  I will ask the individuals in the

12   gallery to please be silent during counsels' comments and

13   any other official proceedings or you will be removed.

14       Please proceed.

15            MR. JOHNSON:  And you look at the other purchases.

16   I believe Mr. Davis cited them.

17            THE COURT:  Sir, did you hear me?  Please do not

18   talk while we're in court at this point.

19       Please proceed.

20            MR. JOHNSON:  Yes, Your Honor.

21       You look at the other purchases.  There was a house

22   that was purchased for her late husband's best friend's aunt

23   to live in.  A vintage Shelby Cobra kit car.  Natalie

24   doesn't know how to drive a manual transmission.

25   Motorcycle.  Boat.  An airplane hanger.  She wasn't getting

1    her pilot's license.

2         Again, I think it's fair to look at where the money

3    went, how it was spent, who it benefited.  And I don't, you

4    know, say that to speak ill of Michael Cochran.  He's not

5    here to defend himself and that's not the point.

6                   THE COURT:  When did Mr. Cochran pass again?

7                   MR. JOHNSON:  February of 2019, Your Honor.

8                   THE COURT:  Thank you.

9                   MR. JOHNSON:  But these are just the facts where

10   the bulk of these expenditures were.  And facts matter.  At

11   least they should.

12        And then you look at what she gained by what -- against

13   what she lost.  Respect in the community.  The only

14   community she's really only ever known other than when she

15   went off to school and a brief stint in Tennessee to, you

16   know -- of course, she came back here.  This was where she

17   was raised.  This is where she raised her own family.  She's

18   lost respect in this community.  She'll never get it back

19   realistically.

20        I've already touched upon what else she's lost.  You

21   know, being removed from her kids during these, you know,

22   tough transitional years, going through that without having

23   the benefit of either parent.  And that's -- that's tough to

24   imagine.

25        Her once sterling reputation as a pharmacist where she

1    really was an asset to this community, it's going to be

2    difficult for her to ever re-establish herself anywhere as a

3    pharmacist again.

4        I believe during the pretrial phase while she's been

5    out on home confinement, she submitted over 80 applications

6    for pharmacy jobs.  Towards the very end, she got close.  I

7    think she even had the lab coat with her name embroidered on

8    it to assist in -- with administering COVID vaccinations,

9    but it sort of became difficult after CVS had already hired

10   her, just dealing with her other considerations.  But she

11   was ready to serve in that capacity.

12       She has worked at a local antique store since she has

13   been on home confinement, as well, and her employer is here

14   to support her today.

15       Some states allow you to work as a pharmacist with

16   felony convictions; others do not.  The bottom line, it's

17   going to be difficult for her.  It's going to harm her,

18   continue to harm her in that way, as well.

19       And, you know, this case is troubling, Your Honor.

20   I've called it difficult.  It's also troubling.  I mean, it

21   wasn't too long ago when they just -- they looked like the

22   perfect family.  You know, two beautiful children, promising

23   career, nice home, active in sports, a robust circle of

24   friends and the community.  Just to go from that to where

25   we're at now, it's -- it's really hard to wrap your head

1    around.

2        You know, they -- a lot of people want you to believe

3    it's nothing but insatiable greed.  It's -- I think it's

4    more than that.  It's easy to condemn, but it's kind of hard

5    to understand what it's like in someone else's shoes.

6        So, I would ask the Court to consider all that she will

7    lose when fashioning the term of imprisonment in this

8    matter, alongside with what she gained.

9        And, again, when I'm talking -- some of the victims,

10    when they spoke, they mentioned about, you know, she's going

11    to hide behind her kids and this and that.  And I just want

12    the Court to know I'm not saying that we should say poor,

13    poor Natalie.  She's going to miss her kids while she's in

14    prison.  That's not what I'm saying.

15        I'm saying that the Court can look at that from a

16    qualitative, you know, consideration to look at, you know,

17    what her kids have already lost, the years of their life she

18    stands to be removed from them, even with a sentence at the

19    bottom of the range, and take that into consideration in

20    addition to just picking the number.

21        You know, Judge, it's very easy to say just throw the

22    book at her.  Lock her under the jail.  You know, every

23    letter asked for the max sentence of 135 months.  If the top

24    of the range would have been 180, or 240, or 350, we all

25    know they would have asked for that, too.

1          You know, and that's one of the beauties of our system,

2     is that he with have federal judges who enjoy lifetime

3     appointments who don't have to go along with the crowd.  I

4     mean, can you imagine?

5          And Mr. Davis said you -- Your Honor stands in the

6     place of the victims today.  Well, I disagree.  You know, we

7     -- there's a reason we don't let victims choose the

8     punishment.  You know, what kind of world would that be?

9          You could steal someone's goat and get executed if you

10    left it up to them.  You know, so, the courts enjoy

11    insulation from making sometimes unpopular decisions.

12         And I know I'm asking this Court to issue an unpopular

13    decision today by imposing a sentence towards the bottom of

14    the range but, again, I think when the Court weighs

15    everything, her personal history, her completely clean

16    criminal record, you know, her service in the community, her

17    other charitable works, many of which are detailed in the

18    letters of support, and the other ways that she has

19    continued to be punished for this offense, a sentence at the

20    top is not appropriate and a sentence closer to the bottom

21    of the range would achieve a just sentence for purposes of

22    the 3553(a).  Thank you.

23              THE COURT:  Thank you very much.  I would ask you,

24    too, Mr. Johnson, given the Court's findings with respect to

25    the guideline range, to get into the range that you have

1    suggested in your sentencing memoranda would now require a

2    downward variance.  And so, I want to make sure that I

3    understand the basis for your variance.  I'd first ask you,

4    do you wish to present any evidence on the variance beyond

5    what the Court has heard thus far?

6          MR. JOHNSON:  No, Your Honor.  The only other

7    additional evidence would be Ms. Cochran's allocution.

8          THE COURT:  Understood.  And then, do you need

9    additional time to develop the variance argument or secure

10   sources of proof?

11         MR. JOHNSON:  No, Your Honor.

12         THE COURT:  And I want to make sure I understand

13   the grounds for the variance.  As I listened to your

14   comments, four things sort of captured, I think, what you

15   were suggesting, but I want to make sure that's the case.

16   You're relying on her educational and other achievements,

17   the loss of time with her children going forward, the effect

18   on her kids of her misconduct, and the loss of her

19   reputation.  Are there any other matters generally that you

20   assert are the basis for a downward variance?

21         MR. JOHNSON:  Just in keeping with -- Your Honor

22   referenced education.  I would just include her

23   contributions to the community as a pharmacist, particularly

24   her work in diabetes outreach and education, but I believe,

25   otherwise, the Court has a fair understanding of the grounds

1    that we are requesting.

2        If I may, Your Honor?

3            THE COURT:  Certainly.

4            MR. JOHNSON:  I would include her record of

5    employment in there, as well, not just the type of

6    employment.

7            THE COURT:  Upon careful consideration of the

8    Presentence Investigation Report and the addendum,

9    sentencing memoranda, counsels' proffers here today, and all

10    of the matters that otherwise have been placed on the record

11    in writing and orally, I make the following findings,

12    tentative findings, under Section 3553(a):  As to the nature

13    and circumstances of the offense, I find that Ms. Cochran

14    operated an elaborate and sophisticated Ponzi scheme with

15    the intention of defrauding all investors.  She solicited

16    roughly two and a half million dollars from her friends,

17    family, community and financial institutions through

18    fraudulent misrepresentations about her purported government

19    contracting companies.

20        I recognize that the defendant also falsified tax

21    documents, presented investors with fraudulent government

22    contracts, and created a fictitious federal reserve employee

23    to induce investments.

24        As to the history and characteristics of the defendant,

25    I find that the defendant is a highly educated individual.

1   She holds a Doctorate in Pharmacology, a Master's in
2   Business Administration, and an Associate Degree in
3   Anticoagulation Management.  The Court is shaking his head
4   as it states what the defendant has done because I see that
5   with her education she could have made a significant
6   legitimate income.  She could have done great good as a
7   result, but it appears that she was driven to illegitimate
8   means by greed.  She used her education and her social
9   status, as counsel noted, to do good things in the
10  community, but also to gain the trust of friends and family,
11  to encourage them to deplete their savings and borrow beyond
12  their means, all the while knowing they would never see the
13  money again.

14       Ms. Cochran reports a good upbringing.  She was raised
15  by both parents who have been troubled by this fraudulent
16  scheme, as well.  The Court does not find them to constitute
17  victims.

18       She has three biological siblings, one of whom was also
19  a victim of this conduct.  She's a mother to two children
20  ages 13 and 15.  The children currently reside with her and
21  her parents in Daniels, West Virginia.

22       The defendant describes her mental health as good and
23  notes a diagnosis of Post-Traumatic Stress Disorder
24  following the death of her husband.  The Court also
25  recognizes that the defendant reports suffering from

1    physical and emotional abuse during her marriage.

2         As to her physical health, the Court notes that Ms.

3    Cochran reports suffering from heart conditions and

4    Leukopenia.  I also note the victim impact statements note

5    that Ms. Cochran lied about a cancer diagnosis and about

6    receiving chemotherapy and radiation.  She told her victims

7    or others things like, "Can't come today.  Too sick from

8    chemo" and "Sorry for the late response.  This radiation

9    treatment makes me tired."  That's extremely manipulative

10   and demonstrates the lengths to which she would have these

11   victims surrender further funds to her and it's extremely

12   troubling given all the individuals who are suffering with

13   that type of diagnosis and to use that once again

14   demonstrates the complex and unusually sinister course of

15   conduct that she has engaged in.

16        I note favorably to the defendant that she has a

17   substantial employment history indicating the ability and

18   means to achieve financial security without these fraudulent

19   acts.  As counsel noted, having the type of position that

20   she has, even with being convicted of a felony, does not

21   disqualify her from exercising her privileges for this

22   profession once she is released, so she does still have a

23   significant earning ability when she is released from

24   prison.  That is helpful to both her and the victims who

25   would expect restitution.

1    From 2005 until 2013, she worked as a pharmacist ate

2    various locations, including Kroger, Rite Aid and Walgreens.

3    From 2013 to 2017, she was employed as a clinical pharmacist

4    by Community Health Systems.  From 2006 until 2017, she also

5    served intermittently as an assistant professor at Marshall

6    University and West Virginia University and an adjunct

7    faculty member for the University of Charleston.  It's just,

8    frankly, astonishing the good that the defendant would have

9    been capable of doing if she would have remained focused

10   thereon.

11   September of 2017 is when the defendant left her lawful

12   occupations to operate a Ponzi scheme.  The defendant was

13   unemployed beginning in May, 2019, but recently was hired by

14   CVS Pharmacy to administer the COVID-19 vaccines.

15   I note, as well, that on July 24, 2019, Ms. Cochran

16   filed a voluntary petition for Chapter 7 bankruptcy in the

17   Southern District of West Virginia, which has previously

18   been discussed.

19   I wanted to mention and note, as well, as part of my

20   findings on the factors the comment made by Donna Bolt, who

21   was grief stricken, testifying she has no idea how she will

22   be able to pay some of her bills as a result of the offense.

23   Another in-law, Ed Bolt, again, both of whom had a

24   great trust in the defendant and who loved her, was aghast

25   when he recalled her saying that she wanted the Bolts to be

1    comfortable in their retirement, knowing all the while that

2    her scheme would destroy them financially.  It is, frankly,

3    quite shocking.

4        I note the LLC comments of Mr. Davis accurately

5    observing that Ms. Cochran is a, quote, "master of fraud and

6    deceit".

7        And then there was Jeff Vickers of Premier Bank, who,

8    by all accounts, was well respected in his professional

9    endeavors, but he was suffering quite a bit in fear of

10   losing his job for falling for the defendant's misconduct.

11   He was astounded at the ease with which she manufactured her

12   responses to his questions, once again showing the practice

13   efforts of achieving this fraud on such a wide-scale basis.

14       The Court was also impacted by Stephanie Hamilton and

15   her recent loss of her husband.  She was devastated by the

16   defendant using her desire, Ms. Hamilton's desire, to spend

17   more time with her very ill son in order to hook her, Ms.

18   Hamilton, in the defendant's schemes.

19       The scholarship disappointments are in a category of

20   their own.  Very little else needs to be said in that

21   regard.

22       So, that covers the Court's Section 3553(a) findings.

23       Ms. Robeson, is there anything that the Government

24   would like to proffer before the Court imposes sentence?

25            MS. ROBESON:  Yes, Your Honor.  Mr. Johnson has

1    made the argument that Ms. Cochran's guidelines have been

2    artificially high.  You know, this fraud, a lot of these

3    things happen in fraud cases.  I think after reviewing the

4    Presentence Report, listening to the victims, this case is

5    really in a class of its own.

6        Before these sentencings, I usually try to quantify in

7    some way the number of lies that the defendant has told, the

8    number of fraudulent transfers, how long this has gone on,

9    and this case was just off the charts.  I just couldn't do

10   it.  I would ask that the Court keep that in mind when

11   imposing sentence.

12       And, also, the Government is not out for bloodlust.  We

13   just wish to have a fair sentence.  We think the guidelines

14   take into account all of these ideas and to have a sentence

15   within her guideline range.

16           THE COURT:  Thank you.

17       Mr. Johnson?

18           MR. JOHNSON:  Your Honor, I believe I made my

19   request for a variance on the bankruptcy grounds and the

20   Court considered it and denied it.

21           THE COURT:  That's correct.

22           MR. JOHNSON:  I do not -- I know I also made an

23   objection on the intended loss, a guideline objection.  I

24   would submit that as another grounds for a variance, just on

25   the simple basis I think it's sort of -- it's almost

1    perverse to put the $4.8 million that Mr. Dan Foley stood to

2    lose on this, you know, contract to elevate that beyond what

3    the actual people lost, that's a perversion, and I think

4    that should be a grounds in and of itself for at least two

5    level -- or a two-level downward variance.  And I'll leave

6    you with that.  Thank you.

7                THE COURT:  But is there anything else in addition

8    to that that you would like to proffer before the Court

9    imposes sentence?

10               MR. JOHNSON:  Only Ms. Cochran's allocution, Your

11   Honor.

12               THE COURT:  Very good.  And it was my intention to

13   call on Ms. Cochran next.

14        Ms. Cochran, I would be pleased to hear from you, if

15   you could please put that microphone up and speak directly

16   into it so that I can hear you.

17               THE DEFENDANT:  Standing here today, I'm

18   heartbroken and ashamed that I've been the source of

19   anyone's grief and pain.  I know there's not enough words to

20   say how truly sorry that I am for each and every one of the

21   families.

22        I know they're angry and rightfully so.  I know there's

23   no punishment sufficient to right the wrongs that they have

24   suffered.  And I offer no excuses, only sincere apologies

25   and deep regret.

1    For years before Michael passed, life had been more

2    than difficult for me and the children and now, for the

3    victims, as well.  When Michael began take steroids and

4    using illicit supplements, he was using far and above the

5    normal doses and processing controversial alternative

6    therapies.  It became his addiction.

7    The steroid use turned him into a completely different

8    person.  He would be loving one minute to taking a

9    sledgehammer to our furniture the next.  He became

10   physically and mentally abusive to us.  Life began --

11   became, for the children and I, a constant state of don't

12   make Mike mad.  We were ostracized and cut off from our

13   families and friends and we were only allowed to interact

14   with them or text them when he was present.

15   We begged him to stop the drugs.  People in this very

16   room today tried to intervene, as well, but to no avail.

17   Life became hell for us and, to protect the kids, I started

18   to get into a situation where I would always give in to him.

19   I would never question him and I would appease him at every

20   turn.  If Mike wasn't happy, no one in the house was allowed

21   to be.

22   What did make him happy was money and, when Mike had

23   money, money made him happy.  It was just enough was never

24   enough.

25   When we went to buy his boat that he had been -- had

1    his heart set on, he wanted three and not one.  The

2    renovations to our home were largely spent on an extra

3    garage for his sports car.  All of the toys and items that

4    were seized from our house and not returned by the police

5    were his, with the exception of a couple of Ashton's things.

6    He even took helicopter lessons before he could even begin

7    to afford one.

8        I acknowledge I received jewelry from him in Fall of

9    2018, but that was his way of apologizing to me for

10   physically hurting me by trying to run me over with his

11   truck.

12       Mike was my everything.  He was my husband of 19 years.

13   We've been together since we were 17.  He was my best friend

14   and he was the father of my children.  I have never wanted

15   to publicly criticize him or tarnish his memory and that's

16   why the children and I have suffered in the quiet and in

17   silence until now.

18       I would like to discuss a few things from the letters

19   written to the Court.  I am so very sorry, Eddie and Donna,

20   that you feel I would ever try to disparage the relationship

21   that you have with your grandchildren, Nicole and Ashton.

22   Ashton sent that text to you of his own accord and I didn't

23   even hear about it until after it had been done.

24       I've been a part of your lives since I was 17 years

25   old.  I've always tried to keep you involved with the

1    children, be it through family dinners, school functions and

2    supports schedules.  Even at Christmas in 2018, when Mike

3    refused to come see you, I brought the kids anyway, just the

4    three of us, because I knew it was important for you to see

5    them at the holidays.  The kids and I were forced to pay a

6    price that night when we got home because he was so angry

7    that we went.

8        To my sister, Wendy, you have known me literally since

9    the first day of my life.  I love you.  I would die for you.

10   The kids and I miss Penny, Chuck and you (phonetic), and

11   your families in our lives.  It breaks my heart that you

12   think I would intentionally hurt you.

13       To Mr. Miller and Mr. Gray of Hauling Reconstruction,

14   your letter stated that I preyed on individuals I could

15   manipulate.  I had never met you or even heard of you until

16   our business lawyer and Mike's best friend, Chris Davis,

17   introduced you into our lives.

18       The same goes with Mr. Vickers of Premier Bank.  It was

19   at Chris Davis' suggestion that we use you for the loan

20   because he said he had an in with you.  And I'm sorry, Mr.

21   Vickers, that you felt like I intimidated you at all.  That

22   was never my intention.  I didn't even know that you felt

23   that way because, at the last game, you came over and you

24   patted me on the back and said that my child was one of the

25   best players on the team.

1          Mike and I were paying Chris legal fees into a private

2     account that Chris set up on the side to handle our legal

3     matters.  So, the fact that he talked today when he was

4     actually on our side, too, was a complete shock.

5          I will do everything I can to ensure that everyone is

6     made financially whole.  I'll work as long as I live and as

7     much as possible.

8          I have applied to over 200 jobs since March of 2019 and

9     Mr. Johnson said 80 pharmacy jobs, but the rest were even

10    just minimum wage jobs.

11         I know that we've agreed to a monthly restitution of

12    $500.00 a month, but I would like to do more, and it is my

13    goal that I would like to get to $1,000.00 a month and

14    beyond that, if feasible.

15         I would also want my parents, Larry and Daphne Jessup,

16    to be recognized as victims.  I know they submitted a

17    statement to the Court.  They are rightfully owed their

18    money and I should be held responsible to pay them back.

19         I love my family and friends and am mortified that any

20    of them and their loved ones were hurt or have ill will

21    towards me.  Most of you in this room have known me for

22    decades.

23         You know the person I've always been prior to this.

24    I've never even had a speeding ticket.  In fact, my best

25    friend, Chris' wife, Jennifer Davis, once told the

1    Register-Herald I was their guardian angel.  I would give

2    anything for any of you.

3        Since I was 15, I've worked hard.  I've had three jobs

4    in college at one time.  I dedicated countless hours to

5    community service and church activities.

6        I've lost my husband.  I've lost my family, my friends,

7    my reputation and, worst of all my, christian testimony.

8        Every day, I wish Mike were here.  I wish he hadn't

9    left me to deal with this alone.  I wish that he had never

10   started the drugs.  I wish we could turn back the clock.

11   But even though the last few years were so difficult, the

12   kids and I miss him every day and we talk about him.  We

13   would give anything to have him back.  We focus on the good

14   memories and I try to impress upon them that the man he

15   became was just the drugs and that he never stopped loving

16   them.

17       I pray every day that I can rebuild the relationships

18   with my family, my friends and community, and that everyone

19   involved in the events of the last three years would be

20   blessed beyond measure.  I take full accountability for the

21   crimes I am pleading to and I do not wish to put the blame

22   on anyone else.

23       The most important thing in my world are my two amazing

24   kids, their health and their safety.  As a single mom, I

25   hope to be afforded the opportunity to raise them to learn

1    and grow from all we've been through and to become better

2    adults for it.

3         During the last 19 months on home incarceration and

4    then home confinement, there have been many tears shed by

5    Nicole, Ashton and me.  Every missed event, every missed

6    practice, first day of her high school was monumental to

7    them.  I will now most likely miss my daughter graduate.  I

8    will miss her play tennis, go to prom, and the honor that

9    she was bestowed to attend Yale University this July.

10        I will miss my son and his high school sports career,

11   learning to drive, and getting his first job.

12        Just the thought of one day without them is torture.

13   It's been the three of us for so long sticking together.

14   We're so close as a family and they're the only reason that

15   I'm still standing today.  I can't even voice the words to

16   apologize to them because I don't know how to say good-bye

17   to them without falling apart.

18        I ask that you have mercy on me and to allow me to

19   spend as much time with my kids as possible.  We only have

20   each other and now they have no one to wipe away their

21   tears, celebrate their victories, mourn their defeats and

22   plan their futures.  I thank you for listening to me and for

23   taking all of this into consideration.

24             THE COURT:  Thank you very much, Ms. Cochran.

25        First, before I get to the imposition of sentence, I

1    want to speak about the request for variance.  On the

2    intended loss variance, I cannot vary based upon deviating

3    from binding precedent.  And so, for that reason, I find

4    that the fact that the intended loss exceeded the actual

5    loss is not a proper ground for variance and for the other

6    reasons supporting imposition of sentence and discussed in

7    the 3553(a) factors, the Court will not be varying on that

8    ground.

9         I have considered the remaining variance arguments, the

10    educational and other achievements of the defendant, the

11    loss of time with her kids from the incarceration that she

12    will face, the effect on her children that being apart from

13    them will cause, her loss of reputation, her contributions

14    to the community through professional achievements and her

15    record of employment.

16         With respect to her educational and other achievements,

17    record of employment, and contributions to the community

18    through professional achievements, I don't believe it would

19    be appropriate to vary on those grounds, first of all,

20    because of the seriousness of the offenses and the fact that

21    the defendant's imprisonment range is effectively capped by

22    the parties' agreement, although she might deserve an even

23    stiffer sentence.

24         I think that all of those three things actually enable

25    her in some respects to perpetrate the fraud that she did,

1    giving her credibility in the community.  All of those

2    achievements and efforts obviously had an impact on the

3    victims, gaining their trust, and keeping that trust over

4    time even when it seemed at times that what she was doing

5    did not line up with what the facts were telling the

6    victims.  So, I don't believe it's appropriate to depart on

7    those grounds for those reasons, but also for the other

8    reasons stated by the Court in its 3553(a) findings, the

9    seriousness of the offense and its brazenness.

10        With respect to the loss of time with her children, the

11   effect on children, loss of her reputation, all of those,

12   unfortunately, are a result of her very poor decisions not

13   just while her husband was alive, but for quite a time

14   thereafter.

15        I was particularly impacted by the comments of the

16   grief stricken Donna Bolt and her husband regarding the fact

17   that even while her husband lay dying, she was attempting to

18   continue the perpetration of her extensive fraud and even in

19   a more robust and thoughtful way.  It's very difficult for

20   the Court to wrap its mind around that.

21        And so, for all of those reasons and, again, the others

22   expressed on the record, the Court does not find a variant

23   sentence to be appropriate under the circumstances.

24        I would ask counsel for the defendant if there are any

25   objections at all to the conditions of supervised release,

 1    special or otherwise, that are set forth in the Presentence

 2    Report?

 3              MR. JOHNSON:  May I have a moment, Your Honor,

 4    briefly?

 5              THE COURT:  Certainly.

 6        (Pause)

 7              MR. JOHNSON:  Yes, a few objections, Your Honor.

 8    Perhaps just go in what I think is the order set forth in

 9    the Presentence Report.  I'd object to the drug testing

10    conditions.  It does not appear to be necessary.  She does

11    not have a substance abuse problem.

12              THE COURT:  Does the Government wish to be heard

13    on that?

14              MS. ROBESON:  No, Your Honor.

15              THE COURT:  Very good.  I'll sustain that

16    objection and not require the defendant to undergo substance

17    abuse testing at this time.

18              MR. JOHNSON:  Relatedly, Your Honor, I believe

19    there's a condition in Paragraph 168 about urinalysis and

20    drug screening.  We would just ask that all of those be

21    removed.

22              THE COURT:  And until such time as those might

23    become relevant, the Court does sustain your objection.

24              MR. JOHNSON:  I would ask for the community

25    service requirement to be removed.  Ms. Cochran's -- upon

1   her release, her time is best spent working earning money to

2   pay back restitution and support herself.  She should be

3   able to be employed and community service would just detract

4   from that.

5           THE COURT:  I apologize for the interruption.  For

6   some reason, this phone, anytime there's a new call, it

7   gives me an alert.  If you would please repeat that for the

8   record.

9           MR. JOHNSON:  Yes, Your Honor.  My objection was

10  just to the community service requirement in Paragraph 168,

11  Subsection 4.  Obviously, her time is better spent working

12  where she can earn money to pay back restitution and support

13  herself rather than performing community service.

14          THE COURT:  I will suspend the community service

15  requirement, so long as the defendant is engaged in gainful

16  employment.

17          MR. JOHNSON:  Thank you, Your Honor.

18      Your Honor, I believe the Government and Ms. Cochran

19  have agreed, subject to the Court's approval, that her

20  monthly payments be at a figure of $500.00 per month upon

21  her release.

22          THE COURT:  The Court plans on imposing $25.00 a

23  month per quarter while she's incarcerated and the

24  Government -- the United States and the defendant have

25  agreed upon a $500.00 per month payment; is that correct?

1          MR. JOHNSON:  Yes, Your Honor.  And, obviously,

2     should Ms. Cochran find herself with a higher paying job,

3     that figure can be adjusted upward accordingly, but that

4     would just be a starting point for -- upon her release.

5          THE COURT:  Understood.  The Court is required by

6     statute to specify the manner and schedule upon which the

7     restitution is to be paid.  I have to consider the financial

8     reasons and other assets of the defendant, including whether

9     any are jointly controlled, projected earnings or other

10    income of the defendant, and any other financial obligations

11    of the defendant, including obligations to defendant -- to

12    the defendant -- pardon me.

13         I've specifically considered Paragraphs 151 through 155

14    of the Presentence Investigation Report.  I do find that the

15    $500.00 a month figure, especially inasmuch as the defendant

16    wants to pay that amount, and then to increase it, if

17    possible, is appropriate under the circumstances.  And so,

18    the Court will so order that schedule and that amount upon

19    her release from prison.

20         MR. JOHNSON:  Your Honor, that would be all I have

21    as far as supervised release conditions.

22         THE COURT:  No other conditions?

23         MR. JOHNSON:  No other objections, yes, Your

24    Honor.

25         THE COURT:  Okay.  And so, the Court would intend,

1    unless counsel objects, to simply adopt those conditions as

2    modified by the Court herein in the Presentence Report and

3    to not re-state them and their justification separately

4    during this proceeding.  Any objection to that?

5          MR. JOHNSON:  No, Your Honor.  Thank you.

6          THE COURT:  Very good.

7     Anything further?

8          MR. JOHNSON:  No, Your Honor.

9          THE COURT:  This case is a very difficult one.  I

10   would note that the maximum sentence which the defendant

11   could have faced was far, far longer than even what the top

12   of the guideline range is.  It's only by virtue of the

13   Government's willingness to offer some sort of a bargain and

14   avoid the difficulty of trial and what that would visit upon

15   the victims and family members and, also, perhaps the

16   negotiating efforts of defense counsel, as well, effective

17   negotiating efforts, that we are even in a position of

18   discussing a 135-month sentence, which is at the top of the

19   guideline range.  It could have been far, far more

20   significant.

21     The Court obviously takes into account the victim

22   testimony, the hardships that have been visited upon the

23   victims in fashioning the sentence.  Very, very serious at

24   times.  But the Court also understands its independent

25   obligation, the necessity of being impartial sometimes when

1    the circumstances are at their worst and passions run high.

2    And so, I am mindful of the necessity of stepping back,

3    taking a dispassionate look guided by the applicable

4    statutory factors and the advisory guideline range in

5    arriving at an appropriate sentence.

6        Nevertheless, I'm heavily impacted by what I see.  One

7    of the most complex in practice frauds that the Court has

8    seen is before it today.  And just hearing how persistent

9    the defendant was and convincing and manipulative gives the

10   Court great concerns going forward and emphasizes the need

11   for a disabling sentence to assure that nothing like this

12   ever happens again.  That is foremost on the Court's mind,

13   in addition to all of the other considerations that guide

14   the Court.

15       And, for that reason, the Court is choosing a top of

16   the guideline sentence of 135 months.  That would be

17   135 months on Count Six, 120 months on Count Eighteen, to be

18   served concurrently.

19       Upon release from prison, the defendant shall be placed

20   on supervised release for a term of three years.  Within

21   72 hours of release from custody, the defendant shall report

22   in person to the United States Probation Office in the

23   district in which she is released.

24       The Court adopts in their entirety the conditions of

25   release and the justifications thereon that are set forth in

1    the Presentence Report.  I adopt them and include them

2    herein with re-statement -- without re-statement, pardon me,

3    on the record except as modified by the Court's rulings.

4         I impose no fine in this case because I think it's

5    imperative that the defendant devote all of her financial

6    efforts to attempting to restore the victims to the state

7    that they were prior to her fraudulent activities.  So,

8    there will be no fine.

9         With respect to restitution, pursuant to Sections 3663

10   and 3663(a) and the parties' plea agreement, I order the

11   defendant to pay restitution to the identifiable victims of

12   the offense.  The plea agreement recognizes that Ms. Cochran

13   owes restitution in the amount of $2,564,063.33.

14        The Presentence Investigation, however, sets forth the

15   accurate amount of restitution owed totaling $2,567,838.53.

16   In accordance with the applicable paragraphs of the

17   Presentence Investigation Report, I find that the full

18   amount of loss sustained by the victims is as stated therein

19   culminating in -- or pardon me.

20        With respect to Edward and Donna Bolt, $245,360.69;

21   Wendy and John Poteat, $117,814.34; Lacy and Thomas

22   Treadway, $28,151.50; Charles Hawley, $317,772.00; Frank

23   Steven Maynard, $86,526.00; Kevin Bailey, $688,981.00;

24   Hauling Reorganization, III, $424,715.00; Jonathan and

25   Jessica Miller, $73,867.00; John and Stephanie Hamilton,

1   $4,160.00; Dan Foley, $50,000.00; Premier Bank, $250,000.00;

2   First Community Bank loan on the vehicle, $15,791.00; AJ

3   Equity Group, $8,584.00; Funding Metrics LLC, $2,116.00; and

4   Last Chance Funding, $254,000.00.

5        The Court has previously made its findings as to the

6   ability to pay considering all applicable factors and the

7   Government's and the defendant's joint agreement that the

8   amount of $500.00 to be raised under appropriate

9   circumstances is appropriate in this case.

10       So, I order that you will pay the outstanding

11  restitution in the amount of $2,567,838 -- pardon me --

12  $2,567,838.53 through monthly installments of $500.00 per

13  month to be raised upon an appropriate showing by the United

14  States Attorney on motion.  The monthly installments shall

15  commence within 30 days of your release from incarceration

16  and continue until the obligation is paid in full.

17       Restitution payment instructions will be set forth in

18  the judgment in the criminal case to be entered by the

19  Court.

20       I find that any interest on the restitution is to be

21  applied under the circumstances.

22       Pursuant to the parties' plea agreement, Ms. Cochran

23  has agreed to forfeit certain property to the United States.

24  A preliminary order of forfeiture was entered by the Court

25  on December 3rd, 2020 and the Court will be proceeding in

1    accordance with that upon further request by the United

2    States and in accordance with the plea agreement.

3        The Court orders the defendant to pay a special

4    assessment due immediately of $200.00.  That's $100.00 on

5    each count of conviction.  The Court notes that the special

6    assessment was paid in full on September 21, 2020.

7        Again, I have stated my findings previously on the

8    Section 3553(a) factors for reasons that a downward variance

9    is not warranted under the circumstances and I believe that

10   this sentence reflects the seriousness of the offense,

11   provides just punishment, it promotes respect for the law,

12   it serves an important deterrent function in this community,

13   and also will encourage others to not commit similar crimes

14   in the future and it will protect the public from further

15   crimes by the defendant.

16       The defendant will also have access to certain care

17   while in the custody of the Bureau of Prisons and this

18   sentence avoids unwarranted sentencing disparity.

19       The sentence is within the guideline range and the

20   sentence has been imposed, as I stated, for the reasons

21   suggested.

22       Ms. Cochran, you may have a right to appeal the Court's

23   sentence.  If you wish to appeal the Court's sentence, you

24   must file a written notice of appeal with the clerk of this

25   court within 14 days of the Court's judgment and conviction

1   and Mr. Johnson, I'm sure, will aid you with that.

2       If you fail to file that notice of appeal within

3   14 days, you will waive your right to appeal.  If you can't

4   afford to prosecute that appeal, the United States will pay

5   those costs on your behalf.

6       Ms. Robeson, does the Government have a motion?

7       MS. ROBESON:  Yes, Your Honor.  We would ask that

8   the defendant -- oh, I'm sorry, Your Honor.  I would ask to

9   dismiss the remaining counts in the indictment.

10      THE COURT:  Thank you very much.

11      The Court dismisses Counts One through Five, Counts

12  Seven through Seventeen, and Counts Nineteen through Twenty

13  Six against the defendant.

14      The defendant is currently released on a $10,000.00

15  surety bond.  The Probation Office notes that there is no

16  reason not to permit her voluntary surrender.  I would ask

17  if one of the conditions of bond presently is home

18  confinement with electronic monitoring or not?  Mr. Johnson?

19      MR. JOHNSON:  I believe that's still the case,

20  Your Honor.  She does transport her children to school

21  during the day and brings them home in the evenings, as I

22  mentioned earlier, I believe, and she is still wearing an

23  ankle bracelet, Your Honor.

24      THE COURT:  Understood.

25      Ms. Robeson, what's the Government's position

1    concerning the defendant's voluntary surrender?

2              MS. ROBESON:  Your Honor, we would oppose that and

3    ask for her to be incarcerated at this time.

4              THE COURT:  Well, what's the basis for that

5    request?

6              MS. ROBESON:  We believe that's consistent with

7    the statute and she's had more than enough time, as the

8    sentencing was continued previously at the end of January,

9    to prepare for this.

10             THE COURT:  Well, has the standard changed between

11   her plea of guilty and now?

12             MS. ROBESON:  No, it hasn't, Your Honor.

13             THE COURT:  Did you oppose her request at the

14   plea?

15             MS. ROBESON:  No, Your Honor, I did not.

16             THE COURT:  What's the basis for the change then

17   if the standard is the same?

18             MS. ROBESON:  I think we're in a different posture

19   now, Your Honor.

20             THE COURT:  Could you elaborate on that, please?

21             MS. ROBESON:  Sure.  She's been sentenced at this

22   time.  We think it's appropriate.  But I don't want to

23   belabor the point, Your Honor.

24             THE COURT:  Well, I'm not asking you to belabor

25   it.  I'm asking you to support a position that's changed

124

```
1    dramatically since the time of the plea.
2              MS. ROBESON:  Nothing has changed dramatically.
3    There's been no bond violations, I think, if that's what the
4    Court is getting at, but we think at this time it is
5    appropriate to be surrendered.  And, also, we were concerned
6    about coronavirus at the time and now, we're less concerned
7    because the population has been getting better.
8              THE COURT:  Understood.
9         Mr. Johnson?
10             MR. JOHNSON:  Yes, Your Honor.  As I look around,
11   we're all still wearing a mask.
12             THE COURT:  I'm having some difficulty hearing
13   you.  I want to make sure that microphone is on.  Please
14   proceed.
15             MR. JOHNSON:  We are still all wearing masks, Your
16   Honor.  Ms. Cochran has not been vaccinated.  Obviously,
17   it's far more crowded in the regional jail than it is going
18   to be at a BOP facility, most likely Alderson, I would
19   imagine.  But, again, that's just an unnecessary risk.  She
20   does have risk factors with her heart -- her heart problems.
21   You know, and not to mention she has a year and a half of
22   compliance.  I mean, you know, the Court should weigh
23   heavily on that.
24        And, on this point, Your Honor, I was going to make the
25   request that the Court allow her to self-report on June 1st
```

1   of 2021 and I'll give the Court the reasons why.  Both of

2   her -- as I stated, both of her children are in school.  Her

3   parents assist, but she still, you know, gets them back and

4   forth.  They're both A students, Your Honor.  I got copies

5   of their grades from this year.  Straight As across the

6   board.  She's doing a good job on that score.  So, it seems

7   like it would be very fitting to allow them to finish the

8   year.  We're not that far from it.

9        I mean, I had a client sentenced in January that was

10  allowed to self-report and she still hasn't been designated.

11  So, what I'm asking for is really not that far out of step

12  with normal practice anyway.

13       So, this would allow her to, you know, enable the

14  children to finish up this school year.  She still has, Your

15  Honor, the same amount of time to do.  She has been

16  perfectly compliant on bond.  She has worked.  And, again,

17  her employer is here on her behalf.  She has gotten along

18  just fine with her probation officer.

19       There's just no reason, you know, other than -- I mean,

20  I hear all -- during these victim impact statements asking

21  for her not to self-report.  That strikes me as a curious

22  coincidence that they continue to echo this same thing.  I

23  don't think I've ever heard, you know, that being mentioned

24  during victim impact statements.  So, I would ask the Court

25  to give that no consideration as it's, again, outside the

1    lane of what an victim impact statement should be.

2        Again, her parents are working towards purchasing her

3    home to allow the kids to have at least one stable part of

4    their life to continue and she's assisting with transition.

5    So, again, I would just ask that she be treated the same as

6    anyone else and I think we all know that anyone else in her

7    shoes would be allowed to self-report and we'd just ask for

8    that same consideration in this case.

9            THE COURT:  Ms. Robeson?

10           MS. ROBESON:  Your Honor, if the Court does choose

11   to allow her to self-report, the Government would ask that

12   Ms. Cochran be required to pay the $500.00 per month as

13   we're waiting for the self-report.

14           MR. JOHNSON:  No objection to that, Your Honor.

15           THE COURT:  Well, I am not certain.  I want to

16   make certain that you truly do not have objection to that.

17   It is very unusual.  There is no basis for saying that the

18   $500.00 -- or, I mean, it's typically the case that the

19   sentence is ordered that that obligation begins after

20   supervised release starts.  Supervised release isn't going

21   to start until after the sentence of incarceration.  So,

22   this would be a purely voluntary decision on the defendant's

23   part to pay the $500.00 during such time as she is out.

24           MR. JOHNSON:  I believe she's already made two

25   such payments in that amount, Your Honor, and it's just her

1    desire to do so.  She does want to make things right.

2              THE COURT:  Anything further?

3              MR. JOHNSON:  No, Your Honor.

4              THE COURT:  Well, I -- first of all, I would say

5    that the victims have every right to be upset about what has

6    occurred to them.  Part of the criminal sentencing process

7    is deterrence, of course, but there is a retribution

8    element, too, I think that the guidelines recognizes.

9    That's not something that courts undertake, but I do think

10   that that is sometimes a justification for criminal

11   penalties.

12       So, to say that the victims can't have some sort of

13   anger and want to see the incarceration sentence begin

14   immediately is not something that the Court adopts, but I

15   understand counsel's position on it.

16       I find that the defendant should be allowed to

17   surrender voluntarily, but not on June 1st, 2021.  It will

18   be either -- I know that the Bureau of Prisons is very

19   behind on the designation of institutions.  And so, what I

20   am going to say is either the earliest of either the date

21   that the defendant is designated to an institution by the

22   United States Bureau of Prisons, at which time she will, as

23   directed, submit herself to the facility; or should that

24   designation not occur by May 1st, she is to surrender

25   herself to the United States Marshal for the district to

1    begin service of her sentence.

2        Based on the defendant's ongoing compliance with her

3    conditions of pretrial release, the recommendation of the

4    probation officer, the fact that she is of help to the

5    community with her efforts to get people vaccinated and

6    other considerations, as well, her compliance on bond, I

7    find that she's offered clear and convincing evidence that

8    she is unlikely to flee and is unlikely to pose a danger to

9    any other person or the community if released.

10        So, again, I do permit her to surrender voluntarily or

11    to the United States Marshal according to what the Court

12    earlier specified.

13        She'll remain released on the previously executed

14    $10,000.00 surety bond subject to the conditions set forth

15    in the order setting conditions of release previously filed

16    herein.

17        Ms. Cochran, I need to tell you something.  I want to

18    remind you of two things.  First, if you knowingly fail to

19    report as ordered, I can impose an additional sentence upon

20    you of up to ten years in prison and a $250,000.00 fine.

21    Second, if you commit any offense whatsoever before your

22    voluntary surrender date, then in addition to this sentence

23    that I am imposing, in addition to any sentence for that

24    offense, I must impose an additional sentence and, if that

25    offense you committed is a felony, that's another ten-year

1    term maximum.  If it's a misdemeanor even, it's an

2    additional term of imprisonment of up to one year.  And

3    those sentences would run consecutively to that which is

4    imposed herein.  Long story short, please continue to do

5    what you have done since the beginning, comply with your

6    conditions of bond, and appear as directed for any other

7    proceedings before the Court and for service of your

8    sentence.

9         Are there any other matters the Court should address at

10    this time?

11         Ms. Robeson?

12             MS. ROBESON:  No, Your Honor.

13             THE COURT:  Mr. Johnson?

14             MR. JOHNSON:  Just briefly, Your Honor.  We

15    respectfully request that the Court designate Alderson as a

16    recommended place for her to serve her sentence.  In all

17    likelihood, she would be designated there without such

18    recommendation, but I would submit to the Court that her

19    placement at Alderson would best enable her to maintain

20    relationships with the family she does have left.

21             THE COURT:  Understood.  I not only recommend FCI

22    Alderson for service of her sentence, but I also direct

23    that, upon intake, the Bureau of Prisons perform a full

24    physical and mental evaluation upon her for treatment of any

25    needs or medical conditions that are discovered or that are

1    set forth in the Presentence Report and continuing to need

2    treatment.

3         Anything further?

4              MR. JOHNSON:  No, Your Honor.  Thank you.

5              THE COURT:  Thank you very much.

6         Court is adjourned.

7         (Proceedings concluded at 5:42 p.m., March 18, 2021.)

8

9    CERTIFICATION:

10        I, Ayme A. Cochran, Official Court Reporter, certify

11   that the foregoing is a correct transcript from the record

12   of proceedings in the matter of United States of America,

13   Plaintiff v. Natalie P. Cochran, Defendant, Criminal Action

14   No. 5:19-cr-00247, as reported on March 18, 2021.

15

16   s/Ayme A. Cochran, RMR, CRR                 March 26, 2021

17   Ayme A. Cochran, RMR, CRR                       DATE

18

19

20

21

22

23

24

25