```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT BECKLEY
_____x
                                   :
UNITED STATES OF AMERICA,          :  Criminal Action
v.                                 :  No.  5:19-cr-00247
NATALIE P. COCHRAN                 :
and                                :
UNITED STATES OF AMERICA           :  Civil Action
v.                                 :  No. 5:19-cv-00537
REAL PROPERTY SITUATED AT          :
433 4-H LAKE DRIVE, DANIELS,       :  Date:  February 11, 2022
RALEIGH COUNTY, WEST VIRGINIA      :
together with all                  :
improvements, fixtures, and        :
appurtenances thereon, and         :
all leases, rents, and             :
profits derived therefrom;         :
                                   :
REAL PROPERTY SITUATED AT          :
219 N. EISENHOWER DRIVE,           :
BECKLEY, RALEIGH COUNTY, WEST      :
VIRGINIA,                          :
together with all                  :
improvements, fixtures, and        :
appurtenances thereon, and all     :
leases, rents, and profits         :
derived therefrom                  :
and                                :
REAL PROPERTY SITUATED AT 210      :
PARKWOOD DRIVE, BECKLEY,           :
RALEIGH COUNTY, WEST VIRGINIA      :
together with all                  :
improvements, fixtures, and        :
appurtenances thereon, and all     :
leases, rents, and profits         :
derived therefrom                  :
_____x
```

                 TRANSCRIPT OF STATUS CONFERENCE HELD
               BEFORE THE HONORABLE FRANK W. VOLK, JUDGE
                    UNITED STATES DISTRICT COURT
                     IN BECKLEY, WEST VIRGINIA

```
APPEARANCES:
                            AUSA KATHLEEN ROBESON
                            AUSA JESSICA NATHAN
                            United States Attorney's Office
                            Suite 4000
                            300 Virginia Street East
                            Charleston, WV 25301

                            BRIAN R. BLICKENSTAFF, ESQ.
                            Turner & Johns
                            808 Greenbrier Street
                            Charleston, WV 25311

                            ZACHARY JAMES ROSENCRANCE, ESQ.
                            Bowles Rice
                            P. O. Box 1386
                            Charleston, WV 25325-1386

                            DAVID O. SCHLES, ESQ.
                            Suite 306
                            815 Quarrier Street
                            Charleston, WV 25301

                            Larry Jessup (Pro se)



Court Reporter:             Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

1          PROCEEDINGS had before The Honorable Frank W. Volk,

2    Judge, United States District Court, Southern District of

3    West Virginia, in Beckley, West Virginia, on February 11,

4    2022, at 12:31 p.m., as follows:

5          THE COURT:  We are here this afternoon in the

6    Natalie Cochran related cases where the government and

7    others are seeking approval of certain actions.

8       I will ask counsel to please note your appearances for

9    the record.

10         MS. ROBESON:  Kathleen Robeson on behalf of the

11   United States, and with me at counsel table is Jessica

12   Nathan, who is also here on behalf of the United States.

13         MR. BLICKENSTAFF:  Brian Blickenstaff for Robert

14   L. Johns, Chapter 7 Trustee.

15         MR. ROSENCRANCE:  Zach Rosencrance for First

16   Community Bank.

17         MR. JESSUP:  Larry Jessup, father of Natalie

18   Cochran.

19         THE COURT:  Understood.

20      Mr. Jessup, are you here representing your own

21   interest?

22         MR. JESSUP:  Yes, sir.

23         THE COURT:  You are not permitted to represent the

24   interest of others.  As long as you represent just your own

25   interest, then that will work out just fine.

1          Well, I take it that all are familiar with the matters

2      that have come heretofore.

3          I'm going to ask you, Ms. Robeson, to just give me a

4      thumbnail sketch of what the government is seeking and just

5      in general a summary of the actions that pend.

6              MS. ROBESON:  Yes, Your Honor.  Your Honor, before

7      I start, may I remove my mask, or would you like me to keep

8      it on?

9              THE COURT:  Yes, you may do so.

10              MS. ROBESON:  Thank you, Your Honor.

11          The most important action that the United States is

12      seeking is approval for the joint motion for the

13      interlocutory sale, but to give the Court a brief background

14      first, we have a forfeiture action pending in the criminal

15      case against Ms. Cochran and there is also a separate civil

16      forfeiture case filed.

17          All parties agree that whenever the criminal forfeiture

18      is resolved that will necessitate the removal of the civil

19      action.  There will be no need for any further rulings in

20      the civil action.  Ms. Cochran's interest in all the

21      property has been foregone by her guilty plea.  She no

22      longer has an interest in any of these assets.  The parties

23      left are the United States, First Community Bank, the

24      Chapter 7 Trustee, and Mr. Jessup, all who are here today.

25          The first thing that we would like, as I mentioned

1    earlier, would be the joint motion for the interlocutory

2    sale of the property.  And then, as our Joint Status Report

3    indicated, the next action items would be approval for the

4    coordination agreement for the rest of the assets between

5    the United States and the Chapter 7 Trustee which was filed

6    earlier this week.

7        And then, also, I believe earlier in this case First

8    Community filed a claim seeking an interest in both the 4-H

9    property, as well as the bank account.  This Court dismissed

10   the claim as Ms. Cochran's case was on appeal at the time,

11   but indicated that First Community could re-file the claim

12   so to allow them leave to re-file, if necessary, and then

13   allowed that litigation to proceed and also to rule on Mr.

14   Jessup's claim, which has been filed against the Shelby

15   Cobra and the bank account, as well.  The United States has

16   filed a motion to dismiss Mr. Jessup's claim.

17          THE COURT:  What is the basis for seeking to

18   dismiss Mr. Jessup's claim and what was it as to the

19   vehicle?

20          MS. ROBESON:  Yes, Your Honor.  And Mr. Jessup

21   certainly can correct me if I'm wrong, but the way I read

22   the claim was it was to one vehicle, the Shelby Cobra, as

23   well as the contents and the bank account.  And our basis

24   was based on the claim that we thought he presented the

25   interest of a general unsecured creditor.  And under the

```
 1    Fourth Circuit precedent general unsecured creditors do not
 2    have standing in forfeiture matters.
 3              THE COURT:  Understood.
 4         There is one matter you raised quickly that I wanted to
 5    ask you about.  Would you anticipate that the bank will
 6    renew its claim?
 7              MS. ROBESON:  I believe that the bank's counsel is
 8    here and probably in a better position to answer that
 9    question than I am.
10              THE COURT:  Thank you.
11         Mr. Rosencrance?
12              MR. ROSENCRANCE:  Your Honor, as a matter of form
13    we would probably, yes, file a verified claim in the
14    criminal action.  We originally filed a claim in the civil
15    action.  So, just to protect the bank's interest, we would
16    file it in the criminal action and as it relates to the
17    property, yes.
18         As it relates to the seized funds the amount claimed by
19    the bank will have actually decreased from $15,000.00 to
20    around $7,000.00 or so.
21              THE COURT:  Have there been discussions to
22    amicably resolve that sum of cash, the bank's right to it?
23              MR. ROSENCRANCE:  We have not had discussions on
24    that, Your Honor.
25              THE COURT:  Understood.
```

```
 1         And I want to also hear from Mr. Blickenstaff if he

 2   wishes to offer any comments on any of the pending matters.

 3         MR. BLICKENSTAFF:  No, Your Honor.  I think the

 4   summary from Ms. Robeson was accurate.  The trustee is ready

 5   to move forward with the liquidation of both the 4-H

 6   property and the additional real properties, according to

 7   the coordination agreement that was filed with the Court,

 8   and that the Court's reviewed.  We have a realtor that we

 9   have selected and we're prepared to move forward with her

10   and list this property in order to get this property sold

11   and bring the assets into the estate.

12         THE COURT:  Thank you.

13      Mr. Jessup, I'll be pleased to hear anything that you

14   would like to address the Court with regarding these

15   matters.  I would just ask you to pull that microphone as

16   close as possible.  If it's easier for you, you may remove

17   your mask.

18         MR. JESSUP:  Thank you, Your Honor.

19      As I said, I'm Natalie Cochran's father, Larry Jessup,

20   and I'm here to request permission from the Court to have

21   the opportunity to purchase --

22         THE COURT:  If you could avoid resting the paper

23   on the microphone, it interferes with it.

24         MR. JESSUP:  Okay.

25         THE COURT:  There you go.  Thank you.
```

1          MR. JESSUP:  And I'm here today to request

2     permission from the Court to have the opportunity to

3     purchase the property located at 433 4-H Lake Road in

4     Daniels before the property is put up for general sale.

5          Mr. and Mrs. Cochran purchased the property in 2006 and

6     Mike and I spent about ten months renovating the property so

7     it would be liveable.  And then, of course, my daughter was

8     arrested in September of 2019.  She was placed on home

9     incarceration and I was to be responsible for her.  So, my

10    wife and I sold our home and we moved into the home at --

11    with our daughter and two grandchildren.

12         Later, she was put on home confinement.  We continued

13    to live in the house.  And then, when she was incarcerated

14    at Hazelton, we became the legal guardians of the two

15    grandchildren, and this is the only home that these two

16    children have ever known.

17         The house was included in the bankruptcy and seized and

18    I then, after it was seized within the bankruptcy, I made

19    four house payments through Attorney Robert Dunlap.  He

20    wrote a check to First Community on November the 1st of 2019

21    for $5,920.00 and he sent this to the attention of Heather

22    Gonzalez.

23         And then, Mr. Rosencrance sent an e-mail to Mr. Dunlap

24    stating that he was questioning receiving the money from a

25    non-borrower, which I would be a non-borrower.  So, we made

1    no further payments after that.

2        I talked to the bank in July of 2021.  I talked to Ms.

3    Burrows at our local bank and then she referred me to

4    Heather Gonzalez, or she talked to Heather Gonzalez.  They

5    said they would be willing to try to work with me to

6    purchase the house if the government -- after the government

7    made their recommendations.

8        And so, I sent an offer to the bankruptcy court for --

9    to buy the house for $315,000.00 and the property was listed

10    on the Government Asset Report for $302,600.00.

11        Again, this is the only home my grandchildren have ever

12    known and I would like to ask if it's possible for me to

13    arrange to purchase the house, I would like to do that, but

14    if I cannot do that, could the house -- I'd like to ask that

15    the postponement of the house sale be postponed for three

16    and a half years until the children graduate from high

17    school.  That way, we would be able to remain in the house.

18        I would be willing to pay rent on the house to cover

19    the interest, and the property taxes, and the insurance that

20    the bank would incur expenses for.  I'd also agree for the

21    bank to have access to come and check the house to make sure

22    I was maintaining it in proper order.

23        And if neither of these options are possible, I'd

24    request that we may be able to stay in the house until

25    possibly June of this year before it's sold so the kids can

1    finish the year in school.

2        And I appreciate your considering my request.  Thank

3    you.

4            THE COURT:  Thank you very much.

5        And does that cover all of your questions and comments,

6    Mr. Jessup?

7            MR. JESSUP:  Yes.  I didn't realize that the car

8    and the other $15,000.00 would be discussed today, but I'm

9    prepared to talk about that, if we need to do that.

10           THE COURT:  If you would, please let me know what

11   your position is on those matters.

12           MR. JESSUP:  Okay.  If you could just give me a

13   moment to get another letter that --

14           THE COURT:  Yes, sir.

15           MR. JESSUP:  Yes.  In a letter dated to Your Honor

16   on September the 12th, I will read a couple of paragraphs.

17   I'm submitting this letter in response to the opposition to

18   Mr. Jessup's petition submitted to the Court by Ms. Robeson.

19   First, I would like to address my interest in the 1965

20   Shelby Cobra.  In addition to the documentation already

21   submitted to the Court, I'm sending a copy of the title --

22           COURT REPORTER:  I'm sorry, sir.  Could you slow

23   down just a little for me, please?

24           MR. JESSUP:  I'm sorry.

25           COURT REPORTER:  That's okay.

1          THE COURT:  If you can just read it more slowly,

2     Mr. Jessup.

3          MR. JESSUP:  Okay.

4          First, I would like to address my interest in the 1965

5     Shelby Cobra.  In addition to the documentation already

6     submitted to the Court, I'm sending a copy of the title

7     returned to me by the bank when I paid off the loan on the

8     car showing release of the loan and I have attached a copy

9     of the title.

10          Secondly, I would like to clarify the loan on the

11     Denali pickup truck.  The loan was for $15,375.00.  The bank

12     received the money from the man who purchased the truck and

13     did not immediately apply the proceeds to pay off the loan.

14     In between receiving the payment and applying it to the loan

15     the government seized the money as part of Ms. Cochran's

16     bank account.

17          The loan is still outstanding.  As of today, the bank

18     has not charged me any interest on the loan.  However, I

19     checked my bank and discovered that a $7,500.00  payment had

20     been made on the loan reducing the balance to $7,875.00.  I

21     don't know where the payment came from, but assume that the

22     government made the payment.

23          Again, the loan for the $15,000.00, I did sign for

24     that.  It was for that truck.  And it was also included in

25     the -- I guess the restitution agreement to pay back the

```
1    victims and it was listed in that as to be paid back.
2         So, again, the -- my bank, when I go on-line, it's
3    still showing I owe $7,875.00.  Thank you.
4              THE COURT:  Let me ask you, Mr. Jessup, are you
5    now the title holder of the Shelby or is it still in Ms.
6    Cochran's name?
7              MR. JESSUP:  It's still in Ms. Cochran's name.  I
8    just have a copy of the title where the bank released it.
9              THE COURT:  I see.  But it was your funds that
10   paid the debt on that, I take it?
11             MR. ROSENCRANCE:  Yes, sir.
12             THE WITNESS:  Yes, sir.
13             THE COURT:  Did you do that by check?
14             MR. JESSUP:  Yes, sir.
15             THE COURT:  And did you reflect anything on the
16   check that it was to pay off on the obligation or anything
17   of that sort?
18             MR. JESSUP:  Not that I'm aware of.
19             THE COURT:  Understood.
20        Did you have any communications with the bank about the
21   fact that you were paying that off personally on behalf of
22   your daughter?
23             MR. JESSUP:  Well, it was in my name and, of
24   course, my daughter signed, also, but I was the primary
25   borrower on that.  And then, I talked to my bank and told
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    them I wanted to pay it off and, of course, I paid it off.

 2              THE COURT:  Well, let's unpack that statement.

 3    Your daughter holds title on the car, correct?

 4              MR. JESSUP:  Yes, sir.  The title is in her name

 5    and my -- and I think also my son-in-law's name.  Mike was

 6    also on there, I think.  I don't have it with me, so --

 7              THE COURT:  Okay.  But you had mentioned something

 8    about your name was on the title or something?

 9              MR. JESSUP:  No.  No, sir.

10       Just a minute.  Maybe I -- I had the title attached to

11    this letter, but I didn't -- yeah, here it is.  Here's a

12    copy of the title that was sent back to me from the bank.

13    It's in the name of Natalie or Michael Cochran.

14              THE COURT:  I see.

15              MR. JESSUP:  And it was paid off the 20th day of

16    April, 2020.

17              THE COURT:  Understood.  So, that covers your

18    claim to the Cobra.  Is there anything else that you wanted

19    to say in regards to the Cobra?

20              MR. JESSUP:  No, sir.

21              THE COURT:  And then let's talk about the bank

22    account.  Is that in Ms. Cochran's name?

23              MR. JESSUP:  Yes, sir.

24              THE COURT:  Have you had any discussions with the

25    bank about that account?
```

1              MR. JESSUP:  No, sir.  Except when I first

2      borrowed the money and went back in to talk to them, when I

3      paid off the Cobra, I asked them about the other -- the

4      other loan, but we did not settle on any kind of an

5      agreement to pay that off.

6              THE COURT:  What was the reason that you paid off

7      the Cobra loan?

8              MR. JESSUP:  Well, it was -- the Cobra loan was

9      for not only the Cobra, but it was for two vehicles of my

10     own that I ended up with to the bank.  So, I paid it off on

11     all three vehicles.

12             THE COURT:  I see.  But you didn't own the Cobra.

13     Is there a particular reason why you would have paid it off?

14             MR. JESSUP:   Well, it was in -- it was against my

15     credit.

16             THE COURT:  I see.

17             MR. JESSUP:  Yes, sir.

18             THE COURT:  I see.

19             MR. JESSUP:  And I had signed for it personally.

20             THE COURT:  Was the -- I would be willing to hear

21     you now on the bank account, if you want to offer anything

22     on that question of Mr. Rosencrance.  Go ahead.

23             MR. JESSUP:  That was another loan that I took out

24     on the vehicle that belonged to Mr. Cochran, Mike.  And my

25     daughter sold that vehicle.  The man took the money to the

1    bank to pay off the vehicle and to get the title and, like I

2    said, my understanding is between the time that he took the

3    money to the bank and the time it was applied to this loan,

4    the government seized the bank account.

5                 THE COURT:  I see.  Understood.

6         Is there anything else you would like to share with the

7    Court, Mr. Jessup?

8                 MR. JESSUP:  No, sir.

9                 THE COURT:  Thank you.

10        Mr. Rosencrance, what's the nature of the transaction

11   with the Shelby?  Is Mr. Jessup listed as the borrower with

12   that as the collateral or how exactly did this sort out?

13                MR. ROSENCRANCE:  Your Honor, I do not have

14   information as it relates to the Shelby.  We claimed an

15   interest in the proceeds from the sale of the 2014 GMC.  As

16   it relates to the Shelby, I do not have that information

17   available at this time.

18                THE COURT:  Well, as far as the bank was concerned

19   what, if any, interest does Mr. Jessup hold in this bank

20   account or this vehicle?

21                MR. ROSENCRANCE:  Your Honor, I was not aware that

22   he had an interest in the Shelby vehicle.

23                THE COURT:  What about the bank account?  I think

24   that's not in his name, but --

25                MR. ROSENCRANCE:  So, yeah.  I can provide some

1    context on that, Your Honor.  So, at the time of the seizure

2    there was a bank account that was seized in the amount of

3    approximately $44,000.00 and it contained proceeds from the

4    sale of the 2014 GMC Denali, which paid off that loan.

5              THE COURT:  Just on the Denali?

6              MR. ROSENCRANCE:  That's correct, Your Honor.  And

7    it was quite clear there was a check that was designated to

8    pay it off and had the VIN number of the vehicle.  And so,

9    there was an issue with the seizure because we still had the

10   title, but it had been seized.  And so, the third party had

11   the vehicle, but the title had still not been released

12   because the government had seized -- had seized the funds

13   and the bank did not have access to them.  So, we had an

14   issue on that end.

15       And eventually what had happened was the third party

16   had issued an additional payment to the bank to release the

17   title to the third party, which was sold prior to the

18   foreclosure -- prior to the seizure, excuse me.

19             THE COURT:  Understood.

20       I'm going to go back to Ms. Robeson now and ask if you

21   wish to respond to any comments made by Mr. Jessup or by Mr.

22   Rosencrance?

23             MS. ROBESON:  Yes, Your Honor.  Your Honor, I

24   think -- I don't know if this point got across to the Court,

25   but it is my understanding that the loan that was taken out

1    by First Community Bank, the cars were put up -- the loan

2    was not for the car in particular, just to make that point

3    clear to the Court.

4            THE COURT:  So, it was not collateralized as a

5    signature loan?

6            MS. ROBESON:  Your Honor, I apologize.  I do not

7    have the answer to that question at this time, but I can

8    provide it to the Court after this hearing.  I -- I believe

9    it was a loan for $15,000.00 and I believe that they listed

10   the cars as -- I guess that would be collateral, but I -- I

11   do not remember.  I'm sorry, Your Honor.

12           THE COURT:  Okay.  Please proceed.

13           MS. ROBESON:  Okay.  And also, as to the sale of

14   the house, Your Honor, when this agreement was originally

15   discussed I did not think I had the authority to agree to

16   such since this sale had been listed in the Preliminary

17   Order of Forfeiture.

18       And, also, to have a private sale with Mr. Jessup I

19   thought is against the interest of my client and also the

20   many victims in this case as this property -- it's well

21   known the real estate market is doing very well right now

22   and the property most likely would fetch a much higher price

23   on the real estate market.

24       Mr. Jessup still has the opportunity to bid on the

25   property if he wishes and if he can beat out anyone else,

```
 1    but we are very opposed to some sort of private sale.

 2    That's -- it just goes against the interest of justice and I

 3    don't think there is a mechanism in the law for such a sale

 4    on the forfeiture side.

 5              THE COURT:  Anything else?

 6              MS. ROBESON:  No, Your Honor.

 7              THE COURT:  Ms. Robeson, one other thing that is

 8    concerning a little bit.  And Mr. Blickenstaff may be able

 9    to add some insight on this, as well.

10       But Ms. Cochran filed a Chapter 7 proceeding, is that

11    it, Mr. Blickenstaff?

12              MR. BLICKENSTAFF:  That's correct, Your Honor.

13    She filed a Chapter 7.

14              THE COURT:  Okay.  And then I take it sometime

15    after that there was a plea agreement with the government?

16              MS. ROBESON:  That is correct, Your Honor.

17              THE COURT:  And she agreed to give up her interest

18    in these assets that we've been talking about this morning;

19    is that correct?

20              MS. ROBESON:  Yes, Your Honor.

21              THE COURT:  What, if any, input did your client,

22    Mr. Blickenstaff, have in that?  In other words, was Ms.

23    Cochran simply giving up whatever right, title and interest

24    she had or was it agreed between the trustee and the United

25    States that her passing of that title was effective?  Fill
```

1    me on on that area, either of the two of you.

2            MS. ROBESON:  Yes, Your Honor.  And Mr.

3    Blickenstaff can certainly correct me if I misspeak, but

4    during plea negotiations we did not include the trustee.

5    The plea negotiations with her agreement to forfeiture was

6    simply between the United States and Ms. Cochran and her

7    attorney.

8        Afterwards, when this forfeiture action started, that

9    is when the United States started communicating with the

10   trustee and we entered into the coordination agreement.

11           THE COURT:  I see.  Was there any stay violation

12   committed?  I don't have all the exceptions under 362

13   committed to memory, but --

14           MS. ROBESON:  I -- I'm sorry to cut you off, Your

15   Honor.  I do not believe so because our forfeiture -- I

16   think -- I do not believe so but, hopefully, Mr.

17   Blickenstaff provide a more insightful answer than I just

18   did to that.

19           THE COURT:  Thank you.

20           MR. BLICKENSTAFF:  Your Honor, I think it was the

21   trustee's position, at least as far as the stay violation is

22   concerned, is that it's under one of the exceptions under

23   362.  So, it was not an issue.

24       I think that regarding what Ms. Cochran gave up, she

25   certainly gave up any interest that she may have had.  I

1    think the trustee's position was that the estate had an

2    interest in this real estate because of the negotiations

3    between the trustee and the U. S. Attorney's Office and the

4    eventual coordination agreement that we've presented to the

5    Court.  We never really broached that issue as far as who

6    actually has title and interest to this property.

7        So, by the coordination agreement itself, I believe

8    that what we've agreed upon is this, as far as the real

9    estate is concerned, is that the state facility interest, as

10   the owner, the trustee will be authorized to sell that under

11   a 363 sale basically that with the -- in coordination with

12   the U. S. Attorney's Office, but basically with their

13   consent, I guess, I believe, to sell that property, as if

14   the trustee as representative for the estate is the owner of

15   that property.

16       The issue with the purchase price, and the Court is

17   probably aware of that, is that the trustee plans to market

18   the property, put it up onto the open market, and when it is

19   put out on the open market, if a buyer would present

20   themselves, the trustee would file a motion to sell which,

21   consistent with 363, would allow the option for upset

22   bidders to make an upset bid on any sale price, as far as

23   that's concerned.

24           THE COURT:  I do remember that procedure.

25           MR. BLICKENSTAFF:  So, that is the trustee's

1    position.  We do agree with the U. S. Attorney's Office in

2    that we think that the value of the property is in excess of

3    what Mr. Jessup's original offer was.  We also have

4    experienced, as well, that the real estate market is much

5    more lively and hot right now, as far as that's concerned.

6    Based on our experience we've seen some, frankly, unusual

7    prices, as far as sale prices, that we don't usually

8    experience here in West Virginia.

9        So, but the Jessup -- Mr. Jessup would have the

10    opportunity.  He's not barred from participating in that

11    process if the trustee were to find a buyer.  And if there

12    are people that would make a bid acceptable to the trustee

13    based on his assessment and business judgment, either way,

14    he can make an offer straight up through the realtor or he

15    can participate in the process, make an upset bid, if

16    necessary, if that's what he wants to do.

17            THE COURT:  Thank you.

18        There is one thing that's troubling me that hopefully

19    counsel can shed some light on.  I take it, at one point, at

20    least, that the 4-H property had both Mrs. Cochran and her

21    deceased husband on the title; is that the case?

22            MS. ROBESON:  Yes, Your Honor.  I believe that is

23    correct.

24            THE COURT:  So, did -- when Mr. Cochran passed did

25    this process -- I don't know the nature of the deed, if it

 1    was joint with right of survivorship in common or what it

 2    was, but are we certain that Mr. Cochran's estate doesn't

 3    have an interest remaining in this property?

 4              MS. ROBESON:  No, Your Honor, I am not certain

 5    that his estate does not have an interest in the property.

 6              THE COURT:  Say that again.

 7              MS. ROBESON:  No, Your Honor, I do not know that

 8    answer at this time.

 9              THE COURT:  I see.

10         See, there's a --

11         Mr. Blickenstaff, do you wish to address the matter?

12              MR. BLICKENSTAFF:  Your Honor, unfortunately, I'm

13    in the same position as the U. S. Attorney's Office in that

14    I cannot say definitively whether or not Mrs. Cochran's

15    deceased spouse, his estate, would have an interest.  I just

16    don't have a copy of that.

17              THE COURT:  And the other wrinkle that has been

18    added recently here, of course, is the indictment of Ms.

19    Cochran in state court.  And something that occurred to me

20    is whether there is a prohibition in state law, as there is

21    in some state laws, respecting her ability to even receive

22    his share of the property through the estate process if she

23    is ultimately adjudicated to have been involved in his

24    demise.

25         And I am perfectly happy to grant whatever relief the

1    parties are entitled to, but this issue of her ownership of

2    the property and how this recent state criminal indictment

3    affects whatever she purported to take is something that,

4    frankly, gives rise to concerns on the Court's part.

5         Are you prepared at this time to address that, Ms.

6    Robeson?

7              MS. ROBESON:  No, Your Honor, I am not prepared to

8    address that at this time, but I am happy to provide

9    whatever briefing after this hearing that the Court would

10   like so that you may have an informed position from the

11   government.

12             THE COURT:  Understood.

13        Mr. Blickenstaff, do you wish to comment?

14             MR. BLICKENSTAFF:  No, Your Honor.  I think that

15   we would also be in the same position.  We would be happy to

16   investigate that matter and to brief it accordingly.

17             THE COURT:  Thank you.

18        Mr. Rosencrance?

19             MR. ROSENCRANCE:  Your Honor, I would concur.  I

20   would -- I would also add that if that's the route the Court

21   is inclined to take I'm more than happy to provide some

22   context on the Shelby vehicle and the loans, as I was unable

23   to provide that information today.

24             THE COURT:  Understood.

25        Well, I think we're at a little bit of a stopping point

1    here today given the outstanding questions that the Court

2    will need to receive further briefing on.

3         Mr. Jessup, do you intend to continue to represent

4    yourself throughout these proceedings?

5              MR. JESSUP:  Yes, Your Honor.

6              THE COURT:  Very well.  This is a very -- may very

7    well be a very complex matter that you or even the victim

8    community may wish to be heard on through legal counsel, or

9    otherwise, but anyone who is gathered here from the witness

10   community who would like to speak, I will give you an

11   opportunity to do so now, if you wish, and I would encourage

12   all concerned to retain legal counsel, or at least consider

13   doing so, if you have not already considered it.

14        Is there anything in closing you would like to say, Mr.

15   Jessup?

16             MR. JESSUP:  No, sir.

17             THE COURT:  Thank you.

18        I see some individuals at the back of the courtroom.

19   Do either of you wish to be heard today?

20             MS. BOLT:  If the government would be okay with me

21   speaking.

22             MS. ROBESON:  Yes, ma'am.

23             THE COURT:  What I'm going to ask you to do is

24   please come forward and you can speak here at one of the

25   government microphones, if they can make that available to

1    you.  Or, better yet -- yes, that may be better.

2         So, if you would come forward.

3         Actually, I'm going to ask the the courtroom deputy to

4    have the microphone at the podium turned around so that

5    you'll be able to speak into that.

6          If you could please state your full name for the

7    record.

8              MS. BOLT:  May I take my mask off?

9              THE COURT:  Certainly.

10             MS. BOLT:  My name is Donna Bolt.  I am Michael

11   Cochran's mother.

12        Good afternoon, Judge Volk.  I am the mother of Michael

13   Brandon Cochran who died suddenly on February 11th, 2019.

14        We, the victims of Natalie Paige Cochran's Ponzi

15   scheme, deserve and are entitled to restitution.  We are

16   completely dependent and relying on the Department of

17   Justice and the U. S. Attorney's Office to seize any and all

18   assets and to sell these assets at fair market value to

19   recoup the funds and to aid in reducing the victims'

20   financial losses.  We are Natalie Cochran's mother- and

21   father-in-law and she stole $245,360.60 from us.

22        We are concerned that Larry Jessup feels he is entitled

23   to stay in this home and even purchase the home at 433 4-H

24   Lake Road in Daniels.  Larry Jessup even stated on record

25   that he wrote you a letter on August the 28th of 2021

1    requesting to stay in the home because of the grandchildren

2    and offering to purchase this home for $315,000.00.

3    Although ████ and ████ won't contact us or speak to us

4    since Michael died, they are our grandchildren, too, and we

5    love them very much.  They are also Michael's grandchildren

6    [sic] and no one can change that.

7         If Larry Jessup says he has a claim on this home as

8    Natalie's parents, then we, as Michael Brandon's parents,

9    have a claim, as well, on this home and we want to purchase

10   it for $320,000.00.

11        Larry Jessup is using the excuse that he sold his home

12   at 1406 Old Crow Road in Beaver to move into the 4-H Lake

13   home with Natalie as her guardian after Natalie was indicted

14   and arrested in September of 2019 for the Ponzi scheme.

15   Natalie Cochran was placed on home confinement until her

16   trial date, which finally happened in March of 2021, at

17   which time she was ordered to serve eleven years and

18   three months in federal prison.

19        Larry Jessup did not have to sell his 23-acre home on

20   Old Crow Road; in fact, it was paid in full.  Larry and

21   Daphne Jessup only lived about ten minutes from Michael's

22   house and Larry could continue to be Natalie's guardian or

23   the Jessups could have had Natalie to do home confinement at

24   their home.  Natalie and the kids have moved in with Larry

25   and -- excuse me.  Natalie and the kids could have moved in

1    with Larry and Daphne, as their home was a huge 5-6 bedroom,

2    3-4 bathroom home on 23 acres.

3        The home on 433 4-H Lake Road is all part of a

4    preplanned scheme of Natalie Cochran and her parents, Larry

5    and Daphne Jessup.  Why else would the Jessups sell their

6    beautiful home, especially when their home is paid for?

7        Larry Jessup is using the grandchildren as an excuse to

8    stay in the Daniels home.  Just a reminder, ███████ and

9    ███████ do not go to school in Raleigh County.  They both

10   attend high school in Greenbrier County in Lewisburg, West

11   Virginia 50 miles away and they started going there after

12   their dad suddenly and unexpectedly died on February 11th of

13   2019.  ███████ is now in the eleventh grade and ███████ is in

14   the ninth grade.  The grandchildren will soon be graduating

15   high school and then be off to college, so ███████ and ███████

16   won't be at home.

17       As of February the 10th of 2022, the Raleigh County

18   real estate tax website states that the 2018 and 2019 real

19   estate taxes on the property at 433 4-H Lake Road in Daniels

20   was suspended due to Natalie's filing bankruptcy in August

21   of 2019.  That amount of real estate taxes totaling over

22   $4,000.00 for both years just disappeared off the record.

23       The 2020 real estate tax on this property was paid by

24   someone on 10/25 of 2021.  And the First Community Bank paid

25   around 267.00 in late fees for that year of 2020.

1          The 2021 real estate taxes have yet to be paid.

2     According to a March 26, 2021 request by the First Community

3     Bank attorney to the West Virginia Southern District

4     Bankruptcy Court requesting relief from the automatic stay

5     for the abandonment of real and personal property and to

6     allow First Community Bank to file a petition to recover

7     $15,715.66 in seized funds.  This attorney stated that there

8     has not been a mortgage payment made on 433 4-H Lake home in

9     Daniels since January of 2020.  So, an outstanding mortgage

10    of around $258,998.00, plus interest fees of around

11    $15,850.26, and other charges and fees of $5,436.20, for a

12    total of $280,284.46 owed on this property as of March of

13    2021.  The bank attorney was requesting the bankruptcy

14    relief of automatic stay so the bank could foreclose on the

15    property and the Jessups were going to purchase this home.

16    That was March of 2021.  It is now February 11th, 2022.

17          This home on 4-H Lake Road was purchased by Michael and

18    Natalie for the purchase price of $308,750.00.  Michael did

19    a total remodel of this home, putting his blood, sweat and

20    tears into the remodeling of this home.  He worked

21    diligently to make the home what it is today.  This elegant

22    stately home on 4-H Lake Road in Daniels is worth well over

23    $450,000.00 and it sits on 3.83 level acres.

24          After 2018, when Natalie's Ponzi scheme was in full

25    force, some of the improvements that were made to the home

1    -- new furniture, paint, new windows, an additional two-car

2    garage, central heat and air system, and beautiful white

3    vinyl fencing that completely surrounds the 3.83-acre

4    property -- these improvements were paid for using the

5    victims' stolen monies.

6         If Larry Jessup is requesting to purchase this 4-H Lake

7    home, then we and all of the victims should be able to

8    purchase this home, as well.

9         The First Community Bank attorney has also requested to

10   use the seized funds of $44,935.01 in the checking account

11   ending in 6379 and listed under the name of Tactical

12   Solutions Group LLC, one of Natalie's fake businesses, to

13   pay off a $15,715.66 truck title lien that Natalie Cochran

14   and Larry Jessup both signed on March 19th of 2019.  Natalie

15   Cochran sold this 2014 GMC Denali truck to Motion Auto Sales

16   on June 23rd, 2019.  She received the funds, but she never

17   gave the buyer the truck title because Natalie and her dad

18   Larry took out a lien on the truck title in March 19, 2019.

19   That $44,935.01 belongs to the victims for restitution.

20   Larry Jessup should have to pay this $15,715.66 loan since

21   his name was listed on the loan agreement and since Natalie

22   Cochran is now in federal prison at Hazelton FCI.

23        Larry and Daphne Jessup have been living in this home

24   rent free for almost three years.  Larry Jessup has filed

25   claims, you know, for the following assets that were seized

1    by the government on June 25th of 2019:  The Tactical

2    Solutions bank account, checking account, $44,935.01, and

3    the 1965 Shelby Cobra replica, asset value of $47,000.00.

4         Larry Jessup is not and never was a victim of financial

5    loss by his daughter's deceit and evil deeds.  We were.  He

6    does not have the right nor is he entitled to any of these

7    seized assets.

8         Judge Volk, the sole purpose of all these proceedings

9    and seizures of assets, including real properties, is to

10   recover monies that were stolen by Natalie Paige Cochran and

11   her fake government contracts.  The number one priority here

12   is restitution for the victims.

13        And regarding the grandchildren, ██████ and ██████,

14   they will soon graduate from high school and be out of the

15   home on their own.  They will be going off to college.

16   ██████ and ██████ are very strong, they've had to deal with

17   a lot in the last few years, and they will be just fine.

18        Today, February the 11th, 2022, is the three-year

19   anniversary of my son's death.  This hearing regarding the

20   matter of Michael's home on 433 4-H Lake Road in Daniels is

21   being held today, on February 11th, 2022, on Michael's

22   three-year anniversary of his death for a reason.  This is

23   all part of God's plan.  The hearing on this matter has been

24   postponed and rescheduled a few times for one reason or

25   another, as God was giving Larry and Daphne Jessup several

1    opportunities to re-think the issue about claiming Michael's

2    home, giving the Jessups a chance to do the right thing

3    because, in their hearts, the Jessups know they have no

4    right or claim to this home.  But I guess Larry Jessup

5    thinks he deserves this home.  So, God is going to have the

6    final say on the third anniversary of Michael Brandon's

7    death.

8         This statement is in memory of my son, Michael Brandon

9    Cochran.  Although Michael Brandon is not here and cannot

10   speak for himself, I am speaking on behalf of my son.  I am

11   his voice.

12        Thank you.

13             THE COURT:  Thank you very much.

14        I wondered if you would be willing to supply that

15   statement.

16             MS. BOLT:  I have a copy for you, sir.

17             THE COURT:  So, if you will give that to Ms.

18   Robeson, I would ask you to please file it on behalf of --

19             MR. SCHLES:  I cannot -- I cannot hear well.

20             THE COURT:  Is that any better, Mr. Schles?

21             MR. SCHLES:  Yes, Your Honor.

22             THE COURT:  Thank you.

23        What I was asking was whether the witness had the -- a

24   copy of the document she just read.  I have asked her to

25   tender that, a copy of it, to Ms. Robeson, who will then

1   file it on the record.

2        And I would say, Mr. Jessup, that I will give you an

3   opportunity to respond to it in writing by, let's say, a

4   week.  Would that give you enough time?

5        Thank you very much.

6        Thank you for your comments.

7             MS. BOLT:  Yes, sir.

8             THE COURT:  And just, again, please supply Ms.

9   Robeson a copy of that document.

10       Ms. Robeson, anything further?

11            MS. ROBESON:  Yes, Your Honor.  Since we are not

12  -- it seems that it may be sometime before our motion for an

13  interlocutory sale is ruled upon.  The United States would

14  like to move for some provision to be made for rental

15  payments on the property for Mr. Jessup or some form of

16  adequate protection payments.  I can put this request in a

17  motion, if the Court would like, just because property has

18  been depreciating rapidly.

19       We did the numbers before the hearing.  Looking at the

20  last payoff date, which would have been in June of this past

21  summer, to today's payoff date, it has increased over

22  $10,000.00, or more than $10,000.00 is now due to the bank

23  for the unpaid payments on the mortgage amount and we would

24  like to prevent further depreciation of this asset as we

25  move forward.

1          THE COURT:  I understand that the bank refused the

2     payments though that Mr. Jessup had attempted to make.

3          Mr. Rosencrance?

4          MR. ROSENCRANCE:  Yes, Your Honor.  We had some

5     concern at the beginning of the bankruptcy case receiving a

6     payment from a non-debtor.  However, since then we have

7     tried to obtain a monthly payment from the Jessups and the

8     bank has still not received a payment since January of 2020.

9     So, the bank would request that payments be made during the

10    pendency of this Court's ruling.

11         THE COURT:  What I would say is we have some

12    lingering ownership issues, as well, and --

13         MR. SCHLES:  Your Honor --

14         THE COURT:  Mr. Schles, if you could hold on for

15    one moment.

16         We have some lingering ownership issues, as well,

17    perhaps.  The Court will set a briefing schedule for those.

18         Ms. Robeson, if you wish to have conversations with the

19    interested parties and come up with some even escrow amount

20    and you could present all of that to the Court and I'll see

21    whether it's authorized by law.

22         Mr. Schles, please proceed.

23         MR. SCHLES:  Yes, Your Honor.  In regards to your

24    question earlier, West Virginia Code 42-42(a) does bar a

25    person convicted as long as not deterring another person

1    from taking either from the estate or from insurance

2    proceeds and it states that essentially the person convicted

3    of -- or that the estate should be distributed as if the

4    convicted person was dead at the time of the distribution,

5    which I believe would be the grandchildren as the inheritors

6    of any interest Michael Cochran has in the property and it

7    may be appropriate to appoint a guardian ad litem to

8    represent the minor children's interests.

9              THE COURT:  Those comments may be well taken, Mr.

10   Schles.  That's something the Court will investigate

11   further.

12             MR. SCHLES:  Thank you.

13             THE COURT:  And, of course, any party may be heard

14   in writing on that point, as well.

15        I will be receiving your response, Mr. Jessup, by mail.

16   I thank you again for your comments here today.

17        Ms. Robeson, any final words?

18             MS. ROBESON:  No, Your Honor.

19             THE COURT:  Thank you.

20        Mr. Blickenstaff?

21             MR. BLICKENSTAFF:  Just one, Your Honor.  It

22   doesn't -- it's not definitive, but I did want to make the

23   Court aware of this, that regarding the ownership issue of

24   the property, having access to the Raleigh County Assessor's

25   Office, I was able to look up the -- at least as how the

1    assessor lists the property.  It does seem to list Natalie

2    Paige Cochran as the sole owner.  I believe that it is

3    necessary, though, to provide evidence of that to this Court

4    by way of a deed or something of that nature, but it may

5    appear that she may be the sole owner of that property on

6    4-H Lake Road.

7                THE COURT:  At all times?

8                MR. BLICKENSTAFF:  Yes.

9                THE COURT:  Or was that by virtue of it passing to

10   her through the estate process?

11               MR. BLICKENSTAFF:  No.  It was sold to her on

12   April 26, 2006 from the Hollidays and conveyed to her

13   solely.

14               THE COURT:  Well, this matter needs to be further

15   addressed to the Court in writing.  I do appreciate that

16   earlier statement.

17      Mr. Rosencrance?

18               MR. ROSENCRANCE:  Your Honor, the only thing I

19   would add is that both Natalie and Michael are on the deed

20   of trust.  However, we all know that's not dispositive of

21   who owns the property, but we'll investigate further.

22               THE COURT:  Understood.

23      Well, the Court will be entering a briefing order and if

24   today's hearing has excited any other thoughts or approaches

25   from any interested parties then those, of course, should be

1    presented in writing, as well, and we'll see where the

2    proceedings lead from here.

3        Anything further?

4            MS. ROBESON:  No, Your Honor.

5            THE COURT:  Mr. Jessup?

6            MR. JESSUP:  One more point, please.

7            THE COURT:  Yes.

8            MR. JESSUP:  I did offer, when I made the offer

9    for the house of $315,00.00, to start making payments of

10   rent of $1,200.00 a month.  Is that not correct, Mr.

11   Rosencrance?

12           MR. ROSENCRANCE:  Your Honor, we have not received

13   any payments.  I'm not sure if that offer was contingent

14   upon us accepting the sale of the property or not, but the

15   fact of the matter is the bank has not received a single

16   monthly payment since January of 2020.

17           THE COURT:  Understood.  And I understand Mr.

18   Jessup's position that he may have had conversations with

19   the bank officials to the contrary, but that is also

20   something that you can place in your response, if you would

21   like.

22           MR. JESSUP:  One other thing that I will place in

23   my letter.  My daughter called the court and wanted to be

24   here today to speak and they said there would be no victims

25   to be able to speak.  So, I just wanted to make record of

1    that.

2              THE COURT:  Ms. Cochran wished to speak, your

3    daughter?

4              MR. JESSUP:  No.  My daughter, Ms. Lowery, wanted

5    to speak.

6              THE COURT:  I see.  Understood.

7         Well, if there's nothing further, the Court will be in

8    recess.

9         I would ask all parties to please watch the docket

10   carefully for the Court's order.  You may not be on the

11   distribution list, but you can still view it as a public

12   record on the Pacer system.

13        Thank you very much.

14        (Proceedings concluded at 1:18 p.m., February 11,

15   2022.)

16

17   CERTIFICATION:

18

19        I, Ayme A. Cochran, Official Court Reporter, certify

20   that the foregoing is a correct transcript from the record

21   of proceedings in the matter of United States of America v.

22   Natalie P. Cochran, et al., Criminal Action No.

23   5:19-cr-00247 and Civil Action No. 5:19-cv-00537, as

24   reported on February 11, 2022.

25

s/Ayme A. Cochran, RMR, CRR                    March 16, 2022

Ayme A. Cochran, RMR, CRR                                DATE